**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**AMERICAN MUNICIPAL
POWER, INC.**

        **Plaintiff,**

                                **Case No. 2:17-cv-708**

      **vs.**                        **Chief Judge Algenon L. Marbley**

                                **Chief Magistrate Judge Elizabeth P. Deavers**

**VOITH HYDRO, INC.,**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court for consideration of Re-Filed American Municipal Power, Inc.'s Motion to Compel (ECF No. 59), Defendant's Memorandum in Opposition to Plaintiff's Motion to Compel (ECF No. 62), American Municipal Power, Inc.'s Reply Memorandum (ECF No. 63), American Municipal Power, Inc.'s Supplemental Memorandum (ECF No. 76), and Defendant Voith's Amended Response to Plaintiff AMP's Supplement (D.E. 76) (ECF No. 80).[1] For the reasons that follow, the Motion to Compel is **GRANTED IN PART AND DENIED IN PART**.

---

[1] Defendant Voith Hydro, Inc. ("Voith") initially filed a response with an accompanying motion to file an exhibit under seal. (ECF Nos. 77, 78.) After the Court denied without prejudice, the motion to seal, Voith decided not to re-submit a motion to seal and instead filed the Amended Response, which simply removes the portion that refers to the exhibit originally sought to be sealed; the Amended Response therefore adds no new arguments or information. (ECF No. 80 at 1 n.1.)

**I.**

**A.      Factual Background**

**1.      The Hydro Projects**

Plaintiff American Municipal Power, Inc. f/k/a American Municipal Power-Ohio, Inc. ("AMP") is a nonprofit that, among other things, serves as a wholesale power supplier for member municipal power systems.  (Complaint, ECF No. 1, at ¶¶ 1, 6.)  AMP purchases, generates, and distributes electrical power for AMP members (political subdivisions of various states) serving customers in several states, including Ohio, Kentucky, and West Virginia.  (*Id*. at ¶ 6.)  AMP contracted for four hydroelectric power plants to be designed and built at existing locks and dams along the Ohio River at the Cannelton Locks and Dam near Hawesville, Kentucky ("Cannelton"); the Smithland Locks and Dam near Smithland, Kentucky ("Smithland"); the Captain Anthony Meldahl Locks and Dam near Foster, Kentucky ("Meldahl"); and the Willow Island Locks and Dam near New Martinsville, West Virginia ("Willow Island") (collectively, the "Projects").  (*Id*. at ¶ 7.)  The Projects are run-of-the-river hydroelectric generating facilities with an intake approach channel, a reinforced concrete powerhouse and a tailrace channel.  (*Id*. at ¶ 8.) The Projects divert water from existing dams through horizontal bulb-type turbine and generating units to generate electrical power.  (*Id*.)

AMP describes the machinery and one particular component on each of the eleven turbines (commonly referred to as a "discharge ring") as follows: [2]

> In its simplest form, a run-of-the-river hydroelectric project unit funnels river water through a channel near the river bed and past a propeller-like group of blades called a "runner." As these runner blades spin, the generator to which they are attached creates energy. The AMP projects contain 11 Units, including two units at Willow Island and three units each at Cannelton, Smithland, and Meldahl with runners enclosed within discharge rings at each plant.

---

[2] Voith does not dispute AMP's summary of this machinery.

Each end of a unit's channel is constructed of formed concrete or steel liners encased in concrete. At the middle of the channel, however, is a steel tube-like structure that directly surrounds the runner, and is suspended in midair within the power plant building structure known as the "powerhouse." This water-filled steel tube-like structure is known as the discharge ring.

Despite some variation along its approximate 11-foot length, the diameter of the discharge ring is approximately 26 feet on AMP's hydroelectric plants. The space between the runner blades and the inner surface of the discharge ring is very small to increase the efficiency of the turbine.

(ECF No. 59 at 3–4.)

AMP included the following representation of one of the discharge rings situated among other bulb turbine components:



(*Id.* at 4.)

### 2. The Contracts

AMP selected Voith to provide the major powerhouse equipment, including the hydraulic bulb-type turbines, governing systems and generators (the "Voith Equipment") associated with the Hydro Projects. (*Id.* at ¶ 13.) AMP and Voith executed four individual agreements, one

relating to each of the Projects, for Design, Fabrication & Supply of Turbine and Generator Equipment (collectively, the "Contracts"). (*Id*. at ¶ 13; *see also* copies of contracts from each Hydro Projects, ECF Nos. 1-1, 1-2, 1-3, 1-4.) Each Contract requires Voith to, among other things, (a) design, fabricate and supply the unique and specialized Voith Equipment to the Projects; (b) provide project specifications and installation instructions relating to the Voith Equipment; (c) direct and oversee installation and field testing of the Voith Equipment by separate contractors; and, (d) ensure proper performance of the installation of the Voith Equipment by the contractors on the individual projects. (Complaint, ¶¶ 14–15; *see* ECF Nos. 1-1, 1-2, 1-3, 1-4.) The Contracts required Voith to, *inter alia*, perform pursuant to certain deadlines ("Milestones") and provided that Voith would be liable to AMP for liquidated damages if Voith failed to timely achieve the Milestones. (Complaint, ¶¶ 20–22; Articles 3.1, 3.2, 3.3 of ECF Nos. 1-1, 1-2, 1-3, 1-4.) The Contracts further provide that Voith would reimburse AMP for third-party claims for damages due to delays in the Projects caused by defects in Voith's work, not to exceed $23,000 a day for all claimants or, in total, 10% of the Contract price. (Complaint, ¶ 23; Article 3.5 of ECF Nos. 1-1, 1-2, 1-3, 1-4.)

The Contracts require Voith, under certain circumstances, to provide AMP with a "root cause analysis," including design and performance calculations:

> [I]f there are two or more similar failures of any component of the Work [all Voith-provided labor, materials, equipment, and services as defined in the Contracts], the Contractor [Voith] must promptly perform a "root cause analysis" of the failures and promptly submit to the Owner [AMP] and Engineer a detailed and comprehensive report of that analysis including all related design and performance calculations and measurements. This section applies regardless of whether the multiple failures all occur in one unit or there is one failure in one unit and one or more failures of the same component in the other units.

(Contracts, Article 8.02(D)(4) of ECF Nos. 1-1, 1-2, 1-3, 1-4.)

4

The Contracts further provide that Voith expressly warrants, *inter alia*, that Voith's Work, including the Voith Equipment, will conform to the Contracts and be free of defects in workmanship and material and that all Voith's services included within the work, and including the Voith Equipment, will be performed in accordance with the Contract. (Complaint, ¶¶ 24, 27; Article 5 of "General Conditions" of Contracts, ECF Nos. 1-1, 1-2, 1-3, 1-4.) Under the Contracts, Voith must perform all work "consistent with the professional standards of skill, care, and diligence exercised by entities licensed to provide (where required under Laws and Regulations) and regularly providing comparable services and work on power plant projects of similar complexity, design, and cost in the United States." (*Id.*)

In addition, upon written notice of a breach of warranty, Voith must, at its own cost, investigate and correct any non-conforming work. (Article 5, Section 5.09.G of Contracts, ECF Nos. 1-1, 1-2, 1-3, 1-4.) The Contracts go on to provide as follows:

I. If the Contractor fails to promptly commence and diligently pursue correction of non-conforming Work after receiving notice to do so under Paragraph 5.09.G, the Owner may correct the non-conforming Work without giving further notice to the Contractor.

J. If in the Owner's opinion the non-conforming Work presents a threat of harm or danger to people, property, or the environment, the Owner may order the Contractor to immediately correct the non-conforming Work under Paragraph 5.09.H, or the Owner may correct the non-conforming Work itself without prior notice to the Contractor.

K. If the Owner corrects non-conforming Work as described under Paragraph 5.09.I or 5.09.J, the Owner may deduct from the Contract Price all of the reasonable costs described under Paragraph 5.09.H that the Owner incurs to correct the defective Work. If those costs exceed the unpaid balance of the Contract Price, the Contractor must immediately pay the difference to the Owner.

L. Paragraphs 5.09.G, 5.09.H, 5.09.I, 5.09.J, 5.09.K, and Agreement, Exhibit G, paragraph 2.2.3:

1. apply on a unit-by-unit basis;

2. describe the Owner's sole and exclusive remedy for a breach of the warranties described under Paragraph 5.09.C and 5.09.D whether in contract or in tort or under any other legal theory, and whether arising out of warranties, representations, instructions, installations or defects from any cause;

3. apply to remedial Work performed under Section 5.09.H, but such Work will not renew or restart the Correction Period except in the case of the cavitation-pitting warranty as described under Agreement, Exhibit G, paragraph 2.2.3.3; and

4. do not apply to the performance guarantees described under Agreement Sections 4.3 and 4.4.

(Article 5, Sections 5.09.I, 5.09.J, 5.09.K, and 5.09.L of Contracts, ECF Nos. 1-1, 1-2, 1-3, 1-4.)

### 3. Vibrations at Meldahl Project and cracks in Voith discharge rings in other plants

In October 2015, Voith's on-site personnel at the Meldahl Project observed, and advised Voith's engineering department of, movement in the Meldahl Unit 2 discharge ring. (Exhibits 3 and 4, ECF No. 59-1, PAGEID ## 690, 692–93.) Specifically, Scott Burtch, Voith's Site Manager for the Meldahl Project, was "very concerned" about the "excessive" pulsating and vibrating he observed:

I observed the discharge ring at Meldahl vibrating and pulsating excessively to the point that water was squirting from the discharge ring itself as it was pulsating and vibrating. In my many years of experience, I have never observed a component of this type and magnitude vibrate and pulsate to this extreme degree.

[] I was very concerned from both an operational and safety perspective about the vibrations and pulsations of the discharge ring. Because of my high level of concern, I demanded both orally and in writing that the Voith York engineering department take a serious look at the cause of the vibrations and pulsations of the discharge ring.

(Exhibit 47, Declaration of Scott Burtch ("Burtch Declaration"), ECF No. 63-1, ¶¶ 4–5 (emphasis in the original).)

In November 2015, during commissioning of the plant at Meldahl, AMP and its consulting engineers at MWH, expressed concerns about vibrating and pulsating observed in the

Meldahl Unit 2 discharge ring during unit operations. (Exhibit 1, ECF No. 59-1, PAGEID ##

681–83.) On November 9, 2015, Voith responded as follows:

> Our head of power unit (turbine and generator) engineering was at Meldahl last
> week to take a look at the general behavior of unit 2, as it is the first unit to be put
> into commercial operation. He was pleased with the temperature, noise and
> vibration levels. He also had the opportunity to take a closer look at the discharge
> ring.
>
> Pulsations in the discharge rings are expected. They results [sic] from the rotation
> of the four runner blades in the water passage. The discharge ring is designed to be
> more flexible than stiff to better absorbed them.
>
> We are also in receipt of MWH letter dated 11/6/2015 on the same subject. Please
> note that we already initiated a fatigue analysis of the discharge rings aiming to
> respond to this letter. Preliminary results will be available next week.

(Exhibit 2, ECF No. 59-1, PAGEID # 686.)

At the end of 2015, discharge rings designed by and manufactured by Voith that were

used in hydroelectric plants in Brazil were cracking. (Exhibit 14, excerpt of Deposition of

Nathan Eveler, ECF No. 59-1, PAGEID # 722–23.)

On February 11, 2016, Voith sent to MWH, AMP's engineers, a fatigue analysis on the

Meldahl discharge rings. (Exhibit 21, ECF No. 59-2, PAGEID # 748; Exhibit No. 22, ECF No.

59-2, PAGEID ## 750–86.)

### 4. Cracks appear in discharge rings at the Projects and Voith's repairs

In early February 2016, a crack was discovered in the discharge ring of Unit 2 at the

Meldahl Project, requiring that Unit 2 be shut down. (Exhibit 16, ECF No. 59-2, PAGEID

#732.)[3] Voith mobilized a team to develop a weld procedure to make repairs. (*Id.*; Exhibit 20,

ECF No. 59-2, PAGEID # 746.)

---

[3] AMP filed its forty-six exhibits to the Re-Filed Motion to Compel totaling nearly 300 pages in
four mass filings instead of filing each exhibit separately. (*See* ECF No. 59-1 (containing
Exhibits 1–15); ECF No. 59-2 (containing Exhibits 16–30); ECF No. 59-3 (containing Exhibits

On April 1, 2016, Voith internally noted that repairs would be needed to all 11 units at Cannelton, Smithland, Willow Island, and Meldahl hydro plants and acknowledged that "the original design flaw" in the discharge rings originated with Voith's Heidenheim, Germany Engineering Center ("VHEC"), which originally designed the discharge rings. (Exhibit 23, ECF No. 59-2, at PAGEID # 788.)

By May 2016, cracks also appeared in Cannelton Units 2 and 3, requiring they be shut down while Voith mobilized welders to make repairs. (Exhibit 24, ECF No. 59-2, PAGEID ## 791–93; Exhibit 25, ECF No. 59-2, PAGEID ## 796–97.) Voith acknowledged that the discharge rings at Cannelton were "cracking faster and more severely than the other sites." (Exhibit 24, ECF No. 59-2, PAGEID # 791.) In February 2017, two additional cracks appeared in Cannelton Unit 3. (Exhibit 28, ECF No. 59-2, PAGEID # 806.) Voith internally acknowledged that "the discharge ring repairs will be taking a little longer than anticipated." (Exhibit 41, ECF No. 59-3, PAGEID # 893.) Voith began discharge ring repairs in October 2017. (Exhibit 31, ECF No. 59-3, at PAGEID # 815.)

After Voith completed repairs on the Cannelton discharge rings in early June 2018, new cracks appeared in the repaired Cannelton units in late June 2018. (Exhibit 32, ECF No. 59-3, PAGEID # 818; Exhibit 33, ECF No. 59-3, PAGEID ## 821–23; Exhibit 34, ECF No. 59-3, PAGEID ## 825–26.) On June 29, 2018, AMP notified Voith of two new cracks at Meldahl Units 1 and 2, requiring that Unit 1 be shut down and that Unit 2 operate at 50% rated power. (Exhibit 34, ECF No. 59-3, PAGEID # 825.)

---

31–45); ECF No. 59-4 (containing Exhibit 46).) AMP's decision to do so unnecessarily increased the burden on the Court by requiring it to repeatedly sift through multiple exhibits in the mass filings to locate specific exhibits cited in the briefing. In future filings, the Court expects AMP to file exhibits separately with a brief description of each exhibit as Voith did in its response. (*See* ECF No. 62.)

### 5. Cracks discovered in September 2018 at Smithland and Cannelton

On September 18, 2018, Voith discovered cracks in all three units at Smithland, resulting in the shutdown of the entire Smithland plant. (Exhibit 38, ECF No. 59-3, PAGEID ## 848–49.) On the same day or the next day, a crack was also discovered in Cannelton Unit 2 (collectively, with the Smithland cracks, "the September 2018 cracks"), requiring that unit, too, be shut down. (*Id.* at PAGEID # 848; Exhibit D, ECF No. 62-4.) On September 21, 2018, Voith sent AMP a letter reminding AMP that the modifications at Smithland had been delayed in order to accommodate AMP's operations over the summer, and, therefore, not all Voith-recommended modifications had been implemented. (Exhibit C, ECF No. 62-3.) In the same letter, Voith also detailed a unit-by-unit plan for completion of the necessary repairs to the September 2018 cracks and associated modifications. (*Id.*)

### 6. Voith's Root Cause Analysis

On September 30, 2018, Voith issued to AMP a "Root Cause Analysis" ("RCA"), which acknowledged discharge ring cracking at the various Projects, subsequent investigation, and explained the scope of the RCA as follows:

> Cracking reoccurred in modified areas of CWM units. An investigation determined that the further cracking was from discontinuities that arose because the modified locations did not meet the quality requirements as defined on the revised drawing. Based on these identified reasons, repairs and corrective actions were taken to resolve further instances of discharge ring cracking.

> This Root Cause Analysis (RCA) delineates the occurrence of discharge ring cracking, the methodology used to identify possible causes, the investigation into those possible causes, the results of the evaluation, and the resulting corrective actions and their outcomes. *Note that the cracks discovered in September 2018 at Smithland and Cannelton are still under investigation and an addendum will be added as appropriate.*

(Exhibit 39 (RCA), ECF No. 59-3, PAGEID # 854 (emphasis added); *see also id*. at PAGEID ## 856 ("Note that the cracks discovered in September 2018 at Smithland and Cannelton are still under investigation and an addendum will be added as appropriate."), 878 (same).)

As of the date of the RCA, there were thirty-one cracks in the discharge rings throughout the four Project locations.  (*Id*. at PAGEID # 856.)  The RCA acknowledged that "[t]here are [Voith] modifications that have accumulated a significant number of operational hours without reoccurrence; however, in some instances, the initial modified location cracked."  (*Id.* at PAGEID # 876.)  Eleven of the thirty-one cracks occurred in modified locations.  (*Id*. at PAGEID # 856.)  The RCA determined that after Voith redesigned and re-implemented its recommended modifications, no additional issues have been reported in any of these areas, except in one area caused by a weld defect in the original manufacture of the discharge ring. (*Id*. at PAGEID # 877.)

The RCA also identified the "Root Cause" and "Secondary Root Cause" of the cracks as follows:

### 6.5.2 Welding Area (Access)

During repair in the field, welding was required without removing the discharge ring, and thus the welding position was required to be overhead. Welding in the overhead position is common; however, higher welder skill is necessary.

In addition to the welding position, the welding environment was constrained by the proximity of other powerhouse structures to the area requiring repair. This impacted the design of modification weld joints, limited access for a welding torch, and limited the welding personnel's ability to have a clear field of vision while welding. Welding access was determined to be a contributing factor to the root cause of the discharge ring cracking (see Section 6.4.2.1).

(*Id*. at PAGEID # 867.)

**7 Root Cause**

The original design was based on static analysis. The discharge rings were exposed to cyclic loading which caused fatigue cracking in locations of high stress amplitudes. . . .

**9 Secondary Root Cause**

In locations of high stress amplitudes, the transitions from one thickness to another were not designed to have a gradual shape or gradual thickness transition, resulting in a geometric discontinuity at the change in shape or thickness.

The discharge ring is a welded fabricated component. During welding, there may be surface and subsurface discontinuities that are inherent to the process. The weld inspection and testing acceptance criteria were defined from the requirements for a static loading based design. These two separate sources of discontinuities caused stress concentrations that were the initiation points for fatigue cracking.

(*Id*. at PAGEID # 868.)

### 7. Status of cracks and repairs

On October 26, 2018, Voith sent a letter to AMP, addressing the crack discovered at Cannelton in September 2018. (Exhibit D, ECF No. 62-4.) Voith noted that its repair work to that crack began on September 25, 2018, and was completed on October 15, 2018. (*Id*.) Voith advised that this repair work did not impact the completion of planned modifications on the Cannelton units. (*Id*.)

AMP represents in its briefing that Voith made all repairs to the Cannelton discharge rings by February 2019. (ECF No. 59 at 11.) Voith represents in its briefing that there are currently no known un-remediated cracks in the discharge rings and that all cracks were repaired at Voith's cost. (ECF No. 62 at PAGEID ## 1074, 1076; ECF No. 80.)

**B.     Procedural Background**

**1.     AMP's allegations and claims**

On August 14, 2017, AMP filed this action against Voith, asserting four claims for breach of contract and four claims for breach of express warranty based on the four Projects at Smithland, Cannelton, Meldahl, and Willow Island.  (ECF No. 1.)  AMP specifically alleged that Voith materially failed to perform as required by the Contracts and breached as follows:

(a) delivering drawings and equipment late and out of sequence;

(b) delivering defective, incomplete and uncoordinated drawings and defective installation instructions;

(c) delivering defectively manufactured guide bearings and discharge rings;

(d) defectively designing and/or manufacturing equipment and equipment components;

(e) delivering equipment that was not completely and/or properly manufactured and required significant additional field work to install;

(f) failing to deliver "Category C" parts necessary for Voith Equipment assembly;

(g) failing to timely and completely address installation issues with the Voith Equipment, including but not limited to, failing to timely and completely address turbine alignment issues;

(h) failing to provide check sheets consistent with the Contracts' specifications;

(i) refusing to promptly and accurately address problems with the Voith Equipment;

(j) failing to maintain a consistent executive and project management team and site representatives who were informed and prepared to address ongoing issues; and

(k) causing substantial delay and damage to the Hydro Projects, all in material breach of the Contracts.

(Complaint, ECF No. 1, ¶ 28; *see also id*. at ¶¶ 40, 45.)  AMP goes on to allege as follows:

46.  As result of Voith's material breaches of the Contracts and the extensive damages caused to AMP and to AMP's general contractors, and pursuant to General Conditions Section 10.04.A entitling AMP to withhold payment from Voith, AMP

has withheld approximately $40 million in payments under the Contracts to offset the damages and costs incurred by AMP and its general contractors due to Voith's material breaches of the Contracts.

47. As a result of Voith's material breaches of the Contracts, AMP suffered significant damages and delays including, inter alia, millions of dollars in additional costs of installation, construction and engineering, liquidated damages, lost power production and other costs and damages.

(*Id*. at ¶ 46–47.)  AMP seeks damages in an amount of "at least $40 million[.]"  (*Id*. at PAGEID # 20.)

## 2.    ESI negotiation and ESI Protocol

According to the parties' Rule 26(f) Report submitted on November 30, 2017, the parties agreed to exchange lists of custodians from whom ESI will be obtained, proposed keyword search terms, and proposed date ranges to be applied to the electronically stored information ("ESI") by January 30, 2018.  (ECF No. 27 at 4.)  On December 18, 2017, based on the parties Rule 26(f) Report, the Court ordered that the parties begin a rolling production of documents by March 2, 2018.  (ECF No. 30 at 2.)

On April 23, 2018, the Court issued the Stipulation and Order Regarding Protocol for the Search for and Production of Electronically Stored Information and Hard Copy Documents ("ESI Protocol").  (ECF No. 38.)  The ESI Protocol provided, *inter alia*, as follows:

C.      . . . . The parties agree that the terminating date to be used in any date range will be no later than August 14, 2017.  The parties will use reasonable efforts to identify and, if appropriate, produce ESI created after this date on an as needed basis and in accordance with the delivery specifications attached in Exhibit A hereto.

D.      By February 16, 2018, the Receiving Party[4] may request additional Search Terms and/or date ranges to be applied to the Producing Party's ESI.

---

[4] "'Receiving Party' or 'Requesting Party' means the party to the Action receiving documents pursuant to this Protocol or in response to a formal request for the production of documents or information."  (*Id*. at PAGEID # 448 (Section I.A.7).)

E.    The Producing Party[5] reserves the right to object to any additional Search Terms and/or date ranges requested by the Receiving Party.  The parties shall meet and confer in person and/or by telephone regarding any disputed Search Terms and/or date ranges, and if they are unable to reach resolution, the Receiving Party may raise this issue with the Court.  This Stipulation shall not preclude a motion to the Court as discovery progresses seeking use of broader or different Search Terms than initially proposed or agreed upon, on good cause shown.

(*Id*. at PAGEID # 453 (Section III.D and E).)  On the same day, the Court, by separate Order, ordered that ESI production be completed by September 28, 2018.  (ECF No. 39.)

Following ESI discovery disputes and after considering the positions of the parties, the Court issued the Memorandum of Decision on June 4, 2018.  (ECF No. 46.)  This Decision memorialized the methodology for applying keyword searches, including that Voith's single-word Project name search terms were over-inclusive and that AMP's request that Voith search its ESI collection without reference to the Project names by using as search terms including various employee and contractor names together with a list of common construction terms and the names of hydroelectric parts was overly inclusive and would yield confidential communications about other projects Voith performed for other customers.  (*Id*.)  With this guidance form the Court, Voith began running searches on the data it had collected from its 190 custodians for the agreed-upon date range of January 1, 2006 to August 14, 2017, using forty-three search terms.  (ECF No. 62 at PAGEID # 1084.)

Shortly thereafter, Voith proposed modifications to the word searches to run searches on ESI already collected.  (Exhibit I, ECF No. 62-9.)  AMP refused the proposed modifications, advising that the ESI Protocol had been negotiated and that Voith did not show good cause for the proposed modifications "at this late stage in the process[.]"  (Exhibit J, ECF No. 10.)

---

[5] "'Producing Party' means the party to the Action producing ESI and Documents pursuant to this Protocol or in response to a formal request for the production of documents or information." (*Id*. (Section I.A.6).)

In June and July 2019, the parties exchanged the names of mediators and agreed upon a mediator with an eye towards mediating in the fall of 2019.[6]  (Minute Entry dated June 12, 2019; Transcript of status conference held on July 17, 2019, ECF No. 71, pp. 25–28.)

Thereafter, despite progress made with ESI production, the process was onerous, resulting in the Court granting the parties' request to extend the deadline for completing ESI production to November 15, 2018, and then to December 15, 2018.  (Minute Entry dated July 31, 2018; Minute Entry dated August 28, 2018; ECF Nos. 49, 50.)  Fact discovery was later extended to December 3, 2019.  (ECF No. 54.)  Thereafter, discovery progressed well (Minute Entry dated May 6, 2019; Minute Entry dated June 12, 2019), but still required modification of the case schedule and ultimately extending the fact discovery deadline to June 5, 2020.  (ECF Nos. 69, 71, 74.)

### 3.      Discovery dispute regarding September 2018 cracks and Motion to Compel

On January 18, 2019, AMP sent Voith a letter noting the additional new discharge ring cracks that occurred as late as 2018, and, "[g]iven the on-going nature of this material defect the previously agreed to ESI termination date of August 14, 2017 is not sufficient."  (Exhibit 42, ECF No. 59-3, PAGEID # 895.)  AMP therefore requested that Voith re-collect ESI from August 14, 2017, to the present for thirty custodians who had worked on the discharge rings and requested Voith run thirty-seven search terms paired with select AMP Project-specific terms against their ESI.  (*Id*. at PAGEID ## 895–98.)

Unable to resolve the dispute, the parties presented the matter to the Court, which ordered the matter to be briefed.  (ECF Nos. 55.)  After this issue was fully briefed (ECF Nos. 59, 62,

---

[6] On October 29, 2019, the parties advised the Court via email that mediation has ultimately been scheduled initially for December 11–13, 2019.

63), the Court permitted supplemental briefing to reflect information obtained through the discovery process.  (ECF Nos. 75, 76, 80.)  This matter is now ripe for resolution.

## II.

"District courts have broad discretion over docket control and the discovery process." *Pittman v. Experian Info. Sol., Inc*., 901 F.3d 619, 642 (6th Cir. 2018) (citations omitted).  "'It is well established that the scope of discovery is within the sound discretion of the trial court.'"  *Id*. (quoting *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993)).  Federal Rule of Civil Procedure 26(b) identifies the acceptable scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1); *see also* Fed. R. Civ. P. 33(a)(2) ("An interrogatory may relate to any matter that may be inquired into under Rule 26(b)."), 34(a) ("A party may serve on any other party a request within the scope of Rule 26(b)[.]").  In short, "a plaintiff should have access to information necessary to establish her claim, but [] a plaintiff may not be permitted to 'go fishing'; the trial court retains discretion."  *Anwar v. Dow Chem. Co*., 876 F.3d 841, 854 (6th Cir. 2017) (citing *Surles ex rel. Johnson v. Greyhound Lines, Inc*., 474 F.3d 288, 305 (6th Cir. 2007)); *see also Superior Prod. P'ship v. Gordon Auto Body Parts Co., Ltd*., 784 F.3d 311, 320–21 (6th Cir. 2015) ("In sum, '[a]lthough a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted to 'go fishing' and a trial court retains discretion to determine that a discovery request is too broad and oppressive.'" (quoting *Surles ex rel. Johnson*, 474 F.3d at 305)).

"[T]he movant bears the initial burden of showing that the information is sought is relevant." *Prado v. Thomas*, No. 3:16-cv-306, 2017 WL 5151377, at *1 (S.D. Ohio Oct. 19, 2017) (citing *Gruenbaum v. Werner*, 270 F.R.D. 298, 302 (S.D. Ohio 2010)). If the movant makes this showing, "then the burden shifts to the non-movant to show that to produce the information would be unduly burdensome." *Id.* (citing *O'Malley v. NaphCare, Inc.*, 311 F.R.D. 461, 463 (S.D. Ohio 2015)); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (stating that a party claiming undue burden or expense "ordinarily has far better information—perhaps the only information—with respect to that part of the determination" and that a "party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them").

## III.

### A.    AMP's request

AMP seeks an order compelling Voith to produce responsive documents and ESI utilizing a revised period of time, additional custodians, and key search terms in order to capture information concerning the post-August 2017 cracking of the discharge rings at the four Projects. (*See generally* ECF Nos. 59, 63, 76.) Specifically, AMP seeks ESI and documents created after August 14, 2017, to the present. AMP initially proposed using for the ESI search the following sixteen custodians ("the first-requested custodians"), whom AMP believed "were involved in the discharge ring repairs and are represented in the exhibits AMP has filed in support of its Motion to Compel":

| Custodian (Voith Germany) | Title / Role |
| --- | --- |
| Thomas Neidhardt | Turbine Product Owner |
| Jiri Koutnik | Managing Director of Voith Hydro Engineering Center International, Head of Power Unit Expert Support |
| Martin Ultsch | Head of Global Business Services Voith Global Business Services EMEA GmbH |
| Uwe Wehnhardt | Member of the Corporate Board of Management and Chairman of the Management Board |
| Norbert Riedel | Executive Vice President, Chief Technology Officer |
| Tobias Keitel | Chief Operating Officer |
| Lucas Kunz | Engineering Manager |
| Stephan Jahnke | Unit Structural Mechanics/Structural Analysis Team |

| Custodian (Voith York) | Title / Role |
| --- | --- |
| Stanley Kocon | Chief Executive Officer |
| John Seifarth | Director, Engineering |
| Benjamin Scheunert | Hydraulic-FEA Engineer |
| James Bartkowiak | Director, Power Unit Engineering |
| Nathan Eveler | Mechanical Engineer |
| Chris Gutacker | Project Manager |
| Carl Brewster | Manager |
| Lucas Kunz | Director of Engineering, Engineering Manager |

(ECF No. 59 at 13–14.)

In its Supplemental Memorandum, however, AMP represented that it was willing to narrow its request to the following twelve custodians ("the amended-requested custodians"):

| Custodian (Voith Germany) | Title / Role |
| --- | --- |
| Thomas Neidhardt | Turbine Product Owner |
| Jiri Koutnik | Managing Director of Voith Hydro Engineering Center International, Head of Power Unit Expert Support |
| Norbert Riedel | Executive Vice President, Chief Technology Officer |
| Lucas Kunz | Director of Engineer, Engineering Manager |
| Stephan Jahnke | Unit Structural Mechanics/Structural Analysis Team |
| Andreas Greck | *Identified by Norbert Riedel and Ben Scheunert |

| Custodian (Voith York) | Title / Role |
| --- | --- |
| Stanley Kocon | Chief Executive Officer |
| Benjamin Scheunert | Hydraulic-FEA Engineer |
| James Bartkowiak | Director, Power Unit Engineering |
| Chris Gutacker | Project Manager |
| Carl Brewster | Manager |
| Li Chen | *Identified by Norbert Riedel and Ben Scheunert |

(ECF No. 76 at 5 n.7; List of amended custodians and search terms, Exhibit D, ECF No. 76-4.)

AMP initially requested that AMP use the following search terms ("the first-requested search terms"):

1. "discharge ring"
2. DRs
3. mandoor
4. "split flange"
5. crack
6. "strain gauge"
7. Fatigue
8. fillet
9. weld
10. stress
11. repair
12. rib
13. "slip joint"
14. scallop
15. indication
16. "hot spot"
17. Pulsat!
18. vibrat!

19. CFD
20. grind!
21. IIW
22. reinforc!
23. stiffen!
24. stiffness
25. pressure
26. modification
27. mods
28. "design flaw"
29. gussets
30. propogat!
31. shell
32. "skin plate"
33. excavat!

AND

("Ohio River" OR ORBU OR Cannelton OR CANN OR Smithland OR SMIT OR Meldahl OR MLDA OR "Willow Island" OR Willow OR CSWM OR CSW OR AMP OR "American Municipal Power" OR Pete OR Crusse OR Gerken)

(ECF No. 59 at 14–15 (explaining that "[t]he use of an exclamation point ("!") denotes using a stemming or root expansion function to capture variants of a root term (i.e. "pulsate," "pulsating," etc.)").)

In its Supplemental Memorandum, AMP represented that it also was willing to narrow its request to the following search terms ("the amended-requested search terms"):

1. "discharge ring"
2. DRs
3. mandoor
4. "split flange"
5. crack
6. "strain gauge"
7. Fatigue
8. stress
9. rib
10. "slip joint"
11. indication
12. "hot spot"
13. pulsat!

14. vibrat!
15. CFD
16. IIW
17. stiffen!
18. stiffness
19. pressure
20. "design flaw"
21. gussets
22. propogat!

AND

("Ohio River" OR ORBU OR Cannelton OR CANN OR Smithland OR SMIT OR Meldahl OR   MLDA OR "Willow Island" OR Willow OR CSWM OR CSW OR AMP OR "American  Municipal Power" OR Pete OR Crusse OR Gerken)

(ECF No. 76 at 5 n. 7; List of amended custodians and search terms, Exhibit D, ECF No. 76-4.)

## B.    Relevance

AMP contends that Voith's ESI related to the discharge rings since August 14, 2017, is important to the issues in this case as defects in the discharge rings present potential safety concerns to AMP and its personnel and "financial risk" to AMP, including engineering costs. (ECF No. 59 at 15–18; ECF No. 63 at 3–6; ECF No. 76.)  AMP specifically argues that the requested discovery is relevant to its claims that Voith breached the parties' Contracts by defectively designing and manufacturing the discharge rings.  (*Id*.)

Voith disagrees, arguing that AMP has not identified any damages claimed in this lawsuit due to discharge ring issues.  (ECF No. 62 at PAGEID ## 1091–94; ECF No. 80.)  Voith also contends that the requested discovery is not warranted because Voith has repaired, at its own cost, all known discharge ring cracks across the eleven units at all four Projects and that there are currently no known cracks in any of the rings in the operating turbine units.  (*Id*.)  According to Voith, AMP's present request for additional ESI is a fishing expedition searching for information to permit AMP to assert that Voith engaged in a willful misconduct.  (*Id*.)  Voith goes on to

21

argue that AMP's failure to request this discovery earlier in the litigation, particularly when the parties were negotiating ESI search parameters, undermines AMP's present position that the requested ESI is important to the issues in this litigation. (*Id.*)

Voith's arguments are not well taken. The Court is persuaded that information regarding the cracks in the Projects' discharge rings from August 14, 2017, to the present ("the new time period") is relevant to at least AMP's breach of contract claims, which require AMP to prove the following: "(1) that a contract existed, (2) that the plaintiff 'performed its contractual obligations,' (3) that the defendant 'failed to fulfill its contractual obligations without legal excuse,' and (4) that the plaintiff 'suffered damages as a result of the breach.'" *Norfolk S. Ry. Co. v. Allied Erecting & Dismantling Co., Inc.*, 775 F. App'x 178, 190 (6th Cir. 2019) (quoting *Garofalo v. Chicago Title Ins. Co*., 104 Ohio App.3d 95, 661 N.E.2d 218, 226 (1995)). While Voith asserts that AMP has failed to identify any damages AMP suffered flowing from defects in the discharge rings, AMP specifically alleges that it has been damaged by Voith's breaches related to the discharge rings, including incurring additional engineering costs. (Complaint, ¶¶ 46, 47, 53, 59, 65, 71, Prayer for Relief (seeking in excess of $40 million in damages).) AMP is entitled to explore the extent of the defects in the Projects' discharge rings during the new time period, which is relevant to the scope of AMP's damages, an element of its claims. Fed. R. Civ. P. 26(b)(1).

Moreover, AMP also specifically alleges that Voith materially breached the Contracts by, *inter alia*, delivering defectively manufactured discharge rings and defectively designing and/or manufacturing equipment and equipment components. (Complaint, ¶¶ 28(c), (d); 40(c), (d); 45(c), (d); 51(c), (d); 56(c), (d); 63(c), (d); 69(c), (d).) The extent of defects in the Projects' discharge rings during the new time period, including the September 2018 cracks, is therefore

relevant to the scope of Voith's alleged breach of the Contracts.  Fed. R. Civ. P. 26(b)(1).

Voith nevertheless insists that the RCA thoroughly addressed issues that caused the cracking in the discharge rings and that the September 2018 cracks present no new issues beyond those detailed in the RCA, arguing that the RCA specifically addressed planned split flange modifications and welding discontinuity, which was what caused the September 2018 cracks at Smithland and Cannelton.  The Court, however, is not persuaded that the RCA is a sufficient substitute for the requested ESI over the new time period.  As detailed above, the RCA specifically excluded any assessment of the September 2018 cracks, noting that those cracks were still under investigation.  (Exhibit 39 (RCA), ECF No. 59-3, PAGEID ## 854, 856, 878; *see also* Contracts, Article 8.02(D)(4) of ECF Nos. 1-1, 1-2, 1-3, 1-4 (requiring Voith to conduct and submit to AMP a "root cause analysis" if "there are two or more similar failures of any component of the Work").)  Moreover, even if the Court accepts that the RCA implicitly addressed the September 2018 cracks, AMP has submitted evidence, including deposition testimony taken in 2019, that may undermine the RCA's root cause that Voith failed to design for fatigue.  (*Compare* Exhibit 39 (RCA), ECF No. 59-3, PAGEID # 868 (stating that "the original design was based on static analysis.  The discharge rings were exposed to cyclic loading which caused fatigue cracking in locations of high stress amplitudes") *with* Exhibit 48 (excerpt of deposition of Randy Seifarth, P.E., ECF No. 63-2 (testifying that there was a fatigue analysis on the discharge ring) and Exhibit 49 (excerpt of deposition of Daniel McGinnis), ECF No. 63-3 (same).)  In addition, while Voith disputes its significance, AMP has provided recent testimonial evidence from Voith witnesses regarding Voith's task force investigating cracks in discharge rings as well as Voith's efforts.  (*See also* Exhibit A, ECF No. 76-1 (excerpt of Deposition of Norbert Riedel, Voith's Chief Technical Officer from Germany (taken July 10, 2019), testifying

regarding a discharge ring task force that generated updates in various forms, including reports, emails, or memorandum, and that the documents are easily accessible by him and others); Exhibit B, ECF No. 76-2 (excerpt of Deposition of Ben Scheunert, Voith's engineer (taken August 14, 2019), testifying that he and other Voith employees were instructed in and around the summer and fall of 2018 to develop a potential new design for AMP's discharge rings).) Neither the RCA nor Voith's present representations in its briefing is a replacement for (or otherwise obviates) the need for this information. Based on this record, the Court is therefore persuaded that the requested ESI for the new time period is relevant to AMP's breach of contract claims, which include the scope of the breach as well as the scope of AMP's damages. Fed. R. Civ. P. 26(b)(1).

Finally, Voith contends that AMP's failure to seek the requested discovery when the parties were negotiating ESI parameters in early 2018 undermines AMP's present contention that this discovery is relevant to its claims. However, the ESI Protocol obligates the parties to "use reasonable efforts to identify and, if appropriate, produce ESI created after this date [August 14, 2017] on an as needed basis" and the ESI Protocol does not preclude "a motion to the Court as discovery progresses seeking use of broader or different Search Terms than initially proposed or agreed upon, on good cause shown." (ECF No. 38 at PAGEID # 453 (Section III.C, D, and E).) Moreover, new evidence uncovered in the discovery process after the ESI search terms, timeframe, and custodians were negotiated prompted the present Motion to Compel. (*See, e.g.*, Exhibit 48, ECF No. 63-2 (Seifarth deposition excerpt); Exhibit 49, ECF No. 63-3 (McGinnis deposition excerpt); Exhibit A, ECF No. 76-1 (Riedel deposition excerpt); Exhibit B, ECF No. 76-2 (Scheunert deposition excerpt); *see also* Burtch Declaration.) Finally, fact discovery does not close until June 5, 2020 (ECF No. 74), distinguishing this action from the cases cited by

Voith. *See United States ex rel. McBride v. Halliburton Co.*, 272 F.R.D. 235, 236, 239–41 (D.D.C. 2011) (denying request for additional ESI searches where discovery had closed and the responding party had already conducted ESI searches, including an initial search of databases for twenty custodians and an expanded search of databases for 230 custodians); *Davidson v. Apple, Inc.*, No. 16-cv-04942, 2018 WL 6169349 (N.D. Cal. Nov. 26, 2018) (denying in part motion to compel filed "very late in the discovery period" to the extent the plaintiffs already "compromised" regarding that discovery in a previously resolved discovery dispute but granting in part as to other requested discovery).

In short, for all these reasons, the requested discovery relating to the cracks in the discharge rings at the Projects from August 14, 2017, to the present is relevant to AMP's breach of contract claims. Fed. R. Civ. P. 26(b)(1).

## C.    Burden and Proportionality

The parties next dispute whether the requested discovery is unduly burdensome and proportional to the needs of this case. As previously discussed, once AMP shows that the information sought is relevant, the burden shifts to Voith to demonstrate that producing the information would be unduly burdensome. *Prado v. Thomas*, No. 3:16-cv-306, 2017 WL 5151377, at *1 (S.D. Ohio Oct. 19, 2017) (citations omitted); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (stating that a party claiming undue burden or expense "ordinarily has far better information—perhaps the only information—with respect to that part of the determination" and that a "party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them").

Here, Voith contends that the burden of production outweighs any marginal relevance of the requested discovery. In support, Voith first explains its ESI production to date and the accompanying cost and burden of that production. Specifically, Voith represents that it has already produced 540,790 electronically-stored documents in December 2018, and produced an additional 169,396 documents in February 2019. (ECF No. 62 at PAGEID # 1086 (representing further that, of that data, over 32,000 documents mentioned "discharge rings").) Voith also submits the Declaration of Jonathan Robins, who is the National Director of E-Discovery Operations for Ricoh USA, which performed data culling, processing, and hosting services in connection with Voith's production of ESI. (Exhibit M, ECF No. 62-13, ¶¶ 1–3 ("Robins Declaration").) Mr. Robins avers that, to date, Ricoh has billed Voith approximately $1.1 million for its E-Discovery services. (*Id*. at ¶ 10.) Voith notes that Ricoh's bill does not include fees and time expended by Voith's counsel and employees, which included time collecting unfiltered data from 190 custodians. (*Id*. at ¶¶ 4–5.) The volume of unfiltered data Voith collected and transmitted to its E-Discovery vendor was approximately 15 TB.[7] (*Id*. ¶ 4). Voith further explains that in addition to the "collection, review, and production of ESI from 190 custodians for the agreed-upon and ordered date range of January 1, 2006 to August 14, 2017, using the 43 search terms, Voith also identified, collected and produced approximately 900 bankers' boxes containing all hard-copy documents relating to the projects." (ECF No. 62 at PAGEID # 1087.)

---

[7] As Voith explains, "[o]ne terabyte ("TB") is 1000 gigabytes, or the equivalent of 500 billion pages of plain text. (ECF No. 62 at PAGEID # 1087 n.5 (citing *Laethem Equip. Co. v. Deere & Co*., No. 05-10113, 2008 U.S. Dist. LEXIS 129530, at *13 n.1 (E.D. Mich. Dec. 3, 2008) (citations omitted)).)

Voith goes on to explain that compelling Voith to collect data from fifteen[8] custodians using a new date range of August 14, 2017, to the present and using thirty-three new search terms on the newly-collected ESI is unduly burdensome and disproportionate the needs of this case.  In support, Voith points to the Robins Declaration, explaining that Voith will have to go back and identify and re-collect ESI from all email and home share data for each of these custodians.  (Robins Declaration, ¶ 13.)  The email accounts and home shares for these custodians comprise approximately 2 TB of data.  (*Id*. at ¶ 14.)  Once Voith collects the data, it will have to provide the unfiltered data to Ricoh.  (*Id*. at ¶ 15.)  Ricoh will then process the data collected by Voith to extract the metadata from all items, "flatten" the data by extracting all emails, including attachments to emails, and extract data from containers such as zip and PST files.  (*Id*. at ¶ 6.)  Once this initial processing is complete, Ricoh will apply the date filter to identify the data that falls within the newly-chosen date range.  (*Id*.)  Ricoh will then fully index the data to extract text and facilitate the keyword searching. (*Id*. at ¶ 7.)  Once the thirty-three newly-requested searches are run, the responsive data must be fully processed so that it can be uploaded to a document review platform.  (*Id*. at ¶¶ 8-9.)  After these steps are complete, Voith must conduct a privilege review and prepare the newly-requested ESI for production.  (ECF No. 62 at PAGEID # 1088.)  The cost of Ricoh's services alone for performing this production could exceed $100,000.  (Robins Declaration, ¶ 16.)  Accordingly, Voith takes the position that the minimal relevance of this discovery, unnecessarily requested at this late stage of the litigation, does not outweigh the burden and expense of production and is therefore disproportionate to the

---

[8] Voith erroneously refers to fifteen, rather than sixteen, custodians identified in AMP's Motion to Compel.  (ECF No. 59 at 13 (identifying sixteen custodians); ECF No. 62 at PAGEID # 1088 (referring to fifteen custodians in the Motion to Compel); ECF No. 80 at 1 (referring to sixteen custodians); Robins Declaration, ¶¶ 12–14 (using fifteen custodians).)

needs of this case.

Voith's arguments are not well taken. As discussed in detail above, the Court concludes that the requested discovery is relevant to AMP's breach of contract claims and there is no substitute for this information, which is solely in Voith's possession. Fed. R. Civ. P. 26(b)(1), (b)(2); *cf.* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment. While Voith presents evidence that Ricoh's cost for producing this ESI for the new time period for fifteen custodians using thirty-three search terms could exceed $100,000, the Court notes that this cost is not disproportionate to the $1.1 million for the cost of Ricoh's services related to ESI produced to date or to the amount AMP alleges at issue in this action ($40 million). Moreover, Voith's estimate of Ricoh's cost for additional ESI is based on AMP's initial request identifying sixteen custodians and thirty-three new search terms. AMP later revised and reduced its request to twelve custodians and twenty-two search terms, which will presumably require fewer resources to search and produce. (*See* ECF No. 76 at 5 n.7; List of amended custodians and search terms, Exhibit D, ECF No. 76-4.) These numbers— twelve custodians and twenty-two search terms— are also far fewer than the 190 custodians and forty-three search terms previously used in the prior ESI collection. While the Court cannot say based on the present record that the specific number and identity of custodians and specific search terms are appropriate, in light of the cost and scope of ESI conducted to date, additional ESI from the new time period is not disproportionate in this litigation where AMP has alleged $40 million in damages, including engineering costs.[9] Fed. R. Civ. P. 26(b)(1).

---

[9] It is worth noting that Voith has asserted a counterclaim against AMP asserting *inter alia* that "AMP materially failed to perform as required by the Contracts, resulting in interferences, hindrances, delays and defective performance by AMP, MWH and the Installation Contractors that impacted Voith's work," and seeks damages "in excess of $40 million." (Voith's Answer and Counterclaim, ECF No. 22 at ¶¶ 59 & 83.)

Finally, to the extent that Voith complains that the timing of AMP's request increases the burden of production, the Court again notes that the ESI Protocol expressly obligates the parties to use reasonable efforts to produce ESI created after August 14, 2017, and authorizes the filing of a motion to seek broader or different search terms.  (ECF No. 38 at PAGEID # 453 (Section III.C, D, and E).)  Moreover, as previously discussed, new evidence uncovered in the discovery process, including as recently as July and August 2019, and after the parties negotiated ESI search terms, timeframe, and custodians, supports the timing of AMP's present request.  (*See, e.g.*, Exhibit 48, ECF No. 63-2 (Seifarth deposition excerpt); Exhibit 49, ECF No. 63-3 (McGinnis deposition excerpt); Exhibit A, ECF No. 76-1 (Riedel deposition excerpt); Exhibit B, ECF No. 76-2 (Scheunert deposition excerpt); *see also* Burtch Declaration.)  Finally, the Court notes that Voith has more than six months to produce this ESI as fact discovery does not close until June 5, 2020.  (ECF No. 74.)[10]  For all these reasons, the Court finds that the timing of the Motion to Compel does not unduly burden Voith.

## IV.

Accordingly, Re-Filed American Municipal Power, Inc.'s Motion to Compel (ECF No. 59) is **GRANTED IN PART AND DENIED IN PART**.  Specifically, AMP's Motion is **GRANTED** to the extent that it is entitled to some additional ESI related to the post-August 2017 cracking of the discharge rings at the four Projects for the period August 14, 2017, to the present.  However, because the Court is unable on the present record to evaluate the suitability of the twelve custodians and twenty-two search terms identified by AMP (*see* ECF No. 76 at 5 n.7; Exhibit D, ECF No. 76-4), the Motion is **DENIED WITHOUT PREJUDICE** as to these

---

[10] The Court will discuss with the parties at the upcoming status conference whether modification of the present case schedule is necessary to accommodate this additional discovery.

specific custodians and search terms.  The parties are **DIRECTED** to meet and confer regarding the custodians and search terms appropriate to collect the ESI addressed in this decision from the time period of August 14, 2017, to the present.  The parties are **REMINDED** to exhaust all extrajudicial efforts when determining the appropriate custodians and search terms to use in this search.  The parties are **ADVISED** that they should be prepared to update the Court as to their plan for scheduling these discussions as well as any necessary proposed modification of the current case schedule at the next conference set for November 26, 2019.

Finally, Voith's request for AMP to bear the cost of producing the requested discovery (ECF No. 62 at PAGEID # 1097) is **DENIED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**


/s/ *Elizabeth A. Preston Deavers*_____
DATED:  November 22, 2019     **ELIZABETH A. PRESTON DEAVERS**
**CHIEF UNITED STATES MAGISTRATE JUDGE**