**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**AMERICAN MUNICIPAL
POWER, INC.**

       **Plaintiff,**

                            **Case No. 2:17-cv-708**

   **vs.**                    **Chief Judge Algenon L. Marbley**

                            **Chief Magistrate Judge Elizabeth P. Deavers**

**VOITH HYDRO, INC.,**

       **Defendant.**

## OPINION AND ORDER

This matter is before the Court for the resolution of four distinct discovery disputes between the parties as reflected in two motions to compel filed by Plaintiff American Municipal Power, Inc. ("AMP") (ECF Nos. 119 and 121); a motion to compel filed by Defendant Voith Hydro, Inc. ("Voith") (ECF No. 120); and letter briefs addressed to the issue of the application of an Attorneys' Eyes Only ("AEO") designation.  The issues have been fully briefed and the Court resolves them as follows.

### I.

The Court previously set forth the factual and procedural backgrounds of this case in significant detail and, in the interest of brevity, will not repeat its discussion at any length here. *See* ECF No. 84, at pp. 2-15; 2019 WL 6251339, *1-8 (S.D. Ohio Nov. 22, 2019).  Quickly, however, as previously noted, given the nature of this case, the discovery process has been lengthy and, at times, "onerous."  (*Id*. at p. 15.)  The parties have confirmed this continued state of affairs in their current briefing, with both parties noting the sheer volume of discovery

produced to date by both sides. Despite the parties' best efforts, certain issues have remained unresolved, some apparently for some length of time, necessitating the current motions. In light of the briefing and the Court's regular discovery monitoring conferences, the Court is satisfied, despite minor rumblings reflected in the briefing, that the parties have exhausted all extrajudicial means of resolving the issues presented here.

At the outset, the Court offers one more observation. As much of the discussion below will reveal, the issues here are largely driven by the parties' differing interpretations of the same agreements they negotiated to guide these very matters. This fact serves as a reminder that this case, like any case of this magnitude, would have benefited greatly from more work on the front end. While there is no certainty that such work would have eliminated all the issues addressed in the parties' multiple motions, it may have allowed for more effective resource allocation overall. Instead, the parties have filed four motions with the Court for resolution which, as further revealed below, turn on generally unremarkable concepts – (1) redactions for irrelevance from otherwise produced discovery is generally disfavored in this district; (2) disclosure to third-parties generally waives attorney-client privilege; (3) cryptic privilege logs, regardless of the method of information generation, are unacceptable; and (4) a particular type of document is almost always found to be deserving of AEO protection.

## II.

"District courts have broad discretion over docket control and the discovery process." *Pittman v. Experian Info. Sol., Inc*., 901 F.3d 619, 642 (6th Cir. 2018) (citations omitted). "'It is well established that the scope of discovery is within the sound discretion of the trial court.'" *Id*. (quoting *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993)). Federal Rule of Civil Procedure 26(b) identifies the acceptable scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1); *see also* Fed. R. Civ. P. 33(a)(2) ("An interrogatory may relate to any matter that may be inquired into under Rule 26(b)."), 34(a) ("A party may serve on any other party a request within the scope of Rule 26(b)[.]"). In short, "a plaintiff should have access to information necessary to establish her claim, but [] a plaintiff may not be permitted to 'go fishing'; the trial court retains discretion." *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 854 (6th Cir. 2017) (citing *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)); *see also Superior Prod. P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 320–21 (6th Cir. 2015) ("In sum, '[a]lthough a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted to 'go fishing' and a trial court retains discretion to determine that a discovery request is too broad and oppressive.'" (quoting *Surles ex rel. Johnson*, 474 F.3d at 305)).

"[T]he movant bears the initial burden of showing that the information sought is relevant." *Prado v. Thomas*, No. 3:16-cv-306, 2017 WL 5151377, at *1 (S.D. Ohio Oct. 19, 2017) (citing *Gruenbaum v. Werner*, 270 F.R.D. 298, 302 (S.D. Ohio 2010)). If the movant makes this showing, "then the burden shifts to the non-movant to show that to produce the information would be unduly burdensome." *Id.* (citing *O'Malley v. NaphCare, Inc.*, 311 F.R.D. 461, 463 (S.D. Ohio 2015) ); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (stating that a party claiming undue burden or expense "ordinarily has far better information—perhaps the only information—with respect to that part of the determination" and that a "party claiming that a request is important to resolve the issues should be able to explain

the ways in which the underlying information bears on the issues as that party understands them").

## III.

### A.  AMP's Motion to Compel Voith to Remove Redactions of Non-Privileged Information (ECF No. 119)

Voith redacted information it deemed irrelevant from otherwise responsive documents.  By Voith's count, it redacted irrelevant information from 22,152 records, including 5224 Excel files which were produced with "native file" redactions using the Blackout software designed for redacting Excel files[1]. In AMP's view this was done in violation of the governing discovery documents, *see* ECF Nos. 34 ("Protective Order") and 38 ("Production Agreement" or 'ESI Protocol'), and relevant law.  From Voith's perspective, it was perfectly appropriate to make such redactions because Rule 26 restricts the scope of discovery to relevant matter and Rule 34 does not prohibit such redactions.  Accordingly, Voith contends that AMP's request that it be compelled to produce unredacted versions of these records is unreasonable and disproportionate.  Voith's arguments are not well-taken.

Turning to Voith's first argument, Voith makes two assertions – (1) its redactions were proper under Federal Rules of Civil Procedure 26 and 34 generally and (2) they were proper under the circumstances of this case specifically. The Court will address these issues in order.

As the parties' briefing indicates, there are two schools of thought with respect to the provisions of the Federal Rules and the redaction of irrelevant information from otherwise produced discovery.  It is clear, however, that courts in this district have consistently subscribed

---

[1]Voith, taking exception to AMP's characterization that it had refused to identify redacted native Excel files, clarified the number of redactions in its Response.  (ECF No. 122, at p. 2 n.1.)  AMP had identified 16,928 image files that Voith redacted in part and an unknown number of native Excel files. (ECF No. 119, at p. 7.)

to the view that such redactions from what the parties have deemed here to be "combo documents" or "combo information" generally are not to be undertaken.  For example, in *Beverage Distribs., Inc. v. Miller Brewing Co*., No. 2:08-cv-827, 2010 WL 1727640, at *4 (S.D. Ohio Apr. 28, 2010) (Kemp, M.J.) , the Court explained that "ordinarily, the fact that the producing party is not harmed by producing irrelevant information or by producing sensitive information which is subject to a protective order restricting its dissemination and use renders redaction both unnecessary and potentially disruptive to the orderly resolution of the case."  *See also Tween Brands Inv., LLC v. Bluestar All., LLC*, No. 2:15-CV-2663, 2015 WL 6955177, at *2 (S.D. Ohio Nov. 10, 2015) (Frost, J.) (granting a motion to compel production of unredacted documents over the producing party's objection that the redacted information was irrelevant); *Walt v. Gatehouse Media Ohio Holding II, Inc,*, No. 2:19-CV-4262, 2020 WL 4782860, at *2 (S.D. Ohio Aug. 18, 2020) (citing *Tween Brands* and stating "[i]n the Court's view, the Federal Rules of Civil Procedure provide no support for the redaction of irrelevant information. 'Redaction is an inappropriate tool for excluding alleged irrelevant information from documents that are otherwise responsive to a discovery request.' *Bartholomew v. Avalon Capital Grp., Inc.*, 278 F.R.D. 441, 451 (D. Minn. 2011). 'It is a rare document that contains only relevant information. And irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information.' *Id.").*

Likewise, this Magistrate Judge specifically applied the above reasoning in *Jenkins v. Sullivan*, Case No. 2:18-cv-694 (ECF No. 47), in ordering the production of unredacted versions of documents.  In that case, as here, a protective order was in place that fully addressed concerns regarding the disclosure of sensitive information with both "Confidential" or "Highly Confidential - Attorneys' Eyes Only" designations.  *Id.*  Accordingly, the redactions rendered

superfluous the confidentiality designations and therefore were unnecessary.  *Id.*  That also would be the result in this case.  Beyond this, similar to the situation in *Beverage Distribs.,* the sheer volume of information at issue makes it "simply impractical for the Court to view these documents and the arguments in favor of the redactions."[2] 2010 WL 1727640, at *5.

Voith has not set forth any compelling reason or authority, and the Court is not otherwise convinced, that this well-established precedent is inapplicable to ESI.[3]  Moreover, as explained below, the ESI Protocol itself contemplates redactions to ESI relating to privilege.  The ESI Protocol does not distinguish between ESI or Documents as it pertains to redactions.

_____

[2] In fact, in connection with this motion, the parties submitted a sampling of items for *in camera* review. This sampling included at least 41 electronic files including at least 478 pages.  Clearly, this falls within the definition of a large volume of redacted documents as described in *Beverage Distribs*.  2010 WL 1727640, at *5

[3] Similarly unpersuasive to the Court is Voith's argument that particular case law is inapplicable following the 2015 amendments to the Federal Rules of Civil Procedure.  In addition to the cases from this district decided post-2015, *e.g., Jenkins* and *Walt*, other courts also have continued to reject redactions for irrelevance.  *See, e.g., Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC,* No. 12CV00787FLWLHG, 2017 WL 3624262, at *4  (D.N.J. Apr. 26, 2017), *report and recommendation adopted*, No. CV 12-787 (FLW)(LHG), 2017 WL 3668391 (D.N.J. Aug. 23, 2017) ("Analysis of Fed. R. Civ. P. 34, which governs the production of documents between parties, is instructive. Nothing in that rule either expressly or impliedly authorizes a party to unilaterally redact documents. If anything, the Rule contemplates that a party cannot do so".); *TrueNorth Companies, LC v. TruNorth Warranty Plans of N. Am., LLC*, No. 17-CV-31-LTS-KEM, 2019 WL 5460208, at *2 (N.D. Iowa Mar. 19, 2019) (explaining that the practice is "at odds with the liberal discovery policies, the adversary process, and the Court's obligation to read the Rules "to secure the just, speedy, and inexpensive determination of every action and proceeding"); *Olberg v. Allstate Ins. Co*., No. C18-0573-JCC, 2019 WL 6033699, at *2 (W.D. Wash. Nov. 14, 2019) (agreeing with courts expressing disapproval of the practice); *Nieves v. Baptist Mem'l Med. Grp., Inc.,* No. 18-2748-JTF, 2020 WL 3441900, at *2 (W.D. Tenn. June 23, 2020) (recognizing that, in general, parties "cannot unilaterally redact portions of documents based on relevancy grounds.")

Turning to the specifics of this case, Voith argues that its unilateral redactions were appropriate on two grounds – (1) the terms of the Production Order (ECF No. 38) and (2) discussions at a conference with the Court on February 26, 2019.  The Court finds no merit to Voith's interpretation of either.

First, Voith provides a broad-brush interpretation of the Production Order to support its view that its unilateral redactions were proper here, arguing that the Order "expressly allowed parties to withhold irrelevant material even when search terms had 'hit.'"  (ECF No. 122, at p. 2.).  AMP does not dispute that the parties' Documents and ESI that are irrelevant in their entirety were not required to be produced under the terms of the Order.  However, that is not the issue here.  As AMP details, the Production Order, read as a whole, does not provide for redactions to portions of Documents other than redactions for privilege.  *See* ECF No. 38 §§ 1.B.7, VI.A, VI.B.  In further support of its interpretation, AMP notes that the issue of redaction is specifically addressed in § VI.C. which requires that all redactions must be included in a party's privilege log.  As AMP explains, if redactions are to be included on a party's privilege log, it would follow that redactions must be made for privileged reasons. Based on its own reading of the Production Order, the Court agrees that AMP offers the more thorough and reasoned interpretation here.

Further, the Court is not persuaded that the conference discussion is at all dispositive. Rather, as the parties' arguments underscore, whether the issue was resolved at that time appears open to interpretation.  *See* ECF No. 61, at pp. 9-17.  Moreover, the Court puts no stock in Voith's repeated assertion that redactions were appropriate because AMP essentially acquiesced. (ECF No. 122, at p. 10, 12) ("AMP did not object to this." "AMP did not object." "subject had been raised with the Court without objection by AMP").

7

Additionally, and importantly, Voith has not explained how the Protective Order is insufficient to meet its needs here.  Voith merely makes general references to confidentiality concerns and offers the conclusory statement that "[t]he fact that AMP would not be allowed to share that confidential material with anyone else is of no consequence."  (ECF No. 122, at 3.)  Moreover, Voith could have negotiated more robust provisions of the Production Agreement or Protective Order addressed to these issues but did not.[4]

Nor is the Court persuaded that AMP's request here is burdensome and disproportionate the needs of the case.  Voith calculates that a re-review of these records would cost $553,800.  AMP, however, argues that the burden to Voith of producing native versions without redactions is exceedingly minimal.  (ECF NO. 129, at p. 3.).  As AMP explains, Voith is not asserting that these records were privileged – if it were, the redactions would have been logged.  Accordingly, AMP contends that Voith is not required to undertake any privilege review at this point.  Further, AMP notes that, even if a privileged record were to be inadvertently produced, Voith could utilize the claw-back provision from the Protective Order.  The Court agrees that simply producing these records in their native format, as Voith could have done initially, would not appear to be particularly burdensome under the circumstances here.

---

[4]The Court notes Voith's argument that it was no secret that it considered information relating to other projects irrelevant based on confidentiality issues and Critical Electric Infrastructure Information.  (ECF No. 122, at pp. 6-7, 9.)  According to Voith, AMP also had agreed that other project information was not discoverable and should be excluded from the production.  (*Id.* at p. 7.)   Voith asserts that AMP has now changed its position. (*Id.* at 11-12.)  Despite this, Voith has not affirmatively sought relief directed to this issue by way of a protective order.  Further, the Court notes that the Production Agreement (ECF No. 38) provides at § III.L. that "[d]ocuments shall not be withheld from production upon grounds of its confidential nature or upon a claim that it constitutes Critical Energy Infrastructure Information ("CEII"), but may be designated as protected material in accordance with the Stipulated Protective Order."  The parties do not address the impact of this provision on their positions here and the Court expresses no opinion.

In the end, it strikes the Court that rather than utilize the specific procedures negotiated here for the precise purposes of simplification, efficiency, and resource preservation – ideas to which Voith subscribes with respect to other issues – Voith insisted on an "irrelevance review."[5] It chose this path despite its own realization that it was extremely burdensome.  ECF No. 61, at p. 16:9-12.[6]

For all of these reasons, AMP's motion to compel is **GRANTED**.  Voith shall produce unredacted versions of the records they previously produced in redacted form within fourteen days of the date of this order. Voith may, if appropriate, designate documents or portions of the records as confidential in accordance with the Protective Order filed on March 28, 2018.  (ECF 34.)

### B.  Voith's Motion to Compel Production of Communications with Non-Party MWH Americas, Inc.  (ECF No. 120)

Voith has moved to compel 3,497 communications sent to or from MWH Americas, Inc. ("MWH"), AMP's project engineer.  As Voith explains, these documents were withheld on grounds of attorney-client privilege, work product doctrine, or the common interest doctrine/ joint defense privilege.  Voith has categorized the withheld documents as follows[7]:

- 867 communications where AMP has claimed attorney-client privilege but no attorneys are identified;

---

[5] For example, Voith asserts that, given the magnitude of this case, logging email attachments is unnecessary and using metadata for populating a privilege log is necessary.

[6] In support of the reasonableness of its actions, Voith points out that AMP engaged in precisely the same conduct.  This method of justification is not compelling – especially when unaccompanied by an affirmative request directed to the matter. Moreover, in reply, AMP confirmed that it did not redact documents for irrelevancy.  AMP further explained that it identified the documents cited by Voith and confirmed that they were redacted for privilege but inadvertently left off its privilege log.  AMP represents that it now has provided a supplemental privilege log go Voith. (ECF No. 129, at p. 4, n.2.)

[7] According to Voith, some communications appear in more than one category.  (ECF No. 120, at n.1.)

9

- 2,692 communications where AMP has claimed attorney-client privilege but MWH or other third parties were involved violating confidentiality;

- 29 communications where AMP has claimed work product protection but all include MWH or other third parties violating confidentiality;

- 736 communications where AMP has claimed protection under the common interest doctrine or joint defense privilege where all predate AMP's and MWH's joint defense agreement, were exchanged in the course of project construction, and were not in furtherance of an acknowledged common legal strategy.

Addressing each category individually, Voith argues that the emails between AMP and MWH without the involvement of counsel are not protected by the attorney-client privilege because they are ordinary construction project records. According to Voith, as such, these records constitute discoverable facts and do not acquire privilege protection simply because AMP's counsel was copied on an email. Voith also asserts the converse - that, because MWH as a third-party engineer is outside AMP's "privilege circle," including MWH on an otherwise privileged email either waives the privilege or prevents it from arising.

Additionally, Voith contends that the MWH emails do not constitute protected work product because AMP cannot demonstrate that MWH, apart from its project engineer duties, was retained to provide guidance in anticipation of litigation to either AMP or its counsel. Moreover, Voith asserts, to the extent that any others identified in the emails were specially engaged in anticipation of litigation, sharing the work product with MWH a third, and potentially adverse party, waived work product protection. Finally, Voith argues that the common interest doctrine /joint defense agreement cannot provide any basis for withholding any MWH emails because AMP and MHW did not have a specifically identified and acknowledged common legal strategy.

AMP focuses its response on the issue of attorney-client privilege. Other than a passing acknowledgment of the work product doctrine, AMP does not address that issue as a distinct concept in any meaningful way. Similarly, AMP dismisses Voith's discussion of the common

interest doctrine as "purely academic" and does not address the joint defense issue at all. In AMP's view, the common interest doctrine is "merely additive" to what it views as privileged third-party communications. Given AMP's treatment of these issues, the Court will limit its consideration here to the issue of attorney-client privilege.

### 1. Attorney-Client Privilege

"In a diversity case, the court applies federal law to resolve work product claims and state law to resolve attorney-client claims." *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 472 (6th Cir. 2006) (citing, *inter alia*, Fed. R. Evid. 501). In this is a diversity suit, state law governs attorney-client privilege claims, and federal law governs assertions of work product doctrine protection.[8] *See* Fed. R. Civ. P. 26(b)(3). "The burden of establishing the existence of the privilege rests with the person asserting it." *Canton Drop Forge, Inc. v. Travelers Cas. & Sur. Co.*, No. 5:18-CV-01253, 2019 WL 1205295, at *1 (N.D. Ohio Mar. 14, 2019) (citing *U.S. v. Dakota*, 197 F.3d 821, 826 (6th Cir. 1999)).

The attorney-client privilege aims to encourage candid communication between attorneys and their clients and therefore "protects against any dissemination of information obtained in the confidential relationship." *MA Equip. Leasing I, L.L.C. v. Tilton*, 10th Dist. Nos. 12AP–564, 12AP–586, 2012-Ohio-4668, ¶ 19 (Oct. 9, 2012). Under the privilege, "(1) [w]here legal advice

---

[8]On the issue of attorney-client privilege, the parties do not explicitly address whether Ohio law or the law of another state governs here. The Court notes that, in connection with AMP's motion to compel Voith to produce a compliant privilege log, AMP suggests that, based on the relevant contract language, Ohio law applies. (ECF No. 121, at p.8 n.2.) AMP also recognizes that, given that Voith is headquartered in Pennsylvania, that state's law arguably could apply. (*Id.*) AMP explains, however, that Pennsylvania law on this issue is substantially similar to Ohio's. (*Id.*) It does not appear that Voith addresses the issue of governing law. However, in its motion to compel, Voith relies on *William Powell Co. v. National Indemnity Co.,* 2017 WL 1326504 (S. D. Ohio April 11, 2017), a diversity case applying Ohio law on attorney-client privilege. Accordingly, the Court has applied Ohio law.

of any kind is sought (2) from a professional legal adviser in his [or her ] capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his [or her] instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." *Id.* at ¶ 20 (quoting *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, ¶ 18 (2005) (internal quotation marks and citation omitted)).  There is no material difference between Ohio's attorney-client privilege and the federal attorney-client privilege. *Guy v. United Healthcare Corp.,* 154 F.R.D. 172, 177 (S.D. Ohio 1993), fn.3; *Inhalation Plastics, Inc. v. Medex Cardio–Pulmonary, Inc.,* No. 2:07–CV–116, 2012 WL 3731483, at *1 (S.D. Ohio Aug. 28, 2012).  Because a client's voluntary disclosure of confidential communications is inconsistent with an assertion of the privilege, voluntary disclosure of privileged communications to a third party waives a claim of privilege with regard to communications on the same subject matter.  *MA Equip. Leasing I, L.L.C. v. Tilton*, 2012-Ohio-4668, ¶ 20, 980 N.E.2d 1072, 1079-1080.[9]

---

[9] As discussed in *Pinnacle Sur. Servs., Inc. v. Manion Stigger, LLP,* 370 F. Supp. 3d 745, 750–51 (W.D. Ky. 2019), it is less clear as to whether state or federal law governs potential exceptions to and waivers of the privilege. Courts, relying on Federal Rule of Evidence 502, acknowledge that federal law can govern waiver in a diversity case, "even if state law provides the rule of decision. FED. R. EVID. 502(f)*." Id*.  However, as the *Pinnacle* court noted, "federal law does so only when 'disclosure' of the privileged communication is made, whether intentional or inadvertent, 'in a federal proceeding.' FED. R. EVID. 502(a)–(b), advisory committee's note ('[This] rule does not purport to supplant applicable waiver doctrine generally.'")).  *Id*.  As discussed above, under both Ohio and federal law, disclosure to a third-party, as AMP asserts happened here, can waive the privilege. *MA Equip. Leasing I, L.L.C. v. Tilton*, 2012-Ohio-4668, ¶ 20, 980 N.E.2d 1072, 1079-1080; *Cooey v. Strickland*, 269 F.R.D. 643, 652 (S.D. Ohio 2010)  It is also important to note, however, that if Ohio law does not adequately address an issue related to a claim of attorney-client privilege, federal law can and should be consulted for guidance. *Baker v. Chevron USA, Inc.*, Case No. 1:05-cv-227, 2009 WL 10679629, at *2 (S.D. Ohio June 8, 2009)(citing *Cargotec Inc. v. Westchester Fire Ins. Co.*, 802 N.E.2d 732, 735 (Ohio Ct. App. 2003)and  *In re Grand Jury, No. 93CA09*, 1995 WL 365386, at *6 (Ohio Ct. App. 1995)).

Under certain circumstances, however, communications disclosed to people other than the attorney and client may remain protected.  *Cooey v. Strickland*, 269 F.R.D. 643, 652 (S.D. Ohio 2010).  Under Ohio law, communications between an attorney and a client's agent are protected under the attorney-client privilege.  *See Foley v. Poschke*, 31 N.E.2d 845, 846 (Ohio 1941) ("[t]he general rule that communications between an attorney and his client in the presence of a third person are not privileged, does not apply when such third person is the agent of either the client or the attorney"); *In re Heile*, 65 Ohio App. 45, 49; 29 N.E.2d 175, 177 (Ohio Ct. App. 1939) ("[c]ommunications between an attorney and the agent of his client are entitled to the same protection from disclosure as those passing directly between the attorney and his client"). Communications between a client and an attorney's agent are similarly protected.  *Id.*  The parties also cite federal law in support of these the same principles.  *See, e.g., United States v. Kovel,* 296 F.2d 918, 921 (2d Cir. 1961) (The privilege "must include all the persons who act as the attorney's agents." ); *see also Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 19 F.3d 1432, 1994 WL 58999, at * (6th Cir. 1994) (Table) (citing *Kovel* and recognizing that communications can be considered privileged if they were made by the client to a third-party for the purpose of ultimately receiving legal advice, and that third-party was acting as the agent of the client or client's counsel)

AMP, relying on the principles of *Kovel* and similar cases, contends that MWH is covered by the attorney client privilege as "a third-party consultant retained for the purpose of securing legal advice."  (ECF No. 124, at p. 6.)   AMP's discussion of the case law is correct as far as it goes.  However, those cases do not address the circumstances presented here.  AMP has submitted no evidence clearly establishing that MWH was specifically retained as a litigation consultant – by either AMP or AMP's counsel.

Lacking any specific agreement establishing MWH's legal consultant status, AMP is left to otherwise craft one.  To do so, AMP relies on several contract provisions and cites to the long-standing relationship between AMP and MWH.  For example, AMP cites the following contractual provisions contained in the Agreement for Engineering Services for each of the four projects (collectively, the "MWH Agreements"):

> **3.13.16 Contractor Payments**. The Engineer must review and approve, modify, or reject the Contractors' Pay Applications on the basis of the Engineer's evaluation of the applicable Work and Pay Applications . . . .
>
> **3.13.17 Interpretations.** The Engineer must represent the Owner in connection with all issues concerning interpretation or clarification of the Contract Documents. . . .
>
> **3.13.18 Contractor Claims.** The Engineer must (1) document and review all Contractor Claims as provided in the Contract Documents, (2) consult with and make appropriate recommendations to the Owner about each Contactor Claim, and (3) attend dispute resolution meetings convened by the Owner related to each Contractor Claim.
>
> (Ex. A, at p. 41).

According to AMP,  these provisions demonstrate that, in addition to providing general engineering services for the Project, MWH was required to provide a variety of administrative services that necessitated working with AMP's counsel to assist in providing legal advice, including dispute resolution, claims review, and other activities during the course of construction.  AMP further explains that, a brief review of the MWH Agreements reveals that MWH had many other tasks and responsibilities that would have required coordinating and sharing information with AMP's counsel. (*e.g. id*. at provisions 3.7 Turbine/Generator Procurement and Installation Contract Documents Task; 3.8 Turbine Generator Design Task; 3.11 General Construction Bid Documents Task; 3.12 General Construction Bidding and Negotiation Task; 3.13 Manufacturing and Construction Phase Tasks; 3.19 Schedule Monitoring and Reporting; 3.20 Budget Monitoring and Reporting; and 3.21 Progress Monitoring and Reporting).  (ECF 124, at pp. 2-3.)

14

Voith asserts that none of these provisions cited by AMP indicate that MWH would be acting as an agent for counsel assistance.  By way of example, Voith cites § 3.13.17 and asserts that AMP omits the most important parts, which demonstrate that MWH is neither AMP's advocate nor engaged to assist AMP's legal advocate but is instead required to exercise independent judgment for the project.  Further, and not surprisingly, Voith points to other contract provisions that, in its view, demonstrate that MWH was not engaged as a litigation consultant or "counsel's assistant."  According to Voith, the MWH Agreements specifically identify MWH as the Project Engineer, state that AMP is obtaining legal assistance separately, and confirm that MWH is not AMP's agent but is instead an independent contractor who must exercise professional judgment in the interest of the project and not necessarily AMP's interest, and demonstrate that MWH did not undertake fiduciary agent obligations in the MWH Agreements. *See* §§1.3, 2.1, 2.4 ([t]he Engineer is an independent contractor and not an employee or servant of the Owner for any purpose") §§ 2.5; 2.16.2.

Additionally, Voith notes that, although AMP and MWH may have contemplated that MWH might someday become specially engaged to assist with a "legal proceeding," that discussion appears in the "Additional Services" portion of the MWH Agreements and requires further documentation of such a special engagement.[10] Voith notes that AMP has not presented

---

[10] Voith's argument relies on the following provisions:

"**3.22.2 Potential Additional Services.** The Owner may require the Engineer to perform the following Additional Services: …

.8      providing Services in connection with a dispute resolution proceeding or a legal proceeding except where the Engineer is party")."

As an "Additional Service," such an engagement had to be agreed to in a separate writing with its own scope and price to be set for such an extra. § 3.22.21  ("The parties will treat each Additional Services assignment as a scope and compensation addendum to this Agreement. Except when there is danger of imminent harm to people or property, or when the Owner

such additional documentation which in its view confirms that they did not agree to legal assistance under the terms of the MWH Agreements.

AMP's circumstances here, readily distinguishable from *Kovel*, are much more analogous to the situation presented in *Town of Georgetown v. David A. Bramble, Inc*., Case No. 15-554-SLR, 2016 WL 1019630 (D. Del. March 15, 2016), *motion for reconsideration denied*, 186 F. Supp. 3d 329 (2016). In that case, Georgetown argued that its project engineer, DBF was its agent with respect to the construction project giving rise to the litigation. Georgetown contended that the agency relationship was evident from both the contractual documents and its long-standing relationship with DBF. The court, applying Delaware *state law* on the issue of agency, held that DBF was not Georgetown's agent for purposes relevant to that litigation. *Id*. 2016 WL 1019630, at *4. In reaching this conclusion, the Court noted that DBW's status as an independent contractor was not necessarily determinative. *Id*. at *3. Rather consistent with the Restatement (Second) of Agency, central to the Court's analysis was the amount of control Georgetown could be found to exercise over DBF. *Id*. The Court concluded that neither the contract documents nor the long-standing relationship sufficiently established the requisite degree of control. *Id*. at *4. On reconsideration, in response to Georgetown's arguments that the attorney-client privilege can extend to protect communications between a client and a professional who is not an agent, the court agreed but noted that DBF was not a third-party professional hired specifically for litigation purposes. 186 F. Supp. 3d 329, 331. Accordingly, like here, the Court distinguished Georgetown's situation from *Kovel*. *Id*. In sum, the court described DBF's status as "literally a player in the litigation – a fact witness at best, a party subject to the risk of liability at worst." *Id*.

---

otherwise requires in writing, both parties must accept the scope and budget addendum before the Engineer begins providing the associated Additional Services.").

Here, AMP similarly has not established that MWH was a third-party professional hired for litigation purposes. Further, AMP has not otherwise set forth any basis from which the Court could conclude that MWH falls within AMP's "privilege circle." For example, AMP has not framed its argument in terms of state-law agency principles as considered (although ultimately rejected) by the court in *Bramble*. Absent a meaningful argument on this issue, the Court is without any record to make any such determination.

For these reasons, Voith's motion to compel is **GRANTED.** However, the Court notes AMP's request that it be permitted to re-review the documents at issue in the event Voith's motion were to be granted.[11] Given the circumstances, the Court finds this request reasonable. The Court will allow AMP 30 days to complete its re-review before producing any documents at issue here to Voith.

### C. AMP's Motion to Compel Privilege Log (ECF No. 121)

AMP seeks two things: (1) that Voith be directed to produce a privilege log that contains descriptions that comply with the Federal Rules of Civil Procedure and applicable case law and (2) if, through this process, it turns out that documents that are not privileged have been withheld, that Voith be ordered to produce those documents. According to AMP, it has identified four categories of material deficiencies in Voith's privilege log: (1) entries with inadequate descriptions such that it is unable to determine whether the privilege claim is valid; (2) entries in which Voith's Chris Gutacker, a non-lawyer, is listed as an author or recipient with inadequate descriptions; (3) entries in which Voith's commercial manager Nick Karnezos, an attorney but

---

[11] AMP asserts that Voith should be required to provide a revised list of documents requested from AMP's privilege log and AMP should be given the opportunity to re-review these documents. (ECF No. 124, at p. 15, n.5.) AMP has provided no support for its view that Voith should be required to provide a revised list and the Court considers the documents subject to re-review to be the documents identified in Voith's motion.

not employed by Voith as counsel, is listed as an author or recipient with inadequate descriptions; and (4) Voith's failure to log email attachments withheld as privileged.

Voith argues that its privilege log complies with current standards for privilege logs in cases involving large volumes of ESI.  According to Voith, it properly created its log from the ESI metadata, an approach entirely reasonable under the circumstances.

### 1.   Legal Standard

There is no question that simply claiming that information is privileged "is insufficient to meet the burden" of establishing privilege.  *Little Hocking Water Assn., Inc. v. E.I. Du Pont De Nemours & Co.*, No. 2:09-CV-1081, 2013 WL 607969, at *5 (S.D. Ohio Feb. 19, 2013), *aff'd sub nom. Little Hocking Water Ass'n, Inc. v. E.I. Du Pont de Nemours & Co.*, No. 2:09-CV-1081, 2014 WL 5857994, at *5 (S.D. Ohio Nov. 12, 2014) (quoting *In re Trans–Industries,* No.: 1:10 MC 34, 2011 U.S. Dist. LEXIS 37¶ 0, at *10, 2011 WL 1130410 (N.D. Ohio Mar. 28, 2011)).

Fed.R.Civ.P. 26(b)(5)(A) provides as follows:

**(A) Information Withheld**. When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation, the party must:

(i) expressly make the claim; and
(ii) describe the nature of the documents, communications, or tangible things not produced or disclosed - and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

The Rule does not identify the precise information that must be contained in a privilege log.  Instead, courts are required to look to case law for guidance.

Courts have found privilege logs deficient where they have included general categories of persons and entities without identifying anyone by name and position, and provided vague descriptions, such as a notation that a document is "correspondence" or "meeting notes" or "a report containing legal information." *Clark Const. Grp., Inc. v. City of Memphis*, 2005 WL

6187896, at *3 (W.D. Tenn. Feb. 9, 2005).  Similarly, courts have found deficiencies where logs have "identif[ied] only the dates of the documents, a brief description providing no substantive information, and the asserted privilege." *Mafcote, Inc. v. Fed. Ins. Co.*, 2010 WL 1929900, at *5 (W.D. Ky. May 12, 2010).

In *In re Search Warrant Executed at Law Offices of Stephen Garea*, 173 F.3d 429, 1999 WL 137499, *2 (6th Cir. 1999) (unpublished), the Sixth Circuit noted,

> [i]n our view, a person seeking to assert the attorney-client privilege must make a minimal showing that the communication involved legal matters. This showing is not onerous and may be satisfied by as little as a statement in the privilege log explaining the nature of the legal issue for which advice was sought.

Further, as explained by the Court in *Cooey v. Strickland*, 269 F.R.D. 643 (S.D. Ohio 2010):

> The privilege log must be detailed enough to prove that the communications in question were in fact confidential communications relating to legal advice. *In re Search Warrant Executed at Law Offices of Stephen Garea,* No. 97–4112, 1999 WL 137499, at *2, 1999 U.S.App. LEXIS 3861, at *7 (6th Cir. Mar. 5, 1999). The party asserting the privilege must make "at least a minimal showing that the communication contained legal matters," but that showing need not be "onerous and may be satisfied by as little as a statement in the privilege log explaining the nature of the legal issue for which advice was sought." *Id.* at *2, 1999 U.S.App. LEXIS 3861, at *5–6. However, merely conclusory statements may not be enough to satisfy this minimal standard. *Id.* at *2, 1999 U.S.App. LEXIS 3861, at *6. A "cryptic privilege log" does not satisfy this standard if "review of the documents themselves fails to reveal whether they were produced or transmitted in the course of legal representation." *Id.* at *2, 1999 U.S.App. LEXIS 3861, at *7. *See also United States v. Constr. Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir. 1996) ("if the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of the legal requirements for application of the privilege, his claim will be rejected") (quoting *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y. 1993)).

*Id.* at 649.

Given the parties' treatment of this issue, the Court begins its discussion with a clarification of what it considers to be truly at issue in this motion to compel.  First, despite Voith's protestations, the Court does not construe AMP's motion as seriously requesting that

Voith redo its "entire 1,559-page privilege log."  As the Court understands AMP's position, AMP has identified 3,857 entries that it contends are insufficient – 515 generally cryptic entries (15 identified in the body of AMP's motion and 500 more set forth in Exhibit 1A); 935 entries where Chris Gutacker is identified as the sole author of the document (8 identified in the body of AMP's motion and 927 additional entries set forth in Exhibit 1B; and 2,407 entries where Nick Karzenos is identified as the author of the document (8 identified in the body of AMP's motion and an additional 2,399 set forth in Exhibit 1C).  AMP has identified these attachments in Exhibit 1D.  In light of these specifically identified entries, the Court does not view AMP's motion as waging a "wholesale, big picture, generic" challenge to Voith's entire privilege log. Additionally, in what the Court views as a wholly distinct issue, AMP has identified 20,825 attachments that it contends Voith has failed to log.

Within the context of the above clarification, Voith argues the following with respect to the privilege log entries at issue.  First, as noted, Voith contends that its use of metadata was reasonable and consistent with current views relating to large volume ESI production in complex cases.  AMP does not dispute that the use of metadata is part of the process of creating a privilege log and does not challenge Voith's use of it.  Rather, AMP contends that, if the metadata is insufficient to support a privilege claim, additional details are necessary in order for the log to comply with Rule 26(b)(5)(A).

The Court need not belabor this issue.  Case law supports AMP's view.  *See, e.g., Shotwell v. Zillow Grp. Inc.,* No. C17-1387-JCC, 2019 WL 5802656, at *2 (W.D. Wash. Nov. 7, 2019) (order entered where parties agreed that should the available metadata provide insufficient information for the purpose of evaluating the privilege claim asserted, the producing party shall include such additional information as required by the Federal Rules of Civil Procedure); *Royal*

*Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co*., No. 14CV04394AJNBCM, 2018 WL 10038859, at \*1 (S.D.N.Y. Sept. 28, 2018) (Deutsche Bank directed to revise its metadata log to include a meaningful subject matter description to allow the plaintiff and the Court to determine whether the document was at least potentially protected from disclosure where descriptions were insufficient to permit even a facial evaluation of the document.)

As the court recognized in *Royal Park*, "[i]n some instances [the metadata] technique produces an acceptable result, but in other instances it does not." *Id.* at \*1.  That appears to be the situation here.  It is difficult in many instances to reach the conclusion that Voith met the minimum standard for a privilege log.  For example, as AMP contends, entries such as "Email containing Work Product re: [No Subject]" or "Email containing Work Product re: slides" cannot be viewed as meaningful subject matter descriptions.   Consequently, as to Voith's use of metadata generally, to the extent that it has resulted in incomplete subject matter descriptions, Voith will be required to revise its privilege log as it relates to the 515 general entries identified by AMP.

Further, Voith makes the same argument as to the challenges directed to the entries relating to Mr. Gutacker and Mr. Karnezos.  Consequently, the same reasoning applies and Voith will be required to revise its privilege log as it relates to the Gutacker and Karnezos entries.  The Court notes that, in its response, Voith states that at least 59 of the AMP-identified Gutacker entries and at least 364 of the Karnezos entries clearly involve communications with Voith's in-house counsel.  Voith suggests that this is indicative of AMP's failure to make any effort to reasonably review each entry.  However, not every communication to or from an attorney is subject to the attorney-client privilege. Communications not involving legal advice, such as communications seeking business advice, are not protected. *Carman v. Signature Healthcare,*

*LLC*, No. 419CV00087JHMHBB, 2020 WL 807537, at *2 (W.D. Ky. Feb. 18, 2020) (citing *Burton v. Zwicker & Assocs., PSC*, No. 10-227-WOB-JGW, 2012 WL 12925675, at *4 (E.D. Ky. Jan. 9, 2012). Where in-house counsel is involved, the communications may involve both business and legal considerations. *Id*. "'Accordingly, the privilege applies to communications with in-house counsel only if the communication's main purpose is to get or give legal assistance.'" *Id*. (quoting *Burton,* 2012 WL 12925675, at *2). As AMP acknowledges, it is possible that two non-attorney employees could be discussing legal advice from an attorney, thereby preserving the privilege. Absent more detailed descriptions from Voith, however, it is not possible to determine whether that is the situation here.

In the Court's view, AMP has approached Voith with its particular concerns and identified specific entries at issue. Given the nature of the descriptions, it is difficult for AMP to be required to do much more at this point. Accordingly, the Court's resolution of this issue is consistent with Voith's proposed "proper approach" that AMP be required to identify items from Voith's log that it seeks to have re-evaluated.[12] It likewise is completely in line with Voith's recognition that AMP's provision of such a list obviates the need for the Court to undertake any *in camera* review prior to such re-evaluation. Accordingly, AMP's motion to compel is **GRANTED** as it relates to all of the privilege log entries identified above. Voith will be required to provide more complete descriptions for these log entries in order to allow AMP, or the Court if it becomes necessary, to determine whether the ESI item was protected from disclosure.

---

[12] This also is consistent with the approach that Voith describes it previously employed in response to AMP's request that Voith re-evaluate 327 items in its log involving persons AMP thought were independent contractors. (ECF No. 123 at p. 5.)

This brings the Court to the issue of the logging of attachments.  Despite having entered into a Production Order (ECF No. 38), the parties have taken starkly divergent approaches to the treatment of attachments.  In AMP's view, the Production Order at § III.I and Rule 26(b)(5)(A)(ii), require that the attachments be separately logged and did so.  As Voith sees it, it is unnecessary to log individual attachments subject to the same privilege as the underlying communication.  In fact, citing to § VI, Voith contends that the Production Order does not require it.  Accordingly, Voith did not do so and contends that AMP's having done so created more confusion than clarity.

"[F]ederal courts generally 'expect that attachments, like earlier strings in e-mail correspondence, need to be treated separately and logged as such[.]'" *In re Application of Chevron Corp.,* No. MC10371CKKDAR, 2013 WL 11241413, at *5 (D.D.C. Apr. 22, 2013)(quoting *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.,* Civ. A. No. 08–7508, 2011 WL 3738979, *4 (S.D.N.Y. Aug. 18, 2011) (citations omitted)).  This is so even if a court has found that the parent e-mails themselves were privileged.  *Id.*  "It is typical for privilege logs to use descriptions that note and describe both the email and attachment." *MPAY, Inc. v. Erie Custom Computer Applications, Inc.*, No. CV 19-704 (PAM/BRT), 2020 WL 748237, at *5 (D. Minn. Feb. 14, 2020) (citing *Bartholomew v. Avalon Capital Grp., Inc.*, 278 F.R.D. 441, 447 (D. Minn. Apr. 28, 2011)) (explaining that without such logging of attachments, a party or judge reviewing a privilege log would have no idea a party withheld other documents attached or forwarded by email on the grounds of privilege or work-product protection).  This is so because privilege is assessed separately for emails and attachments.  *Idenix Pharm., Inc. v. Gilead Scis., Inc*., 195 F. Supp. 3d 639, 644 n.5 (D. Del. 2016).

In this case, the governing Production Order states, in relevant part:

III.I.  If any original ESI has attachments, the parties will first produce copies of that ESI with the attachments unless the ESI is privileged.  If the ESI is privileged, any attachments to the ESI will be produced unless also privileged.
…

VI.  A.  Producing Parties shall only withhold ESI or Documents as permitted herein, on the basis of privilege within the bounds of applicable law, or upon order of the Court.  Pursuant to Section III(N), the parties shall prepare privilege logs in accordance with Fed.R.Civ.P. 26(b)(5).

The Court finds no merit to Voith's argument that attachments withheld on the basis of privilege are not required to be logged.  The authority cited above aptly explains why the logging of such attachments is necessary and, therefore, expected.  Further, based on the plain language of the Production Order, the Court finds Voith's interpretation unpersuasive. Nothing in that Order appears to except an attachment, once it is deemed privileged, from the provisions relating to the treatment of other privileged documents or ESI.  Moreover, the cases cited by Voith are not directly applicable here.

For these reasons, the Court is inclined to grant AMP's motion to compel on this issue. However, given the sheer volume of attachments involved, the Court would like to address this issue with the parties at the previously-scheduled discovery conference.  Accordingly, the Court will defer ruling on this issue until after the conference.

### I.  Attorneys' Eyes Only Designation

Finally, the parties have delivered letters and exhibits to the chambers email. As the correspondence reflects, the parties have reached an impasse as to a discovery issue related to AMP's designation of a portion of a produced document as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.[13]

---

[13] The Court is being deliberately vague here because the parties submitted the issue for an *in camera* review.  Should the parties require additional explanation, they can put the matter on the agenda for the next discovery conference.

Voith seeks removal of this highly restrictive designation, contending that the document fails to meet the designation standard set forth in the parties' protective order.  Further, Voith asserts that counsel should be permitted to share this document with Voith in order to "meaningfully advise" on specific issues.

For its part, AMP argues that courts routinely grant documents of this nature such protected status.  Further, AMP emphasizes that, in this particular situation, it has agreed to produce the document in redacted form such that counsel can show it to Voith.  As AMP makes clear, it seeks to retain the AEO designation only as to the document's "most highly sensitive and confidential portions."

The cases cited by AMP confirm, and the Court agrees, that documents of this nature are typically granted AEO status given their highly sensitive and confidential nature. Further, the potential for harm and disadvantage identified by AMP is evident.  In fact, Voith's stated purpose in requesting removal of the designation would seem to validate AMP's specifically-identified concerns.

As discussed, AMP has produced the document in redacted form. Voith has not set forth any compelling reason as to why a redacted version of this document is insufficient for its purposes.  A conclusory assertion that it prevents a "full and frank conversation between counsel and client" simply is not enough here.  Accordingly, Voith's request is **DENIED.**

## IV.

For the foregoing reasons, AMP's Motion to Compel (ECF No. 119) is **GRANTED.** Voith shall produce unredacted versions of the records they previously produced in redacted form within fourteen days of the date of this order. Voith may, if appropriate, designate documents or portions of the records as confidential in accordance with the Protective Order

filed on March 28, 2018.  (ECF No. 34.)  Further, AMP's Motion to Compel (ECF No. 121) is

**GRANTED**, **in part,** to the extent set forth above.  Voith's Motion to Compel (ECF No.120) is

**GRANTED.**  AMP shall have 30 days to complete its re-review before producing any

documents at issue here to Voith.  Voith's request that the Court order AMP to remove the AEO

designation is **DENIED**.

      **IT IS SO ORDERED.**


                    */s/ Elizabeth A. Preston Deavers*
**DATED:  August 25, 2020**         **ELIZABETH A. PRESTON DEAVERS**
                    **CHIEF UNITED STATES MAGISTRATE JUDGE**