IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN MUNICIPAL POWER, INC., | : | Case No. 2:17-cv-00708 |
| | : | |
| Plaintiff, | : | District Judge Algenon L. Marbley |
| | : | |
| v. | : | Magistrate Judge Elizabeth Preston Deavers |
| | : | |
| VOITH HYDRO, INC., | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT VOITH HYDRO, INC'S
## MOTION TO COMPEL ESI PRODUCTION

Pursuant to Fed. R. Civ. Proc. 37(a)(2)(B), and for the reasons stated in the attached Memorandum in Support, Defendant Voith Hydro, Inc. ("Voith") moves for an Order compelling Plaintiff American Municipal Power, Inc. ("AMP") to produce certain electronically stored information ("ESI") which AMP has not shown to be privileged but has withheld from production. Voith certifies that it exhausted all extrajudicial means for resolving the parties' differences.

Respectfully submitted,

/s/ John B. Kopf
Kimberly E. Ramundo (0066570)
Daniel M. Haymond (0062152)
John B. Kopf (0075060)
William J. Hubbard (0077033)
THOMPSON HINE LLP
41 South High Street, Suite 1700
Columbus, Ohio 43215
Kim.Ramundo@ThompsonHine.com
Dan.Haymond@ThompsonHine.com
John.Kopf@ThompsonHine.com
Bill.Hubbard@ThompsonHine.com
(614) 469-3300
(614) 469-3361 (fax)

*Attorneys for Defendant Voith Hydro, Inc.*

1

**MEMORANDUM IN SUPPORT**

**INTRODUCTION**

A party who withholds records from production on claims of privilege must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privilege or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). AMP did not do that for the records which are the subject of this Motion and has not shown that those records are privileged. The Court should order AMP to produce them. There are three categories of improperly withheld ESI.

**AMP's Attachments.** Voith seeks to compel production of 12,997 attachments for which AMP has failed to demonstrate privilege.[1] AMP's "Privilege Description" sentences do not sufficiently describe the attachments or provide information demonstrating privilege, and for 4,711 of these items, AMP has not provided the author's name.[2]

Last Fall the Court ordered the parties to work together on attachments. Voith developed a three-step process by which the parties could resolve their disputes while mitigating cost. Voith has almost completed that process for Voith's attachments.[3] AMP could cost effectively fix its problems if it followed the same process. But AMP refuses to complete even the first step, asserting instead that the disputed entries are sufficient. They are not. The Court should order AMP to produce the disputed attachments because AMP has failed to demonstrate privilege for them.

**Emails AMP Withheld From AMP's Discharge Ring Production.** The parties exchanged supplemental productions to discover post-Complaint records about AMP's claims concerning the discharge ring components at the power plants. Voith seeks to compel production of three subcategories of records that AMP withheld: 1) 43 emails sent to other third parties;[4] 2) 38 emails which do not include

---

[1] A spreadsheet of AMP's log entries for these attachments is attached as Exhibit A.
[2] A spreadsheet of the disputed attachment log entries for which AMP has not provided author data is attached as Exhibit B.
[3] It recently came to Voith's attention that its ESI vendor inadvertently missed batching some records for review. Voith is completing its review, production and logging of those missed items now.
[4] A spreadsheet of AMP's log entries for these disputed items is attached as Exhibit C.

counsel but were withheld as attorney-client privileged anyway;[5] 3) 114 emails exchanged with the project engineer, Stantec Consulting Services, Inc. (f/k/a MWH Americas, Inc.) ("Stantec")[6]. The Court should order AMP to produce all of these with their attachments.

**Non-Email Items.** AMP's logs continue to fail to provide the author, let alone describe privilege, for 2,316 disputed non-email items.[7] It is not enough to provide vague sentences like: "Draft providing legal advice regarding letter to Voith regarding Meldahl equipment delivery dates." (Ex. F at Row 1,374: AMPVOITH006_00991695) or "Document providing information in furtherance of legal advice regarding Voith settlement change order." (Ex. F at Row 1,445: AMPVOITH004_00058383) or "Draft prepared during or in anticipation of litigation with Voith regarding AMP's Complaint" (Ex. F at Row 1,888: AMPVOITH006_00991374). AMP has not shown privilege. The Court should order AMP to produce the 2,316 disputed non-email items.

## FACTS

### I. The ESI Order And AMP's Privilege Logs

The ESI Order states that "the parties shall prepare privilege logs in accordance with Fed. R. Civ. P. 26(b)(5)." (Doc. 38 PageID 458.) The Order also provides that if an email is privileged "any attachments to the [email] will be produced unless also privileged." (Doc. 38 PageID 454.)

AMP provided a privilege log and later supplemented it ("AMP's Primary Log").[8] AMP also provided a log for its post-Complaint ESI discharge ring production ("AMP's DR Log").[9]

### II. The Disputes About Email Attachments

Last Summer AMP filed a motion to compel about Voith's email attachments. (Doc. 121 PageID 6430-31.) The Court said it was "inclined" to grant AMP's motion but deferred ruling because the Court was concerned about the volume of work. (Doc. 133 PageID 7782.) After conferring with the parties, during

---

[5] A spreadsheet of AMP's log entries for these disputed items is attached as Exhibit D.
[6] A spreadsheet of AMP's log entries for these disputed items is attached as Exhibit E.
[7] A spreadsheet of AMP's log entries for these disputed items is attached as Exhibit F.
[8] AMP actually provided 33 separate privilege logs, which appear to have been created per custodian. A copy of the combined and supplemented logs is attached as Exhibit G.
[9] A copy of AMP's DR Log is attached as Exhibit H.

which AMP's attachment logging problems were also discussed with the Court, the Court instead ordered the parties to work together to figure out a way to resolve their attachment disputes. (Doc. 141 PageID 7975-76.) The Court cautioned AMP not to make Voith file a motion to compel. (*Id*.)

Voith immediately moved forward with the identification and production of non-privileged email attachments. Voith explained its process to AMP and requested that AMP do the same. *See* Attachment Meet and Confer Communications, attached as Exhibit I. Voith also suggested potential other partial solutions for AMP to implement with regard to AMP's attachment issues. (*Id*.) But AMP refused to follow the process. (*Id*.) And only just weeks ago AMP finally started to implement some of Voith's alternative suggestions for potential partial solutions. (*Id*.) AMP's log entries for AMP's email attachments remain a problem. (Ex. A.)

As explained in more detail in the following sections, AMP's "Privilege Description" sentences for the 12,997 disputed attachment entries do not describe how or why the attachments are privileged, or they only unhelpfully recite that the records are attachments to another privileged item. (Ex. A.) Moreover, 4,711 of them still do not identify their author. (Ex. B.) Worse, recent author data which AMP just provided on June 18, 2021, shows that attachments in AMP's privilege logs were authored by persons who are not in AMP's privilege circle; for example, persons like Voith employees (Ex. A at Row 3,900: AMPVOITH020_00218163), installation contractor employees (*Id*. at Row 6,189: AMPVOITH006_00988284), installation contractor counsel (*Id*. at Row 6,179: AMPVOITH006_00988245), and people at Stantec (*Id*. at Row 653: AMPVOITH006_00984577).

      A.      **AMP's Original Attachment Log Entries Lacked Key Data (Dates/Authors) And Were Misleading About Which Items Were Attachments.**

As Voith pointed out in its prior briefing last summer (Doc. 123 PageID 7279-80), AMP's log entries for attachments, for the most part, did not identify dates, authors, or recipients, and only stated that the items were things attached to privileged emails (without providing meaningful descriptions about the attachments themselves). (Doc. 123 PageID 7279-80.) AMP did not provide dates for thousands of attachments. And if the attachment was not an email, AMP also did not identify the authors for attachments

4

(except in the relatively few instances when that information happened to have been identified within the narrative sentences in the "Privilege Description" column of AMP's logs).

In addition to missing key data needed to evaluate AMP's assertions of privilege, while disputing AMP's ongoing withholding of some Stantec emails, Voith also discovered that AMP had mislabeled whether AMP's log items are attachments. *See* Ex. J (correspondence about inaccurate attachment identifications). AMP sometimes called an item of ESI an "attachment" even though it was not really an attachment, and AMP did not always describe an attachment as an "attachment." (*Id.*)

Early in the meet and confer process, Voith suggested a potential, easy, and partial solution for AMP—export the metadata for the dates and authors and add it to AMP's logs. *See* Oct. 8, 2020, Voith Letter to AMP at 6-7 (attached in Ex. I). AMP, however, refused to do even that, unless and until Voith went first and completed the three-step process for Voith's attachments. *See* Dec. 23, 2020, AMP Letter to Voith at 5 (attached in Ex. I) ("Accordingly, AMP will not agree to a date certain for the mutual exchange of revised privilege logs until Voith has complied with the Court's Order and produced privilege log entries for the remaining attachments that are at issue."). Not only was AMP refusing to address its deficient attachment log entries by undertaking the three-step process itself, AMP would not even export key data which should have been in AMP's log in the first instance, until after Voith had done all of its work. Notwithstanding, Voith undertook to start is work on the three-step process right away, in September 2020. AMP chose to wait.

Voith continued the work it had already begun on Voith's own attachments, employing the three-step process, and Voith continued to ask AMP to do the same and, at the very least, provide the export of metadata for the missing authors and dates. *See* Jan. 14, 2021, Voith Letter to AMP (attached in Ex. I). AMP continued to do nothing, but Voith kept working and provided its log for attachments.

On June 18, 2021, AMP still would not undertake the process for addressing its deficient attachment log entries, but AMP did finally provide some author and date data. *See e.g.* Ex. A. Voith has since reviewed AMP's new data and in the past few weeks has revised the lists of presently disputed items:

5

| Category | Originally Disputed | Revised Disputed |
|---|---|---|
| Attachments | 14,686 | 12,997 |
| Non-Email | 9,842 | 2,316 |

Still, AMP's problems persist.

### B. AMP's "Privilege Descriptions" Still Do Not Describe Privilege.

Even after exporting some metadata, 4,711 of the Attachment items in AMP's logs still do not even identify their author. (Ex. B.) But even the date and author data which AMP had provided for the other disputed attachment items does not solve AMP's problems. More is needed to demonstrate privilege. AMP gave a "Privilege Description" for each. But the descriptions for the disputed items fall well short of showing that the attachments are not discoverable. For example, AMPVOITH020_00213869 is simply: "Attachment discussing acceleration at Meldahl." (Ex. A at Row 3,856.) The disputed attachment log entries listed in Exhibit A readily reveal the systemic problem with AMP's "Privilege Descriptions."

### C. AMP Refused Voith's 3-Step Solution.

AMP should have started and followed the 3-Step Solution Voith developed last Fall, which is more fully described in Voith's October 8, 2020, letter to AMP. (Ex. I.) In Step 1, the party identifies the attachments that had already been produced elsewhere in the party's production in unredacted native form. If the party can confirm to the other that it has already produced a full native copy of records elsewhere in the party's production, then there is no need to log or do anything else in respect to them (because the other party already has the records).

This Step follows the Court's ESI Order, which requires that if an email is privileged "any attachments to the [email] will be produced unless also privileged." (Doc. 38 PageID 454.) It is relatively easy for the parties' ESI vendors to do a search by hash value for the attachments elsewhere in the production to make the confirmation. Voith already did this for its attachments. AMP refuses to do this. This step alone might resolve a material number of the remaining disputed attachment items. Voith eliminated 14,578 of the 20,825 items AMP disputed, just by doing Step One.

In Step 2, the party reviews the remaining attachments to determine whether they could be produced separately from their privileged family members. By definition, none of the attachments that remain for

6

Step 2 have been produced yet (or they would have been eliminated in Step 1). So, unless the remaining attachments themselves are privileged on their own (i.e. "independently privileged" regardless of their association with other family member items), the attachments remaining after Step 1 must be produced to the other party (who has not been given them).

If a party concludes that some of the remaining attachments after Step 1 are not independently privileged, the party does not log anything about them, and instead simply produces them to the other party without metadata information that would identify their association with and identity of their other family members. This helps to protect the producing party from disclosing content about a privileged communication (i.e. the "parent" email) to which the file was attached. Voith did this for Voith's attachments. AMP refuses to do it.

After Steps 1 and 2 are completed, the remaining attachments are records that must be independently privileged in order to be withheld. In Step 3, those remaining attachments get logged with sufficient description to demonstrate privilege. Some of their log description might be provided through metadata, but additional description may be necessary to satisfy the legal standard. Voith has completed this for almost all of Voith's attachments.[10] AMP refuses to do it.

Voith offered this 3-Step Solution early last Fall. But, as shown in the attached meet and confer correspondence on the subject, AMP denied the problems with its log, refused to implement even easy steps to make progress in resolving the parties' disputes, and declined to take action toward resolution unless and until other demands of AMP were satisfied first. (Ex. I.) Voith does not believe this was the cooperation and good faith efforts the Court contemplated when the Court ordered the parties to work together to resolve the attachment issue. AMP has not provided sufficient descriptions of privilege for the disputed items. The Court should compel AMP to produce the disputed attachments.

---

[10] *See* fn 3 *supra*.

**III.     The Disputed AMP Discharge Ring Emails.**

In addition to the problems with AMP's attachments, Voith disputes AMP's continued withholding some items from AMP's discharge ring production. (Exs. C-E.) AMP is withholding 43 items as privileged, but privilege never attached or was waived because these were sent to third parties. (Ex. C.) AMP is also withholding 38 for attorney-client privilege, but attorneys were not parties to these emails. (Ex. D.) The Court should order AMP to produce all of these emails and their attachments.

The remaining 114 emails were exchanged with the project engineer, Stantec (f/k/a MWH). (Ex. E.) Last Summer, the Court ordered AMP to produce emails with Stantec (even if counsel had been included in the communications) because emails with the project engineer are not privileged, and AMP had not shown that Stantec had been specifically retained as a litigation consultant. (Doc. 133 PageID 7771.) Nothing has changed. AMP still has not identified a document through which Stantec was specifically engaged as a litigation consultant, yet AMP refuses to produce emails exchanged with Stantec.

AMP's argument is that these emails "are protected by both the common interest doctrine and joint defense privilege." *See* Meet and Confer Correspondence For Discharge Ring Withholdings (attached as Ex. K) at Jan. 27, 2021, AMP Letter to Voith at 3. AMP relies upon a backdated "Standstill, Tolling and Joint Defense Agreement" (the "JDA") (Doc. 159-2 PageID 8302). But the JDA still does not establish that AMP and Stantec had identified a common legal strategy that they were pursuing. Just the opposite, the JDA expressly leaves that determination for another day (if at all), and even confirms that Stantec and AMP are still adverse to one another with respect to claims involving Voith.

First, while there are several times when the JDA generally and vaguely states that AMP and Stantec have common "interests," the fully integrated document does not state that Stantec and AMP have a common legal strategy, let alone identify one. Instead, the JDA leaves determining whether they share a common legal strategy for another day "if appropriate" at all:

> WHEREAS, Owner and Engineer recognize a commonality of interests in defending against the Voith Claims and intend to cooperate in good faith to investigate, and if appropriate, assert and/or defend claims against and from Voith relating to the Projects;

8

(*Id.*) Although AMP and Stantec said in the JDA that they "intend to cooperate in good faith to investigate" claims involving Voith, the JDA reflects they had not determined if it was yet "appropriate" for Stantec and AMP to "assert and/or defend" together (i.e. share a common legal strategy) in respect to Voith's claims.

Second, the JDA dispels the notion that there is any common legal strategy between AMP and Stantec in respect to Voith's claims because the JDA states that AMP and Stantec remain adverse to each other. The third WHEREAS clause states:

> WHEREAS, pursuant to the Settlement Agreement the Parties have reserved, and not waived or released the Powerhouse Movement Claims, as defined in the Settlement Agreement ("Unresolved Claims");

(*Id.*) AMP and Stantec still have "Unresolved Claims." (*Id.*) The backdated JDA does not protect emails with Stantec, and the Court should compel their production.

**IV.      The Disputed Non-Emails.**

Finally, Voith had identified at least 9,842 non-email items that were missing key information, like the author, date, or recipients of the record, and that fail to demonstrate privilege. *See* Meet and Confer Correspondence For Non-Emails (attached as Ex. L). Voith wrote to AMP about them. (*Id.*) But until just recently AMP refused to provide any dates, authors, recipients, or any other information sufficient to demonstrate that these items are protected from production.

On June 18, 2021, AMP finally provided some exported date, author and file type metadata for these items. (*See e.g.* Ex. F.) But AMP has not provided any revised privilege descriptions, and AMP still has not identified the authors of at least 2,316 of these items. (*Id.*) The Court should compel AMP to produce those items. AMP has not demonstrated they are privileged.

## LAW AND ARGUMENT

A party who withholds records from production on claims of privilege must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privilege or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). The burden of demonstrating the existence of privilege rests on the asserting party. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999); *MA Equip. Leasing I, LLC v.*

9

*Tilton*, 10th Dist. Franklin App. 12AP-564, 2012-Ohio-4668, 908 N.E.2d 1072, ¶ 21. Privilege is waived by voluntary disclosure to third parties. *Dakota*, 197 F.3d at 825; *MA Equip. Leasing I, LLC*, 2012-Ohio-4668, ¶ 25. AMP has not met its burden of establishing that the ESI it is withholding is privileged, and the Court should therefore compel its production. Fed. R. Civ. P. 37(a)(1)(3)(B)(iv).

**I.     AMP's Attachments**

The Court should compel AMP to produce the 12,997 attachments (Ex. A) for which AMP has failed to demonstrate privilege notwithstanding more than 10 months of opportunity following the parties' conference with the Court on this issue.

In its prior decision, the Court referred to legal authorities, and after conferring with the parties further, ordered the parties to work through the issues with each other's attachments. Voith did so in good faith and developed the 3-Step Process described above to resolve the disputes. Instead of working in good faith to resolve its own issues, however, AMP denied problems with its logs, refused to implement the 3-Step Process, insisted that other demands be met before undertaking simple and easy steps to advance resolution, and has unnecessarily delayed implementing anything to correct its deficiencies. (Ex. I.)

As explained in detail above, and as shown by AMP's logs and the attached correspondence, AMP mislabeled whether records are attachments, failed to provide dates of attachments, failed to provide authors of attachments, failed to provide recipients of attachments, and provided poor and insufficient "Privilege Descriptions." While AMP has now belatedly exported some additional information for its attachment log entries, that export has not solved the problems (although it did enable Voith to reduce the list of disputed items).

AMP has not satisfied the legal standards the Court previously cited in its prior decision. (Doc. 133 PageID 7776-80.) Further, AMP's failure to engage in good faith efforts to resolve matters impedes and delays discovery. AMP created log entries for attachments, but no one can tell what most of them even are, let alone determine whether they are privileged, because AMP essentially provided no information about them. Since AMP still has not fixed things, and given the current case schedule, the Court should compel

AMP to produce the disputed records (Ex. A) that AMP labeled "Attachment" but for which AMP has not shown privilege.

## II.     Records AMP Withheld From Its Discharge Ring Production

### A.     Third Party Records

Privilege is waived by voluntary disclosure to third parties. *Dakota*, 197 F.3d at 825; *MA Equip. Leasing I, LLC*, 2012-Ohio-4668, ¶ 25. Forty-three of the disputed emails that AMP has withheld from its discharge ring production involve third parties. (Ex. C.) They must be produced, with their attachments.

AMP argues that they are work product. (Ex. K at Jan. 27, 2021, AMP Letter to Voith at 2.) But AMP has not established that any of the third parties in these 43 emails were specially engaged by AMP as consultants in anticipation of litigation. Because these emails are communications with third parties, the work product protection does not apply, even if these were created by or at the behest of AMP's counsel. *Pravak v. Meyer Eye Group*, Case No. 2:07-cv-2433, 2009 U.S. Dist. LEXIS 136796, at *13-17 (N.D. Ohio Oct. 22, 2009) (communications between objecting party's counsel and third party are not protected work product, and if those communications reflected counsel mental impressions, any protection of those impressions would be waived by sharing them with a third party who was not specially engaged).

For example, AMPVOITH006_01105572 (Ex. C at Row 13) is an email that AMP sent to a third party who built and operates a hydro-electric plant in South America. AMP's log says: "Email prepared during or in anticipation of litigation with Voith and sent to third party with a common interest at the request of legal counsel." Setting aside that it does not describe the subject of the email to help inform why AMP thinks it qualifies as work product, the record cannot be work product because it is not with a specially engaged, non-testifying consultant. AMP has not shown that it hired Santo Antonio Energia (or any of the other third parties involved in the 43 disputed items) as a non-testifying consultant. Voith respectfully requests that the Court order AMP to produce these records and their attachments.

### B.     "Attorney-Client Privileged" Emails Without Attorneys

AMP claims it does not have to produce 38 emails because of the attorney-client privilege, but none of them include counsel. (Ex. D.) Although it is possible that emails that do not include counsel as a sender

11

or recipient may recite within them attorney-client privileged communications (or portions of attorney-client privileged communications), any such portions simply may be redacted. But the 38 emails that Voith presently disputes do not appear to be redactions of such material, and their descriptions do not establish that the withheld records are protected by attorney-client privilege. For example, AMPVOITH027_00126249 is an email from Ms Sullivan (AMP) to Mr. Gerken (AMP). (Ex. B at Row 2.) Neither is an attorney. The description of this assertedly attorney-client privileged email is "Email discussing Smithland flow curtailments." (*Id*.) Nothing about this suggests any attorney is or has communicated anything privileged.

The descriptions for these items do not establish that they are or contain an attorney-client privileged communication. Voith respectfully requests that the Court order AMP to produce them and their attachments.

      **C.**     **Stantec Emails**

The Court previously ordered AMP to produce Stantec emails from AMP's primary document production. (Doc. 133 PageID 7775.) The Court should do the same for the 114 Stantec emails and their attachments which AMP is continuing to withhold from AMP's discharge ring production. They are third party project engineer communications. They are discoverable. AMP's arguments that these emails are protected by the common interest doctrine and the joint defense privilege fail.

      **1.**     **Legal Standards**

"The joint defense or common interest privilege is <u>not</u> an independent basis for privilege but an <u>exception</u> to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party." *N. Am. Rescue Prods. v. Bound Tree Med.*, Case No. 2:08-cv-101, 2009 U.S. Dist. LEXIS 118316, at *20 (S.D. Nov. 19, 2009) (Kemp, M.J.) (emphasis added), *adopted over objections* 2010 U.S. Dist. LEXIS 45302, at *42-43 (S.D. May 10, 2010) (Holschuh, J.). *See also United States v. Suarez*, Case No. 5:13-CR-420, 2014 U.S. Dist. LEXIS 63687, at *17 (N.D. Ohio May 8, 2014) (same). It does not create a privilege on its own, but rather presupposes an otherwise valid privilege already exists, and it applies only as an exception to the rule that disclosure to a third party waives protection. *Id*.

The exception is strictly and narrowly construed. *United States v. Suarez*, Case No. 5:13-CR-420, 2014 U.S. Dist. LEXIS 63687, at *18-19 (N.D. Ohio May 8, 2014) (noting that it only applies "where necessary to achieve its purpose" and it "must be strictly confined" because it is an exception "in derogation of the search for truth") (emphasis added) (quoting *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007)). "The common interest doctrine will only apply where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise." *Id*. (quoting *BDO Seidman, LLP*, 492 F.3d at 815-16).

The parties in a common interest relationship must have "common" (not merely "concurrent") legal (not just commercial) interests. *Libbey Glass, Inc. v. Oneida Ltd.*, 197 F.R.D. 342, 348 (N.D. Ohio 1999). "Thus, the parties must show that the disclosures are made in the course of 'formulating a *common legal strategy*.'" *Id*. (emphasis in original). "Under this approach, communications shared during a business undertaking lose their privileged status, even though such sharing helped address or ameliorate bona fide concerns about the legal implications of some aspect of the business venture." *Id*. Stated differently, "the common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation." *Id*. "Indeed, sharing a desire to succeed in an action does not create a 'common interest.'" *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999).

### 2. The JDA Does Not Establish Joint Defense Or Common Interest Protection.

There is no joint defense between AMP and Stantec. Stantec is not a party defending claims. Moreover, there is no identification in the fully integrated JDA of a single defense that both AMP and Stantec have agreed to jointly pursue, even if Stantec had been a party. In fact, the JDA expressly shows that Stantec and AMP had not decided whether there is any particular defense which they would pursue together:

> WHEREAS, Owner and Engineer recognize a commonality of interests in defending against the Voith Claims and intend to cooperate in good faith to investigate, and if appropriate, assert and/or defend claims against and from Voith relating to the Projects;

13

(Doc. 159-2 PageID 8302.) AMP and Stantec had not decided in the JDA whether it was "appropriate" for them to jointly present any given defense. Moreover, the JDA expressly states that AMP and Stantec "have reserved" claims against each other concerning Voith. (*Id*.)

To be sure, the JDA also recites contradictory and vague assertions like "Owner and Engineer have mutually determined that their respective and common interests will be best served by a common-and-joint defense, and that pursuing an effective joint defense will require them to share and exchange confidential and privileged materials that would otherwise be privilege from disclosure to third parties[.]" (*Id*.) But, again, there is no actual shared defense articulated anywhere in the JDA. In light of the JDA's statement that Stantec and AMP were still determining if there were some actual defenses that would be "appropriate" to assert jointly, and the fact that they remained adverse in respect to Voith's claims, the JDA was just an effort to cloak unprotected communications with a mere incantation of the words "joint defense."

The JDA recites that AMP and non-party Stantec have "common interests" (which are not specifically articulated in the JDA). (*Id*.) But merely having a "common interest" does not satisfy the legal standard for the common interest doctrine. *Libbey Glass, Inc.*, 197 F.R.D. at 348; *Shamis*, 34 F. Supp. 2d at 893. AMP had to show that AMP and Stantec have identified and are pursuing a particular "common legal strategy" (not just a common desire for Voith to not succeed on Voith's claims against AMP or a common desire to establish particular facts). *Id*. The JDA does not establish any common legal strategy.

Moreover, some of the claims between AMP and Voith, such as AMP's claim that the discharge rings are defective, have absolutely nothing to do with Stantec's services, the Settlement Agreement, or JDA. Stantec did not design, manufacture or install the Voith discharge rings, and neither Voith nor AMP have ever asserted that Stantec is liable for the alleged defects in the discharge rings that form the basis for AMP's claims against Voith related to the discharge rings. As a result, Stantec has no interest in those claims at all, let alone a common legal interest with AMP. The emails AMP is withholding are emails from AMP's discharge ring supplemental ESI production. They need to be produced.

The JDA is a backdated record which, at best, generally recites that AMP and Stantec have some vague and undescribed common interests, but it does not demonstrate that AMP and Stantec actually

14

identified a common legal strategy that they were pursuing. Simply wanting Voith to lose on its claims with AMP does not carry the day. The JDA does not prevent waiver of privilege protection for <u>any</u> documents exchanged between AMP and the project engineer, Stantec.

### 3. The Joint Defense And Common Interest Doctrines Do Not Create Privilege.

Even if there were a valid common legal strategy and corresponding agreement between AMP and Stantec (and there is not), the legal doctrines do not create a privilege, but rather simply prevent waiver of a privilege that otherwise independently exists. *N. Am. Rescue Prods.*, 2009 U.S. Dist. LEXIS 118316, at *20; *Suarez*, 2014 U.S. Dist. LEXIS 63687, at *17. If the doctrines applied at all, they do not block discovery of the communications between AMP and Stantec. Instead, they only protect already privileged material.

AMP has completely withheld all parts of communications, and not just the underlying portions that might be protected. And, for the records redacted, the log descriptions are insufficient to establish that the portions redacted are privileged separate from being communicated to a party with whom AMP contends it had a joint defense or common interest agreement.

As an example, AMPVOITH006_01106334 is an email that AMP withheld. (Ex. E at Row 10.) It is from Mr. Panozzo (Stantec) to Mr. Crusse (AMP). (*Id.*) The log description states: "Email prepared during or in anticipation of litigation with relating [sic] to Voith document drawing submission discharge ring finite element analysis [sic]." (*Id.*) AMP's log states this is an "Attorney Client Communication." (*Id.*) Neither Mr. Panozzo nor Mr. Crusse are attorneys. And there is no attorney name referenced, nor does the description suggest there is any legal advice being discussed within this assertedly privileged email. AMP's "Privilege Description" is unclear. But at best it appears to be that the project engineer might be providing AMP with copies of some project records or might be telling AMP about project information. That is not protected. That is simply a communication between a project owner and the project engineer about the project. In any event, Stantec has no interest of its own in the discharge ring disputes anyway, so there is no common legal strategy that Stantec and AMP had agreed to pursue which would prevent the waiver of any protection which results from sharing protected material with third-parties.

Merely reciting the existence of a joint defense or common interest agreement does not *ipso facto* cloak emails between AMP and Stantec with a privilege. AMP has not shown that underlying information in the disputed emails is itself protected, let alone that that protection was not lost by sharing the information with a third-party who had no common legal interest with AMP. The joint defense and common interest rules do not protect the emails and information AMP shared with Stantec. The Court should order them to be produced with their attachments.

**III.    Non-Emails**

Voith disputed AMP's withholding of 9,842 records which AMP withheld from production and which were not emails. (Ex. L.) Not only were AMP's "Privilege Description" for them very poor, but AMP had not even provided key information, like the author, date, or recipients. (*Id*.) One could not even tell what kind of document or file had been withheld, because AMP had used very generic descriptors like "Draft" or "Document." (*Id*.)

Voith wrote to AMP about them on January 14, 2021. (*Id*.) In response, AMP appeared to acknowledge at least the obvious problems of lack of author and date information, and agreed there was a way it might have at least been partially fixed by simply providing an export of metadata for the records. (*Id*.) However, AMP declared AMP would not provide the information until Voith "first produce[s] a log of its attachments (with the additional metadata fields)". (*Id*.) AMP would not even take the step of exporting key missing data, let alone address the problem with its Privilege Descriptions.

AMP decided it would gain a tactical advantage by only addressing and correcting its problems if it first got something AMP wanted from Voith (i.e. an updated privilege log in respect to Voith's email attachments). That was not an appropriate way to address and resolve discovery issues. Discovery is not a two-way street; it is two one-way streets. One party's compliance with discovery is not contingent on the other party's compliance, and, therefore, it was entirely inappropriate for AMP to refuse to comply with its discovery obligations until Voith performed as AMP demanded. That said, and as explained above, Voith worked diligently on its attachments log, and recently produced it to AMP.

On June 18, 2021, AMP finally added date and author and file type data to its logs.[11] But AMP still has not addressed its deficient Privilege Descriptions, and the additional data is often unclear. For example, much of the author data are numbers or initials or usernames which do not clearly identify the person to whom they belong. The data provided reveals that Voith had good reason to dispute these items. For example, AMP withheld, as privileged, things authored by third parties, like Voith and by Stantec. *See e.g.* AMPVOITH006_00991685 (authored by Mr. McCarthy at Voith) (Ex. M at Row 7746); AMPVOITH020_00000833 (authored by Mr. Scheel at Stantec) (*Id.* at Row 8,101); AMPVOITH006_00991677 (authored by Mr. Blaszcyk at Stantec) (*Id.* at Row 7,738). Moreover, AMP still has not provided author data for 2,316 items. (Ex. F.)

AMP's exported data has not backfilled all of the holes in AMP's log entries which prevent finding that AMP has established that the items on the log are privileged. Given AMP's delay in providing even that data (which should have been provided by AMP long ago, but which AMP refused to give until just a couple of weeks ago), Voith has only had limited time to reassess what few holes AMP might have managed to fill. However, since AMP still has not even provided the author information for 2,316 of the disputed items, the Court should order AMP to produce those records now.

As to the remaining disputed items, the Court should order AMP to confer in good faith with Voith about which of those deficient entries have not been resolved. In the course of conferring, AMP should be required to disclose information in its possession about the identities of the authors reflected in the metadata coding which AMP just now provided.

## **CONCLUSION**

For the foregoing reasons, Voith respectfully requests that the Court find that AMP has failed to demonstrate that the disputed items AMP is withholding are privileged, and order AMP to:

1. Produce the disputed attachment items (Ex. A);
2. Produce the 43 emails with third parties withheld from AMP's discharge ring production (Ex. C);

---

[11] A copy of a spreadsheet of AMP's revised log entries for the non-email items is attached as Exhibit M.

3. Produce the 38 e-mails without attorneys withheld from AMP's discharge ring production as attorney-client privilege communications (Ex. D);

4. Produce the 114 emails with Stantec withheld from AMP's discharge ring production (Ex. E);

5. Produce the 2,316 non-email items for which AMP has not identified the author or provided a description which establishes privilege (Ex. F); and

6. Order AMP to continued to meet and confer on the remaining, disputed non-email records.

Respectfully submitted,

/s/ John B. Kopf
Kimberly E. Ramundo (0066570)
Daniel M. Haymond (0062152)
John B. Kopf (0075060)
THOMPSON HINE LLP
41 South High Street, Suite 1700
Columbus, Ohio 43215
Kim.Ramundo@ThompsonHine.com
Dan.Haymond@ThompsonHine.com
John.Kopf@ThompsonHine.com
(614) 469-3300
(614) 469-3361 (fax)

*Attorneys for Defendant Voith Hydro, Inc.*

## CERTIFICATE OF SERVICE

I certify that on July 9, 2021, a copy of the foregoing, *Defendant Voith Hydro, Inc's Motion to Compel ESI Production*, was served electronically through the Court's CM/ECF system upon the following:

David J. Butler, Esq. (dbutler@taftlaw.com)
Michael K. Robertson, Esq. (mrobertson@taftlaw.com)
Taft Stettinius & Hollister, LLP

Judah Lifschitz, Esq. (lifschitz@slslaw.com)
Gregory S. Seador, Esq. (seador@slslaw.com)
Laura C. Fraher, Esq. (fraher@slslaw.com)
Kelley J. Halliburton, Esq. (halliburton@slslaw.com)
Shapiro, Lifschitz & Schram

/s/ John B. Kopf
*One of the Attorneys for Defendant
Voith Hydro, Inc.*

18