**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **AMERICAN MUNICIPAL POWER, INC.** | : |
| | : |
| Plaintiff, | : **Case No. 2:17-cv-00708-ALM-EPD** |
| | : |
| v. | : **CHIEF JUDGE ALGENON L. MARBLEY** |
| | : |
| **VOITH HYDRO, INC.,** | : **MAGISTRATE JUDGE DEAVERS** |
| | : |
| Defendant. | : |

## OPINION & ORDER

This matter comes before the Court on Defendant's six Motions for Partial Summary Judgment (ECF Nos. 257, 258, 259, 260, 262, and 263). In addition to providing responses to the Defendant's several motions, Plaintiff filed its Motion for Partial Summary Judgment (ECF No. 275). Parties were heard on their opposing motions on Monday, September 12, 2022. Defendant's First and Fourth Motions for Partial Summary Judgment (ECF no. 257, 260) is **GRANTED**, while Defendant's Second, Third, Fifth, and Sixth Motions for Partial Summary Judgment (ECF Nos. 258, 259, 262, and 263) are **DENIED**. Plaintiff's Motion for Summary Judgment (ECF No. 275) is **GRANTED in part and DENIED in part**.

### I.    BACKGROUND

#### A.  Factual Background

This matter is a diversity lawsuit stemming from a contract dispute between Plaintiff American Municipal Power, Inc. ("AMP") and Defendant Voith Hydro, Inc. ("Voith"). AMP is a wholesale power supplier that started building four hydroelectric power plants along the Ohio River in the mid-2000s. (ECF No. 275 at 17–18). The power plants are as follows—one at the

Cannelton Locks and Dam near Hawesville, Kentucky ("Cannelton"); one at the Smithland Locks and Dam near Smithland, Kentucky ("Smithland"); one at the Captain Anthony Meldahl Locks and Dam near Foster, Kentucky ("Meldahl"); and one at the Willow Island Locks and Dam near New Martinsville, West Virginia ("Willow Island"). (*Id.* at 18). The instant litigation arises from the design and construction of these Projects, centered primarily around the Cannelton Project.

Voith is a self-described "global supplier of hydroelectric equipment, technology and services" that "designs, manufactures and supplies hydropower equipment and services for hydropower plants around the world." (ECF No. 32-1 ¶ 3). AMP hired Defendant Voith in 2007 to design, manufacture, and supply the required equipment (including turbines, governing system, and generators) and associated services (such as submitting technical drawings and other information for proper installation) for all four Projects. (ECF No. 275 at 18). AMP also hired MWH Americas, Inc., ("MWH") to serve as the Engineer of Record on the Projects. (*Id.*) AMP entered into four contracts—one for each Project—with a contractor ("Installation Contractor") responsible for building the power plants into which Voith's turbine and generator equipment would be installed and for providing the labor to install the equipment consistent with Voith's instruction and oversight. (*Id.*)

The contracts for Cannelton, Smithland, and Willow Island were executed on June 6, 2008, and the contract for Meldahl was executed on March 12, 2009 (collectively, the "Contracts"). (ECF No. 240 ¶¶ 1–2). Each contract contained the same material provisions. The Contracts had a combined initial Contract Price totaling approximately $415 million. (*Id.*). The figure for the current approved Contract Prices stands at nearly $442 million after accounting for various adjustments in the Contracts. (*Id.* ¶ 3)*. AMP has paid Voith the value of the current approved Contract Price minus $33,017,353, which it has withheld subject to the Court's future

determination in this case. (*Id.* ¶ 5). On March 11, 2022, the parties jointly stipulated that the Contractor Liability Limits (set out in Articles 5.2.1, 5.2.2 and 5.2.3 of the Contracts) and the Owner Liability Limits (set out in Article 5.1.1 of the same) of the Contracts will apply without exception to the Parties' damage claims, such that the Contractual Price Liability Limits of the Contracts will be based upon the final Contract Price of the Contracts as determined at trial. (*Id.* ¶ 6–8).

On June 6, 2008, the parties agreed on the duties that would constitute Voith's agreed responsibilities within the Contracts' "Work" sections, located in Section 1.01.A.60 of the Contracts' General Conditions ("GC"). (ECF No. 1 ¶ 19). The Contracts also provide deadlines ("Milestones") pursuant to which Voith was obligated to perform. (*Id.* ¶ 20). If Voith missed the Milestones, it would be liable to AMP for liquidated damages. (*Id.*). The Contracts further provide that Voith warrants that its Work, including the Voith Equipment, will conform to the Contracts and be free of defects in workmanship and material. (*Id.* ¶ 24). The Contracts also warrant that all of Voith's services included within the Work will be performed in accordance with their provisions. (*Id.*).

Excavation and construction on the Cannelton Hydro Project began in 2009; it reached full commercial operation in June 2016. (*Id.* ¶ 9). Excavation and construction on the Meldahl Hydro Project began in August 2011; it reached full commercial operation in April 2016. (*Id.* ¶ 10). Excavation and construction on the Willow Island Hydro Project began in September 2010; it reached full commercial operation in February 2016. (*Id.* ¶ 11). Excavation and construction on the Smithland Hydro Project began in December 2009; it reached full commercial operation in September 2017. (*Id.* ¶ 12).

According to AMP, Voith's performance was less than satisfactory in completing the aforementioned projects. Voith allegedly committed the following errors with respect to its Work with AMP: (i) "delivering drawings and equipment late and out of sequence"; (ii) "delivering defective, incomplete and uncoordinated drawings and defective installation instructions"; (iii) "delivering defectively manufactured guide bearings and discharge rings"; (iv) "defectively designing and/or manufacturing equipment and equipment components"; (v) "delivering equipment that was not completely and/or properly manufactured and required significant additional field work to install"; (vi) "failing to deliver 'Category C' parts necessary for Voith Equipment assembly"; (vii) "failing to timely and completely address installation issues with the Voith Equipment, including but not limited to, failing to timely and completely address turbine alignment issues"; (viii) "failing to provide check sheets consistent with the Contracts' specifications"; (ix) "refusing to promptly and accurately address problems with the Voith Equipment"; (x) "failing to maintain a consistent executive and project management team and site representatives who were informed and prepared to address ongoing issues"; and (xi) "causing substantial delay and damage to the Hydro Projects, all in material breach of the Contracts." (*Id.* ¶ 28).

AMP withheld "approximately $40 million" in payments due to Voith under the Contract to offset Voith's alleged material breaches of the Contracts, which caused damages and delays, "including, *inter alia*, millions of dollars in additional costs of installation, construction and engineering, liquidated damages, lost power production and other costs and damages." (*Id.* ¶¶ 46–47). AMP then filed suit.

### B. Procedural Background

AMP filed the present action on August 14, 2017, alleging eight counts—the first four alleging breaches of contract with respect to each of the four projects at issue and the last four alleging breach of warranty claims. (ECF No. 1). In turn, Voith filed a counterclaim with its answer (ECF No. 22) alleging that AMP agreed to pay Voith a lump sum for each Hydro Project, which included the costs of designing, manufacturing, and supplying the equipment and the costs for startup, testing the equipment, and training AMP personnel. (*Id.* ¶ 15). The Contracts also provided allowances for each Project against which Voith could bill for its oversight of the assembly and installation of the equipment. (*Id.* ¶ 21). During the projects, the parties entered into other Memoranda of Understanding ("MOU") and updated agreements. (*Id.* ¶ 28). Voith now alleges that AMP has failed to comply with its contractual obligations such that Voith cannot realize the bargained-for economies of scale, and that AMP's conduct deprived Voith of the benefit of its bargain on the Hydro Projects. (*Id.* ¶ 30). In its counterclaim, therefore, Voith asserted breach of contract for the withheld payments and unjust enrichment. (*Id.* ¶ 75–90).

Following several years of discovery, Voith filed the first of six motions for partial summary judgment on April 4, 2022. (ECF No. 257). AMP filed its Motion for Partial Summary Judgment on the same date. (ECF No. 275). The parties argued their summary judgment motions before the Court on September 19, 2022, (ECF No. 370), and the motions are now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). This Court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). And "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," but evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment carries the initial burden of presenting this Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see Anderson,* 477 U.S. at 250.

In considering the factual allegations and evidence presented in a motion for summary judgment, this Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III.    LAW & ANALYSIS

The district court should not award summary judgment when there exists a "genuine issue of material fact regarding ambiguous terms in the contract." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008). In those instances, "a jury and

not a judge must consider extrinsic evidence when the contract's language does not make clear the intent of the parties." *Id.* Both parties contend that the clear and unambiguous meanings of the disputed contractual terms support their readings. As the Sixth Circuit has held, "[c]ontract language is ambiguous if it is subject to two reasonable interpretations." *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996). The Court must first determine that a contract provision is ambiguous before "it may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence." *Id.* This Court "may not, however, use extrinsic evidence to create an ambiguity," *id.*; instead, "the ambiguity must be patent; that is, apparent on the face of the contract." *Id.*

In Voith's six motions for partial summary judgment, it groups AMP's eight claims into six "categories":

- Future costs in the amount of $53,000,000 to design, manufacture and install new discharge rings in AMP's plant machinery to replace the 11 allegedly defective discharge rings that are currently in use at each of the projects ("Discharge Ring Claims");

- Liquidated damages in the amount of $11,664,026 for Voith's allegedly late equipment deliveries on the Cannelton project ("Late Equipment Claims");

- Payments that AMP made to its installation contractors due to delays on the projects allegedly caused by Voith and for which it seeks reimbursement in the amount of $8,517,962 ("Delay Damages Claims");

- 109 individual "additional work" claims in the total amount of $4,226,475, which AMP contends it paid to its installation contractors pursuant to Potential Change Order claims ("PCOs") due to defects in Voith's Work ("Additional Work Claims");

- 281 individual "defective work" claims in the total amount of $14,611,632, which AMP contends it paid to its installation contractors pursuant to PCO claims ("Defective Work Claims"). This category includes a subset of 69 PCO claims totaling $10,026,011 that AMP alleges are related to alignment issues ("Alignment and Tolerance Claims");

- Liquidated damages in the amount of $21,863,076 for Voith's allegedly late submittals of various drawings, instructions, and related information enabling AMP to install and use Voith's supplied equipment ("Late Submittals Claim").

(ECF No. 257 at 1–2).

In turn, AMP affirmatively argues that it is entitled to summary judgment in its favor on all of the claims that Voith disputes in its six motions for partial summary judgment. AMP's motion further seeks summary judgment with respect to the following of Voith's counterclaims:

- $5,590,870 for the difference between Voith's purported costs of providing field service work on the Projects and the current Field Service Allowance as allegedly approved by the parties through purported Change Orders ("FSA Claim").

- $4,478,175 in additional compensation for purported "extra work" performed under Work Change Directives issued by AMP ("Work Change Directive Claim").

- $19,462,886 for various other Change Requests Voith submitted during the course of the Projects ("Change Request Claim").

(ECF No. 275 at 11–12). Voith asserts for most of its claims that the relevant Contract provisions are unambiguous; thus, there is no genuine dispute of material fact concerning whether Voith is liable for AMP's asserted claims. In the alternative, Voith asserts that AMP has not put forth evidence to rebut Voith's evidence demonstrating that it is not liable for AMP's claims.

AMP's assertions in its Motion for Partial Summary Judgment follow the same general structure. This Court first addresses each of Voith's Motions for Partial Summary Judgment in turn, then discusses AMP's Motion for Summary Judgment.

### A. Voith's Motions for Partial Summary Judgment

### 1. The Discharge Ring Claims

In Voith's first Motion for Partial Summary Judgment, Voith seeks summary judgment in its favor concerning AMP's claim for future costs incurred from Voith's alleged act of providing AMP with defective discharge rings ("the Discharge Ring Claims"). AMP's allegations in its Complaint (ECF No. 1) can be summarized as follows. AMP asserts its claims under both a breach of contract theory and a breach of warranty theory. Under the Contracts, Voith was required to design, manufacture, and deliver a total of 11 turbine and generator units to the four plants and to provide oversight and technical advice to installation contractors that AMP hired directly to construct the power plants and to install the Voith equipment in those power plants. AMP's claims are based in part on the contention that the discharge rings within the turbine and generator units were defectively designed and/or manufactured. Therefore, AMP's claimed damages of approximately $53,000,000 are based on the amount that it contends it would cost to design, manufacture, and install the new replacement rings. The parties agree that the discharge rings fall under the warranty process in Section 5.09 of the General Conditions, but dispute the meaning and application of that section, in particular subsections G-L.

### a. Voith's Argument

Voith argues the following. First, AMP cannot sustain its breach of contract claim because Section 5.09 limits its remedies to the contents therein—and AMP did not fulfill the necessary

conditions of providing Voith the opportunity to resolve the issue as required before fixing it themselves. Section 5.09.F unambiguously bars AMP's desired relief given that the remedies contained therein are "expressly in lieu of all other warranties, express or implied." Section 5.09.F provides the following:

> THE WARRANTIES UNDER PARAGRAPHS 5.09.A, 5.09.B, 5.09.C, AND 5.09D ARE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED. All other warranties, including but not limited to any implied warranties of merchantability and fitness of use, and warranties arising from course of dealing and usage of trade ARE HEREBY EXCLUDED AND DISCLAIMED. THE WARRANTIES UNDER PARAGRAPHS 5.09.A, 5.09.B, 5.09.C, AND 5.09.D CONSTITUTE THE ONLY WARRANTIES OF THE CONTRACTOR WITH RESPECT TO THE WORK.

(*Id.*). If Voith breaches either of those warranties, AMP is required to provide written notice of the breach under Section 5.09.G,[1] and Voith is then required by Section 5.09.H[2] to remedy such nonconforming Work by adjustment, repair, or replacement of the item at its own cost. Under Section 5.09.I,[3] AMP can correct the defective work itself only if Voith fails to correct it; in that case Section 5.09.K[4] allows AMP to recover the "reasonable" costs to repair or replace defective

---

[1] Section 5.09.G provides:
> The Owner shall within a reasonable time notify Contractor in writing of a breach of the Contractor's warranties, and the Contract shall, at its sole cost, promptly (a) investigate the non-conforming Work and (b) provide to the Engineer a schedule for the correction of it.

(*Id.* at 26).

[2] Section 5.09.H provides:
> In the case of a breach of the warranty described under Paragraph 5.09.C or 5.09.D, the Contractor shall:
> 1. At its sole cost, remedy such non-conforming Work by, at the mutual agreement between Owner and Contractor, adjustment or repair or replacement of the item, and any other affected part of the Work, or by re-performance of the service, or in the case of Work covered by the performance guarantees described under Agreement Sections 4.3 and 4.4 by payment of the associated liquidated damages or the parties may agree that the Owner will accept the non-conforming Work under the conditions of paragraph 8.03(D).

(*Id.*).

[3] Section 5.09.I provides:
> At all appropriate times throughout the performance of the Work, the Contract must contact, meet, consult, and otherwise coordinate with the Owner, the Engineer, and others for the purpose of facilitating the Project's design and execution of the Work.

(*Id*).

[4] Section 5.09.K provides:
> If the Owner corrects non-conforming Work as described under Paragraph 5.09.I or 5.09.J, the Owner may deduct from the Contract Price all of the reasonable costs described under Paragraph

work itself, but only if AMP takes steps to repair or replace the work and actually "incurs" costs in doing so. Finally, Section 5.09.L[5] clearly and unambiguously states that the remedies specified in Section 5.09.H are AMP's "sole and exclusive remedy" for breach of the relevant warranties.

When AMP gave Voith notice of a crack in the discharge rings, Voith pursued correction of that work at its own cost. Voith argues that AMP was required to incur costs in connection with replacing the discharge rings as a condition precedent to reimbursement from Voith. *See Ramsey v. Penn Mut. Life Ins. Co.,* 787 F.3d 813, 822 (6th Cir. 2015) ("Ohio law defines a condition precedent as 'one that is to be performed before the agreement becomes effective. It calls for the happening of some event, or the performance of some act, . . . before the contract shall be binding on the parties.'"). Second, AMP's breach of warranty claims also fail because it has presented no evidence that it has suffered any damages from the allegedly defective rings—AMP never corrected any of the allegedly defective rings nor incurred costs from doing so.

Beyond this, Voith suggests that AMP cannot prove that the exclusive warranty remedy failed of its essential purpose because a remedy can only fail of its essential purpose if the buyer did not fully avail itself of the remedy. *See Siriano v. Goodman Mfg. Co., L.P.*, No. 2:14-cv-1131, 2015 U.S. Dist. LEXIS 191458, at *28 (S.D. Ohio Aug. 18, 2015). AMP did not do so here because it did not correct the Work and then seek reimbursement.

---

5.09.H that the Owner incurs to correct the defective Work. If those costs exceed the unpaid balance of the Contract Price, the Contractor must immediately pay the difference to the Owner.
(*Id.*).
[5] Section 5.09.L provides:
    Paragraphs 5.09.G, 5.09.H, 5.09.I, 5.09.J, [and] 5.09.K…
        2.   Describe the Owner's sole and exclusive remedy for a breach of the warranties described under Paragraph 5.09.C and 5.09.D whether in contract or in tort or under any other legal theory, and whether arising out of warranties, representations, instructions, installations or defects from any cause…
(*Id.* at 26–27).

### b. *AMP's Response*

AMP pursues two independent causes of action to recover the full cost of replacement for the defective rings: (1) it is entitled, under the warranty provision of the Contracts to recover the full cost of replacement of the rings which cannot be repaired to meet contractual requirements; and (2) AMP is entitled to compensatory damages in an amount equal to the full cost of replacing the defective discharge rings given that Voith materially breached the Contracts by providing the defective rings. Voith materially breached both its contractual obligation to deliver the specified discharge rings and its warranty under the Contracts that its Work would not be defective.

AMP argues that *Mead Corp. v. ABB Power Generation, Inc.,* 319 F.3d 790 (6th Cir. 2003), stands for the proposition that, "breach of contract should be generally available to plaintiffs as an alternative theory of recovery [to breach of warranty]." *Id.* at 793. Thus, AMP argues, the existence of the warranty as an additional remedy available to AMP would only preclude AMP's breach of contract claim for Voith's failure to repair the discharge rings to meet contractual requirements or to otherwise reimburse AMP if the warranty "state[d] an exclusive remedy" or "limit[ed] the plaintiff from claiming damages as the result of faulty work or materials." *Id.* at 796. According to AMP, the warranty at issue here does neither. In the alternative, AMP argues that it is entitled to recover money damages under a "repair or replace warranty" theory, *See* Ohio Rev. Code §§ 1302.88–1302.89, 1302.93, because Voith has not and cannot repair the rings.

With respect to the first cause of action, AMP argues that its warranty claim is not subject to dismissal because Voith materially breached its obligation under Section 5.09.H.1. by failing to repair properly the defective discharge rings, an independent breach of contract in itself. Voith has acknowledged that the rings have repeatedly cracked; thus, whether Voith has repaired the rings or if it can do so at all is an issue precluding summary judgment. But AMP is entitled to recover

from Voith the full cost of replacing the discharge rings if AMP proves Voith did not or could not repair them. Voith argues by expert testimony that it has made the repairs and has produced proof in the record showing the repeated repairs.

Concerning the second cause of action, AMP argues that the Contracts do not make AMP's actual completion of the repairs a condition precedent to Voith's obligation to pay to replace them under the warranty. The warranty provides instead that, when Voith fails to repair, AMP "may correct the non-conforming Work without giving further notice to the Contractor," (ECF No. 1-1 at 26), and AMP may deduct from the Contract Price all reasonable costs incurred to correct the defective Work. (ECF No. 1-1 at 26). But the provision of GC 5.09.K, which states that "[i]f the Owner corrects non-conforming Work . . . the Owner may deduct from the Contract Price all of the reasonable costs described under GC 5.09.H that the Owner incurs to correct the defective Work," does not require AMP to incur costs to fix the issue when Voith fails to repair or replace. Further, AMP argues that it can show that it suffered damages from Voith's defective rings cracking thirty-four times to date. AMP will also produce at trial evidence of the estimated costs to replace the discharge rings.

### c.  This Court's Findings

The Court **GRANTS** summary judgment to Voith on the Defective Rings Claims. Under Ohio law, the Court must first determine the existence of the actual fact of damage before assessing the amount of damage. *City of Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St. 3d 65, 68, 521 N.E.2d 814, 818 (1988) (holding that, "in order for a plaintiff to recover [damages] in a breach of contract action that amount . . . as well as their existence, must be demonstrated with reasonable certainty."). Section 5.09.F unambiguously provides that the warranties as provided under Sections 5.09A, 5.09B, 5.09C, and 5.09D are the exclusive and sole warranties concerning these claims. To

13

be clear, AMP's breach of contract and breach of warranty claims do not rest on Sections 5.09A, B, C, or D.

Section 5.09.K states that "[*i*]f the Owner corrects non-conforming Work as described under Paragraph 5.09.I or 5.09.J, the Owner may deduct from the Contract Price all of the reasonable costs described under Paragraph 5.09.H that the Owner incurs to correct the defective Work." The effect of the term "if" is to "impose[] a condition on" the following terms. *See Dodd v. United States,* 545 U.S. 353, 358 (2005) (finding that "the definition of 'if' is 'in the event that' or 'on condition that.'"). The word "if" thus carries the same function as other words that Ohio courts have found indicative of conditional language such as "condition," "conditional," "contingent," "subject to," and "unless." *See Grigoryan v. MaxOut Sports, L.L.C.*, 2017-Ohio-6982, 94 N.E.3d 1214, 1221, ¶ 26 (8th Dist.); *accord Campbell v. George J. Igel & Co.*, 2013-Ohio-3584, 3 N.E.3d 219, 225, ¶ 19 (4th Dist.). And "[a] condition precedent is a condition that must be performed before obligations in a contract become effective." *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 140 Ohio St. 3d 193, 198, 2014-Ohio-3095, 16 N.E.3d 645, 650, ¶ 18.

The Court thus finds that Section 5.09.K is unambiguous that the Owner must actually "correct[] [the] non-conforming Work" before it may deduct "all of the reasonable costs . . . Owner incurs to correct the defective Work." To this point, the record does not show that AMP demonstrated that it incurred costs to correct the defective Work. Having failed to demonstrate that it fulfilled the condition precedent of incurring costs to correct the Work, AMP cannot demonstrate that Voith had any obligations at all to reimburse. As such, summary judgment in Voith's favor is warranted as to AMP's claim for $53,000,000 in alleged replacement costs.

14

## 2. The Equipment LD Claim

### a. *Voith's Argument*

In Voith's second Motion for Partial Summary Judgment (ECF No. 258), Voith seeks summary judgment in its favor concerning AMP's claim for liquidated damages due to Voith's late delivery of equipment ("Equipment LD Claim"). Voith argues that damages in breach of contract actions require that there be actual harm and it is uncontested that Voith's equipment deliveries did not delay the Project and did not cause any actual harm. Voith contends that the relevant delivery obligations and dates were established by Cannelton Contract Section 3.2 (ECF No. 1-1 at 4), as modified by the parties' May 2012 Memorandum of Understanding ("MOU") (Butler Decl., Ex. 33).

AMP entered into separate contracts for the supply of the turbine and generator equipment to be installed at each of AMP's four power plants. Voith's Work included shipping and delivering the equipment components to the Cannelton site, as provided in Section 1.01.A.60. The Cannelton Contract provided for liquidated damages if Voith missed an Equipment Delivery Milestone date. Voith does not dispute that it delivered at least some of the components late. The Milestones were modified on several occasions via Change Orders. As relevant here, the parties executed Change Order 20 with an MOU attached in May 2012. (ECF No. 258-8). Attached to the MOU was the "TKB Structure Table," which broke down the Equipment Delivery Milestone table into individual components. The MOU included a section entitled "Settlement Terms," in which "[b]oth [p]arties agree to work together and finalize the TKB Structure Tables which will form the basis for the amended schedule in the Change Orders[.]" The MOU also contained language concerning liquidated damages for equipment deliveries. Voith argues that Change Order 20 settled all claims over previous late deliveries and required the parties to work together to agree on new delivery

dates for the remaining components. The parties never executed a subsequent change order with finalized dates. Voith attributes this to the Installation Contractor being behind schedule and subsequently repeatedly changing the schedule for the work, impacting its need for various equipment.

Voith argues that the liquidated damages provision as established by Section 3.2 of the Cannelton Contract is an unenforceable penalty because it does not represent actual damages. First, Voith argues, the only reasonable interpretation of the contract as modified by the MOU is that liquidated damages are assessed only if the equipment delivery delays the critical path of the project. On Voith's read, Section E of the MOU uses clear language—the TKB Structure Tables were to be finalized in the future to form the basis for change orders for all four projects, including Cannelton. Reading the "Equipment Delivery Liquidated Damages" section of Change Order 20 (ECF No. 258-8) confirms, according to Voith, that liquidated damages for equipment deliveries on all projects were only triggered if there was a critical path delay and no concurrent delay by the installation contractor.

Voith asserts that AMP never disputed that there was no critical path delay from the late deliveries, nor that Voith was coordinating deliveries to meet the contractor's schedule with the knowledge and approval of AMP and its representative, MWH. Further, AMP has not adduced any evidence demonstrating that the equipment deliveries delayed the critical path of the project, so there is no basis on which to conclude that a critical path delay occurred that would warrant imposing liquidated damages. Voith cites as evidence deposition testimony from a contractor that he informed AMP repeatedly between 2012 and 2017 that "[l]iquidated damages for late deliveries are $21,000 for each day after the Contract Delivery Date provided the delay is impacting a critical path activity on the Project construction schedule." (ECF No. 212-6 at 134:6–136:25).

16

Second, Voith suggests that AMP adduced no evidence that there was not a concurrent delay by the installation contractor. And the second sentence of the relevant MOU provision states that "[n]o LDs will be due from Voith in the event there is a concurrent delay by the GC and Voith at the time of delivery by Voith." (ECF No. 258-8). Third, the equipment delivery liquidated damages provision of the Cannelton Contract is an unenforceable penalty because it seeks to charge Voith $21,000 per day, regardless of whether equipment deliveries delayed final completion of the project. But, says Voith, it is inappropriate for an owner to assess liquidated damages when the owner or someone for whom he is responsible is a cause of delay.

Besides, according to Voith, the only evidence that AMP suffered any damage at all is expert Ken Fisher's testimony that those damages represent one day of lost ability to generate power. But since power can only be generated once the plant was complete, the deliveries would have had to cause a delay to the final completion of the project, which they did not. And there can be no damages for a breach of contract where there is no demonstrable harm resulting from the breach. *Kline v. Mortg. Elec. Sec. Sys.*, 154 F. Supp. 3d 567, 604 (S.D. Ohio 2015) ("Under Ohio law, there can generally be no viable action for breach of a contract where the plaintiff cannot show that it has suffered damages flowing from the alleged breach." (citations omitted)). As such, there is no basis on which to assess liquidated damages.

### b. AMP's Response

AMP responds that Change Order 20 in fact documented the parties' agreement to replace the original table with the "TKB Structure Table." The MOU was not an "agreement to agree" on Equipment Delivery Milestones—Change Order 20 expressly provided that the TKB Table now established the new Milestones. Further, the original Milestones were in large part unchanged after the execution of the MOU. The parties did discuss potential future modifications to the

17

Milestones—but, as Voith acknowledges, this was never executed. None of the discussions between parties' representatives on coordination of deliveries constituted a Modification cognizable under the Contract. Although AMP never asserted a Late Equipment Claim during the course of the project, AMP claims that the Contracts do not require it to do so for such a claim to be valid. Section 3.9[6] of the Agreement reads in part: "[i]n addition to other rights that the Owner may have relative to liquidated damages, the Owner may deduct liquidated damages from the Contract Price as the damages accrue provided notice of Owner's intent to do so has been given to the Contractor." (ECF No. 1-1 at 5–6). Section 14.19 of the Cannelton Contract also includes a "No Waiver" clause that provides:

> The failure of the Owner . . . to insist in any one or more instances upon the strict performance of any one or more of the provisions of the Contract or to exercise any rights under the Contract . . . will not be construed as a waiver or relinquishment of that provision or right or of the right to subsequently demand strict performance or exercise the right and the rights will continue unchanged and remain in full force and effect.

(ECF No. 1-1 at 53). AMP did not need to withhold money from Voith during the project for late equipment deliveries to retain the right to do so.

AMP posits that the only material fact is the terms of the parties' Contract. First, Section 3.2 of the Cannelton Contract is unambiguous that liquidated damages are assessed for late equipment deliveries regardless of the impact on the project construction schedule;[7] this was not

---

[6] Section 3.9 provides:
"In addition to other rights that the Owner may have relative to liquidated damages, the Owner may deduct liquidated damages from the Contract Price as the damages accrue provided notice of Owner's intent to do so has been given to the Contractor. If payment then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor must immediately pay the difference to the Owner."
(ECF No. 1-1 at 5).

[7] Section 3.2 provides:
If the Contractor fails to achieve one or more of the Equipment Delivery Milestones (adjusted as provided in the Contract), the Owner and Contractor acknowledge that it would be difficult, if not impossible, to determine the actual damages to the Owner. Consequently, the Owner and the Contractor agree that as liquidated damages and the Owner's sole and exclusive remedy, but not as

changed by the MOU because that only tied late equipment liquidated damages to a critical path delay for the other three projects. Second, according to AMP, the liquidated damages provision in this Contract are enforceable under the test provided in *Samson Sales, Inc. v. Honeywell, Inc.* because (1) the damages are "uncertain as to amount *and* difficult of proof"; (2) "the contract as a whole is not so manifestly unconscionable, unreasonable, and *disproportionate in amount* as to justify the conclusion that it does not express the true intention of the parties"; and (3) "the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof." 12 Ohio St. 3d 27, 28, 465 N.E.2d 392, 394 (1984). Further, argues AMP, the parties here are equally sophisticated and the evidence shows that AMP considered multiple types of probable damages that would result from late equipment deliveries when establishing the liquidated damages rate. Third, AMP contends that this Court must disregard Voith's extrinsic evidence because the contracts are unambiguous. Lastly, AMP argues that it was not required to rule out concurrent delays because Section 3.2 of the Cannelton Contract renders Voith liable for liquidated damages when it "fails to achieve one or more of the Equipment Delivery Milestones" regardless of concurrent delays to the Project schedule. (ECF No. 1-1 at 4).

### c.  This Court's Findings

The Court **DENIES** Voith's Second Motion for Partial Summary Judgment. The "Equipment Delivery Liquidated Damages" section of the MOU is unambiguous. Although it is true that the MOU provides that "[n]o LDs will be due from Voith in the event there is a concurrent delay by the GC [General Contractor] and Voith at the time of delivery by Voith," Voith has the

---

a penalty, the Contractor must, at the Owner's option, pay to or credit the Owner $21,000 per day for each day after the expiration [of] the associated Contract Time that the Contractor fails [to] achieve an Equipment Delivery Milestone.
(ECF No. 1-1 at 4).

responsibility of affirmatively proving that there was a concurrent delay to avoid liability—as opposed to AMP having the burden to prove that there was not. But the Court finds that there is a genuine dispute of material fact concerning whether there was indeed a concurrent delay within the meaning of the Contracts. Voith alleges that it had to coordinate deliveries with AMP to meet the installation contractor's changing schedule, causing some of the delays. AMP disputes that this was a contributor to the delay. As such, whether there existed a "concurrent delay" such that Voith escapes liability is a triable issue of fact.

This Court also finds that the Contract unambiguously provides that the critical path analysis requirement specifically applies to the change orders for the other three projects—not for the Cannelton Project. As such, AMP need not demonstrate that there was a critical path delay to receive its liquidated damages for these claims coming under the Cannelton Contract.

Finally, this Court finds that the liquidated damages clause is enforceable. Applying the factors articulated in *Samson Sales,* 465 N.E.2d at 394, the record supports a finding that liquidated damages is proper: this contract was carefully negotiated and entered into by sophisticated parties, providing a mechanism for awarding damages that the record supports are otherwise uncertain and difficult to prove. Further, this Court does not view this Contract as unconscionable such that it does not express the parties' intent, and the contract is consistent with the parties' clearly expressed intent that damages in that monetary amount should follow the breach. *Id.* After all, as the Ohio Supreme Court has noted, "findings of unconscionability" are rare in a commercial context. *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 55, 537 N.E.2d 624, 639 (1989). This is especially true in cases like this "where there is no great disparity of bargaining power between the parties." *Id.* The Court notes that the project at issue is a large-scale one, and

it does not appear unreasonable within the context of the large financial sums at stake that liquidated damages for a day's delay be set at $21,000.

### 3. Delay Damages Claims

#### a. *Voith's Argument*

In Voith's third motion, Voith seeks summary judgment on the $8,517,962 to which AMP claims entitlement under Section 3.5 of the Contracts. AMP seeks reimbursement for the additional monies it paid to installation contractors due to delays caused by alleged deficiencies in Voith's work across the four projects. Voith refers to these as the "Delay Damages Claims." Voith argues that the entirety of AMP's Delay Damages Claims set forth in its Exhibit 2 can be resolved completely in Voith's favor by application of the unambiguous provisions of the parties' Contracts to the undisputed facts. (ECF No. 259-2). AMP did not present Voith with these Delay Damages Claims during the Projects which, if provided, should include support of contemporaneous daily project cost records as required by the Contracts. So, Voith argues that it is entitled to summary judgment because: (1) one of the conditions precedent to Voith's reimbursement obligation has not been satisfied because AMP did not provide daily time sheets for all related costs; and (2) the contracts unambiguously limit Voith's reimbursement obligation to the actual direct costs incurred by the installation contract due to delay caused by defects in Voith's work, and AMP's delay damage calculation is not based on this. Voith is only responsible for costs incurred by installation contractors associated with defects in Voith's Work as set forth in Section 3.5 of the Agreements to the Contracts. (ECF No. 1 at 24–25). Section 5.2.1 reaffirms the limitations on recoverable damages.[8]

---

[8] Section 5.2.1, entitled "Waiver of Consequential Damages," provides:

On the first point, Voith argues, AMP did not provide daily time sheets reflecting contractors' costs, but the Contracts unambiguously provides that this is a condition precedent to receiving reimbursement. AMP does not even argue that it did so. AMP admitted, through the deposition of both its expert, William Schwartzkopf (ECF No. 259-5 at 8), and its corporate representative, Mr. Crusse (ECF No. 259-6 at 3–4, 6), that AMP did not use daily time sheets to calculate the reimbursement amounts it seeks to recover. Second, although Section 3.5.2 states that Voith's reimbursement obligation is limited to the "actual direct costs" incurred by the installation contractors caused by the delay, AMP admits that the Delay Damages Claims are not calculated using "actual direct costs." And under Section 5.2.1, indirect costs are clearly and expressly excluded. Without daily time sheets, there is no evidence of the actual direct costs incurred by the installation contractors due to delays caused by alleged defects in Voith's work. Lacking evidence of actual direct costs, AMP and its experts resorted to the calculation of a daily rate based on general conditions costs, which are indirect costs. The result is a Delay Damages Claims calculation based on estimated indirect costs as opposed to actual direct costs, which is contrary to the clear requirements of Section 3.5.

*b. AMP's Response*

AMP responds that the time-related costs for which AMP seeks reimbursement are not the type recorded on daily time sheets; therefore, AMP has fully satisfied all the requirements of Section 3.5 of the Contracts. In any event, AMP's Delay Damages Claims are based on the actual costs incurred by the contractors directly attributable to Voith-caused delays. Section 3.5 sets out

---

In no event will the Contractor's liability to the Owner under any legal theory whatsoever include liability for consequential, incidental or indirect damages of any kind or for loss of use or loss of income or loss of profit or loss of revenue or loss of financing or cost of capital or loss of business and/or reputation, or for loss of management or employee productivity.

(ECF No. 1-1 at 7).

the relevant reimbursement provisions. AMP engaged in a multi-step analysis to establish its Delay Damages claims: first, it provided a critical path analysis[9] of each of the Project schedules prepared by AMP's expert, Schwartzkopf; second, Schwartzkopf used Project records, interviews with personnel, and opinions of other experts to determine which of the issues causing the delays were due to defects in Voith's Work; third, Schwartzkopf identified the Voith-caused critical path delays for which the Installation Contractors were compensated and the amount that AMP paid to them for those delays; fourth, AMP's expert William Kime, using the Project's actual cost records and interviews with representatives of the Contractors, calculated the costs actually incurred by the Contractors due to the critical path delays; and last, Schwartzkopf calculated the Delay Damages Claims by comparing the amount AMP paid to the Contractors on account of delays caused by defects in Voith's Work to the amount of costs actually incurred by the Contractors on account of the delays caused by defects in Voith's Work and to the contractual cap provided in Section 3.5.2.

AMP further argues that Section 3.5 of the Contracts provides that Voith must reimburse AMP if AMP incurs costs to compensate third parties for costs incurred by the third parties because of delays to the Project completion caused by defects in Voith's Work. (ECF No. 1-1 at 4–5). AMP contends that Section 3.5 places no limitation on the types of reimbursable costs that may be included in the third-party claims submitted to AMP, other than to limit Voith's liability to "actual direct" costs of the Installation Contractors. The claims for which AMP seeks reimbursement are actual direct time-related costs incurred due to delays caused by Voith's defective Work, none of which includes costs that can be recorded in daily increments. Instead, the costs for which AMP is seeking reimbursement in its Delay Damages Claims are extended time-related "general

---

[9] This critical path analysis was conducted to establish the issues that caused critical path delays to the Project schedules.

conditions costs," i.e., direct costs incurred because of the passage of time, not in specifically identifiable daily increments. Further, AMP expert William Kime stated in his expert reports and at deposition that the costs were not estimates but were actually incurred and paid by the Installation Contractors. (ECF No. 324-9 ¶ 5). According to AMP, the relevant inquiry is whether the costs included in AMP's Delay Damages Claims are "actual direct costs of the Installation Contractor caused by the delay" as the phrase is used in Section 3.5 of the Contracts.

### c.   This Court's Findings

The Court **DENIES** Voith's third Motion for Partial Summary Judgment. As previously stated, "[c]ontract language is ambiguous if it is subject to two reasonable interpretations." *Schachner*, 77 F.3d at 893. Voith cannot simply ask the Court to assume that AMP's costs cannot be "actual direct costs" because they are categorized as "general conditions costs." Both parties have a reasonable read of the daily time sheet requirement under Section 3.5 of the General Conditions. The "subject to the limitations and conditions" language used in Section 3.5 makes it such that providing the "daily time sheets for all related costs on a daily basis" under Section 3.5.5[10] is a condition precedent to reimbursement. But, on AMP's read, the word "related" means that only costs that can be appropriately categorized in a time sheet need be submitted to invoke Voith's reimbursement obligation. Conversely, Voith reads "related" seemingly to mean that all costs that have *any* relation to the delay claims must be categorized in a time sheet. AMP produces no evidence that it provided time sheets on these claims; therefore, if Voith's reading is found to reflect the intent of the parties, AMP loses on these claims. The Contract is ambiguous, however, on this point, and the parties submitted competing evidence relating to the parties' intent in

---

[10] Section 3.5.5 provides that "[t]he Owner will provide daily time sheets for all related costs on a daily basis." (ECF No. 1-1 at 5).

agreeing to the provision. Further, whether AMP's Delay Damages Claims otherwise constitute "actual direct costs of the Installation Contractor caused by the delay," which Section 3.5.2. of the Contracts indicates are the only costs reimbursable under Section 3.5 is also a genuine issue of material fact upon which parties submit competing evidence. As such, summary judgment is improper.

### 4. Additional Work Claims

#### a. Voith's Arguments

In Voith's fourth motion, Voith seeks summary judgment on the $4,226,475 in damages that AMP seeks for "additional work required as a result of Voith's acts, errors and omissions, in the amount paid to the Installation Contractors for the performance of that work." (ECF No. 260 at 5). The damages reflect the amounts AMP allegedly paid to Installation Contractors pursuant to 109 individual Potential Change Order ("PCO") claims for those costs. Voith terms these the "Additional Work Claims." Voith argues that it is entitled to summary judgment because: (1) the Contracts unambiguously preclude the recovery of damages for the Additional Work Claims; and (2) AMP does not produce adequate expert testimony to establish proximate causation between the 109 individual Additional Work Claims and any fault of Voith.

First, Voith suggests that no contractual provision allows AMP to pursue claims for payments made to other contractors to pursue additional work that did not constitute repair or replacement for Voith's defective Work. In his report, for each of the four projects, Schwartzkopf identified four categories of damages to which he claims AMP is entitled: Defective Work, Additional Work, Critical Path Delays, and Equipment Delivery Delays. His report categorizes costs "to repair, modify, and correct defective work" in the Defective Work category. Additional Work is described as costs "to perform additional work that was not originally contemplated for

the Cannelton Project." According to Voith, there is no contractual provision, however, requiring Voith to reimburse AMP for work not originally in the scope of work of AMP's Installation Contractors. It cannot be true that the Additional Work Claims consist of defective work damages, as AMP asserts. The largest Additional Work Claim at Cannelton relates to the need to add climate control to the storage of stators and rotors (PCO 256 for $63,487)—this is work the Installation Contractors would have had to perform anyway. Instead, Voith alleges that AMP's Additional Work Claims constitute consequential damages precluded by the Waiver of Consequential Damages provision, located at Section 5.2.1, which provides: "[i]n no event will the Contractor's liability to the Owner under any legal theory whatsoever include liability for consequential, incidental or indirect damages of any kind." Further, Voith argues that the warranty provisions of Section 5.09 of the Contracts limit AMP to the costs to repair or replace defective Voith work. Section 5.09.H.4 of the Contract provides that Voith is not responsible for "costs incurred or losses suffered by others associated with warranty Work except as stated in Agreement Section 3.5 and General Conditions Paragraph 5.09.H.2." (ECF No. 1-1 at 26). AMP is already seeking damages elsewhere under Section 3.5 and has asserted no claims for costs under 5.09.H.2.

Second, Voith argues that, even if AMP could pursue these claims, it cannot establish proximate causation between each of the 109 individual Additional Work Claims and any alleged act, error or omission by Voith. Because the claims involve complicated engineering design, manufacture and onsite services beyond the understanding of a lay person, proof of proximate causation requires expert testimony. Not one of AMP's experts, however, offer any testimony at all to establish the requisite proximate causation.

*b. AMP's Response*

AMP argues that Section 5.09 of the General Conditions of the Contracts provides the basis for AMP's Additional Work Claims. AMP disputes the allegation that these claims are not related to remedying defects in Voith's Work—in fact, the Installation Contractors were directed, in some cases by Voith itself, to remedy defects in Voith's Work. AMP argues that there are genuine disputes between the parties, not properly resolved on summary judgment, regarding the following material facts: (i) whether each of the PCOs included in AMP's Additional Work Claims relates to a defect or non-conformance in Voith's Work; and (ii) whether the cost of the work performed by the Installation Contractors was performed to remedy such a defect or nonconformance, or is otherwise within the costs for which Voith is responsible under Sections 5.09 and 10.04.C of the General Conditions of the Contracts.

On the first point, AMP argues that the Contract does provide for damages in this instance. If Voith provided a defective part, Section 5.09 makes Voith responsible for all costs associated with remedying that non-conformance. The only way to determine whether any individual claim included within the "Additional Work Claims" includes costs that are recoverable under Section 5.09 of the General Conditions of the Contracts is to review the evidence relating to that individual PCO. This is not an exercise that can be disposed of on summary judgment and Voith does not even attempt to establish that any individual PCO is improperly included within the PCO Claims. On the second point, the issue of causation is not proper for determination at summary judgment. AMP claims it will prove at trial that each of the individual POCs was caused by defects in Voith's Work. Many of the PCOs do not involve any complex engineering issues and/or are within the knowledgeability of the fact witnesses that Mr. Schwartzkopf relied on in his expert reports and deposition.

### c. *This Court's Findings*

The Court **GRANTS** Voith's fourth Motion for Partial Summary Judgment. Section 5.09.K provides relief for these "Additional Work Claims" to the extent that they comprise costs incurred by AMP for the purpose of "correct[ing] [the] non-conforming Work." (ECF No. 1-1 at 26). AMP contends that its Additional Work Claims proceed on two independent theories: breach of contract and breach of warranty.

Under Ohio law, a plaintiff must demonstrate the following to establish a claim for breach of express warranty: "(1) a warranty existed; (2) the product failed to perform as warranted; (3) plaintiff provided the defendant with reasonable notice of the defect; and (4) plaintiff suffered injury as a result of the defect." *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Ents., Inc.*, 2015-Ohio-4884, 50 N.E.3d 955, 960, ¶ 9 (4th Dist.). Similarly, to demonstrate breach of contract under Ohio law, the plaintiff must show: "the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St. 3d 453, 463, 2018-Ohio-15, 97 N.E.3d 458, 469. To establish damages, the plaintiff must show that "the breach of the warranty was the proximate cause of the loss sustained." *Thompson I.G., LLC v. Edgetech I.G. Inc.*, 590 F. App'x 532, 537–38 (6th Cir. 2014). In other words, a plaintiff's failure to produce proper evidence of proximate cause warrants summary judgment on a breach of warranty or a breach of contract claim. *Id.* at 537.

AMP asserts that its Additional Work Claims comprise its claims for reimbursement of amounts that AMP paid to Installation Contractors for work they performed to remedy defects in Voith's Work. In essence, the Court's inquiry at summary judgment is whether AMP demonstrates that Voith's defective work was the proximate cause of the damages AMP asserts in its Additional

Work Claims. AMP's Additional Work Claims seek reimbursement for AMP's *own* damages from incurring extra costs to have contractors fix the deficiencies in Voith's work instead of concerning "costs incurred or losses suffered by others," which is covered in Section 5.09.H.4.[11] The evidence adduced by AMP, however, fails to create a triable issue as to causation between the PCOs listed as Additional Work Claims and Voith's allegedly defective product. Although AMP offers to produce the relevant testimony and circumstantial evidence at trial, AMP must offer some evidence that the "breach . . . was causally related to the injury" to survive summary judgment. *Id.* at 538. And here, AMP has not shown how the alleged defects in Voith's work proximately caused damages in the form and amount of the payments AMP made to the Installation Contractors for work performed to ostensibly fix the defects. As such, summary judgment is proper.

### 5.    Alignment and Tolerance Claims

#### *a.   Voith's Argument*

In its fifth Motion for Partial Summary Judgment, Voith disputes AMP's claims of entitlement to reimbursement for $10,026,011 that it was allegedly forced to pay the Installation Contractors pursuant to 69 individual Potential Change Order ("PCO") claims for equipment alignment necessitated by alleged defects in Voith's Work. Voith refers to these claims as "the Alignment and Tolerance Claims."

Voith argues that: (1) AMP's Contracts with Voith and its Contracts with the Installation Contractors unambiguously make the Installation Contractors responsible for aligning Voith's equipment—not Voith; and (2) AMP cannot show proximate causation between the 69 individual

---

[11] Section 5.09.H.4 provides that "[i]n the case of a breach of the warranty described under Paragraph 5.09.C or 5.09.D, the Contractor shall not be responsible for costs incurred or losses suffered by others associated with warranty Work except as stated in Agreement Section 3.5 and General Conditions Paragraph 5.09.H.2." (ECF No. 1-1 at 26).

Alignment and Tolerance Claims and any defect of Voith because this requires expert testimony that AMP does not have. On Voith's read, Paragraph 5.09.I requires AMP to give notice to Voith of the nonconforming Work, then to allow Voith to fail to begin correcting it promptly, before correcting the Work without further notice. But, says Voith, AMP did not do this nor does it argue that it did. After all, Voith argues, General Conditions Section 5.01.L indicates that Voith has no responsibility for the outcome of the alignment labor that the Installment Contractors engaged in. Section 5.01.L provides the following:

> The Contractor's obligations under this Contract do not include the installation of the Work, and notwithstanding Paragraphs 5.12 through 5.22 of these General Conditions or any other provision of the Contract, the Contract is not intended to transfer to the Contract any of the responsibilities of the Installation Contractor.

(ECF No. 1-1 at 24). Voith posits that AMP's effort to shoulder it with responsibility for the equipment alignment derives from Specifications Section 14-05.B.1[12] of the Voith Contracts, but that section is internally contradictory on the nature of Voith's responsibility. Instead, Voith argues that Section 6.35[13] made clear that Voith's instructions were "provided only to give the general

---

[12] Section 14-05.B of the Cannelton Contract, entitled "Oversight of the Site Work," provides:
  1. The Contractor shall, when directed by the Engineer, furnish one or more competent, full time supervising erectors and test engineers who shall oversee and advise the Installation Contractor in matters of methods, procedures, and precautions to be followed. The Contractor shall be responsible for proper alignments, adjustments, clearances, inspection, field testing of the equipment, and other matters pertaining to the quality of the installation and/or testing of the equipment. The Installation Contractor will furnish the necessary skilled and unskilled labor and facilities required for erection purposes and will be responsible for the progress of the Work. The supervising erector and the Contractor shall be responsible for the proper performance of the installation Work unless he notifies the Owner in writing that the Work is being performed contrary to his instructions, immediately upon such occurrence. The supervising erector and the Contractor shall be responsible for starting, initial operation, commissioning and performance testing of the equipment and shall make final adjustments prior to Commercial Operation.

(ECF No. 262-13 at 5).

[13] Section 6.35-1.06 of the Cannelton Contract, entitled "General Requirements," provides:
  A. The descriptions of the major equipment and installation and field testing requirements contained in this Section and as shown on the Drawings, and on the appended manufacturer's drawings and instructions (Part 8 Reference Documents of these Specifications) are provided only to give the general scope of the Work and are not intended to be inclusive of all equipment items, installation Work, and testing. After procurement of the equipment by the Owner, the manufacturers' drawings and instructions required for its installation will be

---

scope of the Work" and that the contractors may be required to "supply and install temporary bracing, supports and other materials as required . . . whether or not this is indicated on the T/G equipment drawing." Voith maintains that the contractual exclusion of liability in Section 5.01.L of its General Conditions was "a bargained for 'allocation of commercial risk [which] should not be disturbed.'" *Ind. Mich. Power Co. v. Siemens Energy, Inc.*, Case No. 2:12-cv-861, 2013 U.S. Dist. LEXIS 121852, at *23–24 (S.D. Ohio Aug. 27, 2013). Lastly, Voith contends that AMP failed to provide the expert testimony necessary to demonstrate causation between Voith's action and each of AMP's 69 unique Alignment and Tolerance Claims.

### b. *AMP's Response*

AMP responds that Section 5.09 of the General Conditions of the Contracts provide the basis for AMP's PCO Claims (which include the "Alignment and Tolerance Claims"), and that Parts 5,[14] 6,[15] 6A,[16] and 14[17] of the Contracts expressly obligate Voith to perform the Work that Voith performed defectively, which caused AMP to incur the costs associated with Alignment and Tolerance Claims.[18] First, Sections 5.09 and 10.04.C[19] of the General Conditions (ECF No. 1-1 at

---

                furnished for use by the Contractor. OFE shall be installed and tested in accordance with said drawings and instructions unless otherwise specifically directed. In the event of discrepancies between sources of information, the decision of the Engineer shall govern.

(ECF No. 262-9 at 10).

[14] ECF No. 257-3.

[15] ECF No. 267-1 at 149–79.

[16] ECF No. 263-2.

[17] ECF No. 262-13.

[18] The Court here notes that "Sections" and "Parts" of the Contract refer to different documents and sets of provisions; they are not interchangeable terms.

[19] General Conditions Section 10.04.C provides:

                If the Owner is entitled to reimbursement or payment from the Contractor, the Contractor shall make that payment immediately upon demand by the Owner. Notwithstanding anything contained in the Contract Documents to the contrary, in addition to the Owner's other rights under the Contract Documents, if the Contractor fails to immediately make any payment due to the Owner, or the Owner incurs any costs and expenses to cover the default of the Contact or to correct defective Work, the Owner shall have the absolute right to offset such amount against the Contract Price and may, in the Owner's sole discretion, elect either to: (a) deduct an amount equal to that which the Owner is entitled from any payment then or thereafter due the Contractor from the

25–27, 44) of the Contracts require Voith to pay for these claims because the work that was performed by the Installation Contractors were to (1) "remedy the non-conformance" of Voith's Work; (2) was work to remedy "any other affected part of Voith's Work"; (3) was performed to "gain[] access to the non-conforming Work of Voith"; and/or (4) was performed to "reinstall corrected Work" (i.e., to correct a non-conformance in Voith's Work). Voith's Work obligations specifically include: (1) all of the oversight and advice Voith was required to provide pursuant to Part 14 of the Contract; (2) the bracing design and installation instructions it was required to provide pursuant to Part 6 of the Contract; (3) the design and manufacture of various pieces of equipment, including the guide bearings it was required to perform pursuant to Part 5 of the Contracts; (4) and the drawings and submittals it was required to prepare pursuant to Part 6A of the Contracts. Where Voith provided defective equipment or services, Voith is responsible for all costs associated with remedying those defects, including all of the costs included in the "Alignment and Tolerance Claims." Part 14 unambiguously states that Voith is "responsible for proper performance of the installation Work" *unless* Voith notifies AMP that the Installation Contractors are failing to perform in accordance with Voith's instructions.

According to AMP, notwithstanding Voith's claims that Section 5.01.L shows that the Contractors were solely responsible for all responsibilities related to the alignment, the Contractors were obligated to perform work *outside* of its enumerated responsibilities due to Voith's defects. Thus, to the extent that the "Alignment and Tolerance Claims" arise out of defects in Voith's performance of those Voith obligations (as opposed to out of Voith's failure to "achieve proper alignment"), AMP claims Section 5.01.L has no application and Voith is obligated with the costs

---

Owner, or (b) issue a written notice to the Contractor reducing the Contract Price by an amount equal to that which the Owner is entitled.
(ECF No. 1-1 at 44).

associated therewith. AMP argues that Voith's warranty obligations under Section 5.09 of the Contracts require Voith to pay for all of the costs associated with remedying its defective Work. In addition to the warranty provision, argues AMP, Section 10.04.C provides that AMP may offset the amount against the Contract Price that it incurs to correct Voith's defective work. AMP contends that, because all of the PCOs included in the Alignment and Tolerance Claims involve work that was performed by the Installation Contractors to remedy one or more defects in Voith's Work, Voith is responsible for all of the costs associated with those PCOs. AMP lastly argues that it will prove proximate cause at trial, demonstrating that each of the costs associated with each of the individual PCOs under this set of claims were incurred to remedy defects in Voith's Work.

### c. *This Court's Findings*

The Court **DENIES** Voith's fifth Motion for Partial Summary Judgment. Contrary to Voith's argument, General Conditions 5.01.L does not impact the outcome of this claim because it does not concern the question of Voith's *liability* for the defective installation. First, the section within which GC 5.01.L is located discusses only what the direct responsibilities of the Contractor are (i.e., what work *it* is responsible for doing). AMP's claim, however, is that Voith's failure to carry out its non-installation responsibilities resulted in *additional* costs relating to the installation of the Work because the other Contractors had to perform *additional* work. Even so, Section 5.01.L also indicates that the Contract is not intended to transfer to the Contractor any of the responsibilities of the Installation Contract "*notwithstanding* Paragraphs 5.12 through 5.22 of these General Conditions or any other provision of the Contract." (ECF No. 1-1 at 24) (emphasis added). Considering this, GC 5.01.L does not bar AMP's claims seeking reimbursement for fixing Voith's defective Work, which caused the Contractor to submit claims for the additional alignment and tolerance work that resulted. The parties present genuine issues of material fact concerning

whether Voith's Work fell below the standards required by the Contract and if so, whether AMP's "Alignment and Tolerance Claims" were causally related to those defects. Unlike with respect to the Additional Work Claims, AMP's evidence—consisting of expert witnesses, contemporaneous correspondence between the parties, and fact witnesses—creates at least a triable issue on the question of causation. Voith's secondary causation argument, that expert testimony is *required* for all claims instead of on a case-by-case basis, fails for the same reason that it fails in its fourth motion. *See supra* Part III.A.4.

### 6. Late Submittals Claim

#### a. *Voith's Argument*

In Voith's sixth Motion for Partial Summary Judgment, Voith disputes AMP's claim for $21,863,076 in liquidated damages for Voith's alleged failure to achieve Submittal Milestones, which Voith terms the "Late Submittals Claim." Voith's scope of work included the submission of various drawings, illustrations and other materials (defined by the Contracts as "Submittals") for contractually-defined portions of Voith's equipment, to MWH for review and approval. (ECF No. 263-2). The Submittals provided information for MWH to evaluate whether the design of individual components of the equipment complied with the Contracts. (ECF No. 263-3). The Contracts contained Submittal Milestones that set the deadlines by which Voith was to deliver the Submittals to MWH. Section 3.1.2 of the Agreement specified that Voith was required to deliver the Submittals as set forth in Part 6A and Appendix 6A-1. Part 6A contained a list of the Submittals, Appendix 6A-1 of the Contracts specified the deadlines for achieving the Milestones, and Section 3.3 of the Agreement specified a per diem amount of liquidated damages that Voith would owe AMP for each day after the Submittal Milestone deadline that Voith failed to achieve. AMP's claim amount was calculated by applying the per diem late fee to every *individual* submittal

delivered late; but Voith argues that the Contract provides that the per diem should be applied such that damages are only assessed for the *entire* Submittal Milestone. To provide illustration, under Voith's interpretation, if a Submittal Milestone included 20 individual submittals, Voith delivered all 20 individual submittals 10 days late, and the per diem liquidated damages fine was $100, the proper liquidated damage calculation would be $100 x 10 days = $1,000. Under AMP's interpretation, the per diem applies to every individual submittal delivered late, such that the same 20 individual submittals delivered 10 days late would be calculated as $100 x 10 days x 20 individual submittals = $20,000.

Voith argues that the General Conditions define "Submittals" in a manner indicating that a Submittal may be comprised of multiple submitted items. Voith claims that its interpretation reflects the true intent of the parties: Even in defining "Milestone" in General Conditions Paragraph 1.01.37, the parties agreed that it constituted a "principal event specified in the Contract Documents relating to an intermediate completion date or time prior to the Contract Times." (ECF No. 1-1 at 34). Voith contends that this contemplates that the Milestones are either achieved on a certain date or not—there are no individualized subdivisions. On May 17, 2012, the parties signed an MOU to resolve various disputed issues, including one concerning liquidated damages for late submittals. Voith asserts that the MOU resolved that dispute in two respects: (1) Voith paid AMP $2 million in satisfaction of all submittal liquidated damages claims AMP had asserted as of the date of the MOU; and (2) it set new deadlines for all outstanding Submittal Milestones. On Voith's read, the Contract Times are expressly described in Article 3.1 to be the dates set forth in Appendix 6A-1 to Part 6A for achievement of Submittal Milestones. (ECF No. 1 at 23).

In addition, Voith argues that the liquidated damages provision set forth in Article 3.3 provide that the liquidated damages are intended to compensate AMP for actual damages it might

incur if Voith "fails to achieve one or more of the Submittal Milestones." (*Id.* at 24). Thus, says Voith, liquidated damages are to be assessed only for the number of days by which a Submittal Milestone remains incomplete after the due date, regardless of how many individual submittals were still outstanding on the due date. Voith contends that, to perform their work properly, AMP, MWH, and the Installation Contractors needed the complete Submittal Milestone, not just isolated bits and pieces of it. Thus, Voith asserts, the potential actual harm that liquidated damages were intended to address was the potential for delay to the Project as a result of Voith's failure to achieve the complete Submittal Milestone by the due date.

### b. *AMP's Response*

AMP counters that the unambiguous language of the Contracts provides that liquidated damages are assessed on a per drawing basis. Section 3.3, which provide the payment schedule for damages from Voith's failure to achieve one or more of the Milestones, delineates the fees for each type of submittal. Section 3.3 provides that Voith agreed to pay liquidated damages if it "fails to achieve a Submittal Milestone for any other Submittals", i.e., on a submittal-by-submittal basis, not "for a Submittal Milestone" as Voith now argues. (ECF No. 1-1 at 24). AMP alleges that Voith's suggestion is absurd that AMP would have intended a contractual provision that did not distinguish between whether one or 100 drawings are late; there is certainly a difference to AMP between waiting for 100 late drawings and instead waiting for one late drawing while working from the other 99. The MOU and the Contracts are clear that Voith is liable to AMP for liquidated damages on each drawing that is submitted late. AMP contends that the Court must disregard Voith's extrinsic evidence because the Contracts are unambiguous. But even if the Contracts were found to be ambiguous, Voith's evidence would still be insufficient to establish that the parties intended that liquidated damages be assessed on a per-Submittal Milestone basis.

*c. This Court's Findings*

This Court **DENIES** Voith's sixth Motion for Partial Summary Judgment. The Contract is unclear on whether liquidated damages should be assessed on an individual deliverable or a collective basis. The parties debate the import of the language of Section 3.3 itself, the structure of the Submittal Milestones in Appendix 6A-1, and the language of Part 6A of the Contracts. Both parties' reading of the language is reasonable, supporting the Court's finding that the Contract is ambiguous on this issue. *Schachner*, 77 F.3d at 893. The parties dispute the sufficiency of one another's proffered evidence offered to prove their reading or to disprove the other. Further, the adoption of one party's reading over that of another—creating liability for either the individual submissions or collective ones—impacts the *fact* of liability with respect to several of the claims. So, while it is true that "summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations," the Sixth Circuit has also held, "[o]n the other hand, if the extrinsic evidence relevant to the interpretation of an ambiguous contractual provision is contested or contradictory, summary judgment will often be inappropriate." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999). As such, this motion is denied.

### B. AMP's Motion for Partial Summary Judgment

### 1. AMP's Late Delivery of Drawings Claims

*a. AMP's Argument*

AMP first argues that its claims for liquidated damages ("LDs") with respect to Voith's late delivery of drawings are ripe for summary judgment. Voith moved for summary judgment on this issue in its fifth and sixth Motions for Partial Summary Judgment. AMP's claim concerns three groupings of late equipment LDs: (1) LDs for the late Submittals that were outstanding before

the parties signed their MOU providing, *inter alia*, that "Voith will pay a \$2M LD for late submittals to be allocated evenly across all four projects, which will not be assessed until the end of each Project," (ECF No. 258-8 at 8); (2) LDs for late Submittals that occurred post-MOU but which Voith acknowledged were properly assessed; and (3) LDs for late Submittals that occurred post-MOU but the assessment of which Voith disputes.

AMP argues that the Cannelton Contract, GC 6.02 (ECF No. 1-1 at 32), required Voith to deliver equipment in accordance with established Equipment Delivery Milestones, set forth in a table at Section 3.1 of the Cannelton Agreement. (ECF No. 1-1 at 4). AMP contends that the liability was set at \$21,000 per day for each day that Voith was late, as set forth in Section 3.2 of the Cannelton Contract. (ECF No. 1-1 at 4). The parties later changed the dates via the MOU incorporated into the Contract by Change Order 20 (ECF No. 258-8), which replaced the table in Section 3.1 with the TKB Structure Table. (Butler Decl. ¶ 4, Ex. 33). The only material facts relating to this claim are: (i) the applicable Equipment Delivery Milestones (established by the plain language of the Change Orders); (ii) the dates that Voith delivered equipment (shown in Appendix B of this motion); and (iii) the rate of LDs to which AMP is entitled (the plain language of the Cannelton Contract). The Contract can be interpreted as a matter of law. Two LD provisions are at issue—Agreement Section 3.3 concerning the late drawings claim and Section 3.2 of the Cannelton Contract concerning the late equipment. The provisions each unambiguously provide a basis for AMP's LD claims.

Concerning the first group of LD claims for \$2 million in LDs (\$500,000 for each of the four Projects), AMP argues that the May 17, 2012 MOU expressly provides that Voith would pay the claim amount in full to satisfy the late Submittals submitted before the MOU. (ECF No. 258-8 at 8). Because there are no issues of fact with respect to the first set of claims, AMP contends,

summary judgment is warranted. Concerning the second group of LD claims, AMP suggests that it is entitled to summary judgment on those post-MOU drawings because Voith's expert acknowledged in his expert report that the corresponding damages were properly assessed. (ECF No. 272-7). Both the second and third group of LD claims are due summary judgment given that the Milestones were never modified, and that record indicates that Voith submitted the drawings at dates later than the Milestones provided. Voith argues that the Equipment Delivery Milestones were amended after the MOU, but this was wrong—the later Change Orders did not impact these milestones and the communications that Voith alleges changed the arrangements were not modifications following the agreed-upon process. Modifications to the Contract may only be made through signed writings; Voith has presented no evidence that the parties had any agreement, oral or otherwise, to waive the provision of the Contracts that required a signed writing to modify the Contracts.

### b.  *Voith's Response*

Voith responds that, as an initial matter, much of AMP's evidence is inadmissible because Tabs A through D to AMP's Appendix A (ECF No. 261-1) are not project records, and they lack supporting testimony by a witness with knowledge. On the first set of LD claims, AMP's failure to pay outstanding invoices for Voith's Work constitute material breaches of the Contracts which excuse Voith's performance to pay the $2,000,000 claim for the pre-MOU Submittal LDs. Besides, Voith argues that, under Paragraph 14.24.A.1 of the General Conditions, it can offset whatever amounts it may owe AMP under the Contracts against the damages AMP owes Voith for breaching the Contracts. With respect to the second set of claims, which AMP claimed Voith admitted were valid, Voith counters that its expert never agreed that AMP is entitled to be paid the supposedly agreed-upon amounts; he only acknowledged that AMP properly calculated those amounts

*assuming* liability was proven by AMP. Concerning the third set (the LDs for late Submittals that occurred post-MOU but the proper assessment of which is in dispute), Voith argues that AMP is not entitled to summary judgment for the drawings submitted after the new Submittal Milestones established by the May 17, 2012, MOU because Voith disputes that Submittal LDs should be assessed based on each and every individual Submittal that is late; instead, Voith suggests the LDs should be assessed only for each day that an entire Submittal Milestone remained incomplete after the due date. At any rate, Voith contends, the LDs here constitute an unenforceable penalty.

### c. *This Court's Findings*

The Court **GRANTS** summary judgment as to the first portion of AMP's claim relating to whether the MOU required Voith to pay $2 million in LDs for the late Submittals outstanding before May 17, 2012. The MOU, incorporated into the Contract, unambiguously states that "Voith will pay a $2M LD for late submittals to be allocated evenly across all four projects, which will not be assessed until the end of each Project." (ECF No. 258-8 at 8). Voith does not dispute AMP's reading of the MOU nor raise a genuine issue of material fact concerning this claim.

However, the Court **DENIES** summary judgment with respect to the second and third group of claims. As AMP argues, the material facts bearing on these claims are: (i) the applicable Equipment Delivery Milestones (as established by the plain language of the Change Orders); (ii) the dates that Voith delivered equipment; and (iii) the rate of LDs to which AMP is entitled (provided for in the plain language of the Cannelton Contract). Voith does not dispute the accuracy of the recorded dates on which it delivered the equipment. Additionally, the plain language of the MOU indicates that it did not change the rate of LDs to which AMP is entitled. The Court finds, however, that the inquiry of what constituted the operative Equipment Delivery Milestones is a

genuine issue of material fact given that Voith presents evidence that could indicate that the parties engaged in a course of conduct effectively modifying the Milestones.

This Court observes that "Ohio appellate courts have generally held that an oral waiver of a 'non-oral modification' clause is legally permissible when certain circumstances exist." *Special Learning, Inc. v. Step by Step Acad., Inc.*, No. 2:14-CV-126, 2015 WL 10990267, at *6 (S.D. Ohio Sept. 17, 2015). These "certain circumstances" are present when a party engages in "waiver by estoppel," which occurs "when the acts and conduct of a party are inconsistent with an intent to claim a right and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it." *Id.* Evidence of course of conduct can be considered "notwithstanding a 'written changes only' contractual provision, because the series of acts in question are evaluated only as evidence regarding a continuity of the purpose captured by the original contractual terms at the time of formation." *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins.,* 210 F.3d 672, 687 (6th Cir. 2000). The question of whether a no-oral-modification clause is waived by Ohio courts as a question for the trier of fact. *Special Learning, Inc.*, 2015 WL 10990267, at *7.

General Conditions Section 1.01A.38 defines "Modification" as used in the Contract as: "[a] Written Amendment or addendum to the Contract that is signed by both parties, Change Order, a Work Change Directive, or a Field Order." (ECF No. 1-1 at 15). Neither this definition of "Modification" nor any other provision of the Contract expressly provides that a "Written Amendment or addendum to the Contract" is the *only* way to modify the parties' agreement. In other words, the clause does not prohibit the parties from modifying the Contract utilizing other methods. Voith has adduced evidence of conversations between the parties' representatives which a jury could find constituted modifications: an example being a November 5, 2013 internal AMP

email acknowledging that AMP had not agreed to Voith's request to disregard non-field related documents in assessing Voith's late submittal LDs, but stating nonetheless that "it is how we have been calculating LDs to date." (ECF No. 313-20). Even if the fact-finder determined that this activity did not constitute a modification within the meaning of the Contract, a jury could find that the parties' communications constituted a course of conduct indicative of waiver of the Contract's "written changes only" provision. The jury's conclusion on whether the parties modified the Contract will be determinative of which deliveries Voith indeed made late and for which it is liable. Finally, the parties' dispute, discussed in the "Late Submittals Claim" section, *supra* Part III.A.6, regarding whether the LDs are to be assessed for each individual "Submittal" is another question central to establishing the existence and extent of Voith's liability; this, too, is a genuine issue of material fact.

### 2. AMP's Defective Discharge Ring Claims

AMP next argues that its claims for breach of contract and breach of warranty arising out of Voith's allegedly defective discharge rings are not ripe for summary judgment. Parties' arguments here were essentially repeated in Voith's first Motion for Partial Summary Judgment. The Court granted Voith's summary judgment motion on those claims, *see supra* Part III.A.1, and thus does not readdress the same claims in AMP's own motion. Therefore, this Court **DENIES** AMP's Motion for Partial Summary Judgment on these claims.

### 3. AMP's Late Equipment Delivery Claims

AMP also argues for summary judgment on its claims arising from Voith's allegedly late deliveries of equipment. The parties' arguments are identical to those presented in Voith's second Motion for Partial Summary Judgment. *See supra* Part III.A.2. The Court **DENIES** summary

judgment on AMP's Motion for Partial Summary Judgment as relates to this claim for the reasons articulated in that section.

### 4. AMP's Delayed and Defective Work Claims

AMP argues that summary judgment on AMP's Delay and Defective Work Claims is improper because there are genuine disputes of material fact relating to, *inter alia*, whether Voith's Work was defective and what resulting damages were caused by those defects.[20] AMP then argues, however, that "the Court can significantly narrow the issues to be tried by interpreting the Contracts on summary judgment." (ECF No. 275 at 30). AMP thus argues that, "in order to narrow the issues to be tried," this Court should issue summary judgment on the issue of Voith's liability for breach of the following obligations: "(i) provide an adequate BTH bracing system; (ii) provide adequate installation instructions; (iii) properly oversee and advise the Installation Contractors as to the installation of the BTH and alignment of the BTH components; and (iv) be responsible for the proper installation and alignment upon completion of the work." (*Id.* at 31).

This portion of AMP's Motion for Partial Summary concerns the following: (1) AMP's claim for $8,517,962 for reimbursement of delay damages paid to Installation Contractors for delays caused by defects in Voith's Work, pursuant to Agreement Section 3.5 (characterized by Voith as AMP's "Delay Claim"); and (2) AMP's claim for $18,848,423 for reimbursement of amounts paid to Installation Contractors for Work performed to repair or replace defects in Voith's Work for breach of Voith's obligations under GC 5.09 (characterized by Voith as AMP's "Defective Work Claim").

---

[20] The arguments between the parties on this issue were captured in the briefing on Voith's third and fifth Motions for Partial Summary Judgment.

In essence, AMP argues that its Installation Contractors were required to engage in additional work (AMP's "Additional Work Claims") due to Voith's unsatisfactory Work. According to AMP, however, Voith disavows liability even if AMP proves that defects in Voith's Work caused the alignment difficulties on the reasoning that the Installation Contractors are solely responsible for installation and alignment. But AMP argues that if GC 5.01.L indeed relieves Voith of its obligation to oversee the equipment installation work, GC 5.01.L would directly conflict with Part 14, which details Voith's obligations in overseeing the installation work.

Voith responds that Paragraph 5.01.L of Voith's Contracts make clear that, regardless of whatever agreement AMP later reached with its installation contractors, no provision in Voith's Contracts with AMP—including the provisions on which AMP relies in support of its motion— would make Voith responsible for the work necessary to achieve proper alignment of the equipment.

This Court **DENIES** summary judgment on this claim for the reasons stated in the sections of this Order relating to Voith's Third and Fifth Motions for Partial Summary Judgment, *see supra* pp. 24–25, 33.

### 5.  Voith's Change Request Claim

#### a.  AMP's Argument

AMP next argues that it is entitled to summary judgment on several issues concerning Voith's counterclaims of $23,941,061 in additional compensation for purported "extra work" performed under Work Change Directives issued by AMP ("Work Change Directive Claim") and for various other Change Requests Voith submitted during the course of the Projects ("Change Request Claim"). Voith's claims arise from its issuance of various Change Requests seeking

increases in the Contract Price under each Contract for Work performed on the Projects, including for Work arising from the various delays on the Projects.

Specifically, AMP seeks summary judgment in its favor with respect to three subsections of Voith's claim: (1) the $18,696,097 portion of Voith's Change Request Claim (ECF No. 275 at 101), on the basis that Voith failed timely to initiate or substantiate Change Requests as required under the Contracts; (2) the $22,211,784 portion of Voith's Change Request Claim based on delay-related Change Requests (*Id.* at 141), on the basis that Voith failed to provide the necessary delay or time-impact analysis with those Change Requests and failed to provide any credible evidence showing that Voith was not responsible for those delays; and (3) the $22,211,784 portion of Voith's Change Request Claim based on delay-related Change Requests (*Id.* at 150–151) on the basis that Voith failed to prove its actual costs.

AMP makes several arguments concerning this group of claims. First, Voith waived several of its Change Request claims because it failed to comply with GC 7.06.A of the Contracts. (ECF No. 1-1 at 35). Here, GC 7.06.A *required* Voith to initiate its Change Requests within 20 days of when it knew or should have known of the triggering event giving rise to each Change Request, or forever waive its right to seek any compensation related to the subject of the Change Request. Voith was required by GC 7.06.A to meet both the time and content requirements to assert properly—and avoid waiving—its Change Requests. Table 1 shows that Voith's Change Requests were untimely; they were also incomplete because they failed to provide AMP with the "minimum information" necessary to initiate Voith's Change Requests under GC 7.06.B or to substantiate its Change Requests under GC 7.07.B.6. (*Id.* at 36–37). And Voith never argued that it complied with GC 7.06 and GC 7.11's initiation and substantiation requirements. These failures constituted "an irrevocable waiver" of Voith's right to any compensation related to the Change Request. Voith's

argument that AMP waived the requirements by allowing Voith not to follow the process with respect to several unrelated Change Requests is unavailing: AMP's mere knowledge of changed conditions, simple acquiescence to a different course of performance, equivocal conduct, or conduct of doubtful import are not enough to show waiver. *See Vill. of Carthage v. Diekmeier*, 79 Ohio St. 323, 342, 87 N.E. 178, 184 (1909). That Voith and AMP included an unequivocal "No Waiver" provision in GC 14.19.A further supports this view. (ECF No. 1-1 at 53). Whether AMP followed other provisions of the Contracts in connection with Change Requests not at issue in AMP's Motion has no connection to whether AMP intentionally waived GC Article 7's initiation and substantiation requirements as to the specific Change Requests at issue.

Second, many of the Change Requests seek increases in the Contract Price due to Project delays. For Voith to recover on these delay-related claims, GC 7.06 and 7.11 of the Contracts require Voith first to establish the cause of the delays. (*Id.* at 35, 37–38). GC 7.11 applies to all requests by Voith to increase the Contract Price due to delays of Voith's Work and provides that any such increase "[is] the sole and exclusive remed[y] for [Voith] and all Subcontractors for all delays and delay related impacts, inefficiencies, and damages of any kind." The record shows that, despite repeated demands, Voith never provided any delay analysis to establish the cause of the claimed delays—either during the course of the Projects or through affirmative expert testimony in this litigation—and therefore Voith is unable to prove the cause of the delays for which it seeks an increase in the Contract Price. Reading GC 7.11.B, GC 7.07.B.4 and GC 7.06.A together, Voith was required to establish the cause of the delays underlying its delay-related Change Requests to comply both with the contractual substantiation requirements and to establish its entitlement to any additional delay-related compensation.

Third, GC 7.11D limits Voith's Contract Price increases for delay related Change Requests to "the additional costs [Voith] actually, reasonably, and necessarily incur[red] as a result of a delay." But the delay-related damages Voith seeks are not based on actual costs. Fourth, Voith has priced its Change Request Claim using a "modified" pricing formula that was never properly entered into effect as a modification consistent with the contract modification requirements of the Contracts. Instead, the original Change Request pricing formula found in GC 7.09 of the Contracts remained in place after May 2013.

### b. Voith's Response

Voith argues that AMP is not entitled to summary judgment on the $18,696,097 portion because AMP has failed strictly to comply with the Change Request provisions of the Contracts with respect to many of the claims that it is asserting in this lawsuit. The process for handling change requests are set out in Sections 1.01.9 (defining Change Requests), 7.06(B) and 7.07(A). But AMP issued Change Orders that Voith then returned unsigned in accordance with an agreed-upon procedure for some of the very claims that AMP now claims Voith waived for not strictly complying with the Change Request requirements of the Contracts. (*See, e.g.*, ECF No. 315-27). Under the Contract, the Change Request obligations are mutual. But Voith argues that AMP nonetheless did not first initiate Change Requests for most of its claims, including its $53 million discharge ring claim, its $11,664,026 claim for equipment delivery liquidated damages, and its $8,517,962 claim for damages allegedly paid to installation contractors for delays. Even further, Voith is owed payment on several of the Change Requests that AMP disputes. Voith asserts a second unjust enrichment claim for the same costs on the basis that AMP's refusal to pay despite Voith properly following the Change Request process constitutes a breach of its implied obligation

of good faith and fair dealing, in addition to illegal conversion. This claim, Voith contends, should survive the Court's adjudication because AMP did not file summary judgment on that basis.

Voith next argues that AMP is not entitled to summary judgment on the $22,211,784 portion of Voith's change request claim (Table 2 of AMP's motion). First, through the execution of the MOU Change Orders on May 17, 2012, AMP already agreed to compensate Voith for several of the claims listed in Table 2 that AMP now claims were waived. The MOU stated that "AMP agrees to pay for justified field/commissioning labor escalation cost." (Butler Decl. ¶ 4, Ex. 33 at 7). Accordingly, there is no merit to AMP's assertion that Voith waived its right to be paid for field labor escalation and commissioning labor escalation (the first two claims in AMP's Table 2). Second, Section 7.07.D is the only provision in the Change Request substantiation provisions of the Contract that requires a critical path schedule analysis, and it does not apply to any of Voith's time related claims, even if AMP had not waived these Change Request substantiation provisions. There was no "Contract Time" defined for Voith's field and commissioning services, and none of Voith's claims listed in Table 2 of AMP's Motion is a claim in which Voith is seeking an increase in Voith's Contract Time. Third, Voith argues, abundant evidence supports a finding that its claims arises out of the Installation Contractors' delays in completing their work on these Projects. Section 7.11 only applies to requests for an extension of Voith's "Contract Times" and any resulting increase in the "Contract Price" arising out of such an extension—not to all manners of Work delay. Even still, Section 7.11 does not detail the requirements for initiating a Change Request (contained in Section 7.06) or substantiating a Change Request (contained in Section 7.07), and the Contracts provide for an "irrevocable waiver" only for "failure to initiate or substantiate a Change Request".

Voith next argues that AMP is not entitled to summary judgment on the claims listed in Table 3 of AMP's motion because Voith is not required to prove its actual costs as a condition precedent to reimbursement. First, Voith's change requests are not subject to Section 7.11; even if they were, Voith's change requests are based upon the actual costs that Voith has incurred, which the evidence shows. Voith tracked the specific hours of the specific employees whose work was subject to a change request, then provided to AMP the actual rate, per hour, of each individual employee working on a specific change request. Lastly, Voith is also entitled to the 33% markup for the change requests. Section 7.11 does not state that recovery is limited to "direct" costs, or that overhead costs are excluded. Instead, Section 7.11.D, states "[a]ny increase of the Contract Price under this Section 7.11 is subject to other provisions of the Contract . . . ." (ECF No. 1-1 at 38). The "other provisions of the Contract" include Section 7.09, which entitles Voith to a markup for the increase in the contract price. (*Id.* at 37).

### c.   This Court's Findings

The Court **GRANTS** summary judgment to AMP concerning the claims in Table 1; however, it **DENIES** AMP's Motion for Partial Summary Judgment as to the claims in Tables 2 and 3. Evidence of the parties' course of dealing may be considered only once the Contract is determined to be ambiguous. *See Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (holding that, under Ohio law, if a contract is ambiguous its interpretation becomes a question of fact about the parties' intent). But the Court finds that Section 7.06 is unambiguous with respect to the Table 1 claims—it provides that the Change Requests must be initiated within 20 days of the relevant determination and that it must contain certain enumerated information. And, as provided by 7.06.A, failure to initiate and substantiate properly the requests "will constitute an irrevocable waiver of the Change Request." Waiver by estoppel "'exists when the

49

acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it.'" *Hirschvogel Inc. v. Allison Transmission, Inc.*, No. 2:17-CV-458, 2019 WL 2075934, at *8 (S.D. Ohio May 10, 2019). Here, Voith has not demonstrated that AMP caused it prejudice as a result of failing consistently to follow the formal process for some of the Change Requests, nor that AMP's conduct rises to the level that it is inconsistent with its asserted claims. Voith does not provide any evidence creating a genuine issue of material fact as to the claims in Table 1; it instead argues that waiver by estoppel applies by virtue of AMP's failure itself to consistently follow the debated provisions of the Contract.

Regarding the claims in Table 2, however, the substantiation provisions under Section 7.07.D unambiguously apply exclusively to Change Requests for an increase of the Contract Times. And Section 7.11 limits Voith's requests to increase the Contract Price due to delays of Voith's Work such that Voith was limited to damages resulting from AMP's fault. Voith, however, raises a genuine issue of material fact concerning whether the Table 2 claims are based on AMP's delay. This precludes summary judgment.

This Court finds that the Table 3 claims constitute delay-related claims under Section 7.11; and Section 7.11.D limits the increases to the additional costs that "the Contractor actually, reasonably, and necessarily incurs as a result of a delay." (ECF No. 1-1 at 38). Because Voith raises a genuine issue of material fact concerning whether it incurred actual costs, however, summary judgment is improper.

Finally, Voith raises a genuine issue of material fact concerning whether the May 2013 Pricing Formula was adopted consistent with the Contract's process for making "Modifications." Voith and AMP conducted an executive meeting on May 7, 2013, to discuss Voith's suggestions

to adjust the pricing formula established in Section 7.09. (ECF No. 275 at 161–162). At this meeting, Voith suggested the formula that the parties refer to as The May 2013 Pricing Formula. (*Id.* at 162). The parties, however, disagree on the outcome of that meeting. AMP's argument that The May 2013 Pricing Formula could not have been adopted because Contract did not allow for oral modifications is beside the point; under Ohio law, even express contractual "no-oral-modification" provisions may be waived "when the acts and conduct of a party are inconsistent with an intent to claim a right and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it." *See Special Learning, Inc.,* 2015 WL 10990267, at *6. The parties adduce conflicting evidence on this point: most notably, while AMP cites minutes from the May 7, 2013 meeting indicating that the status of the pricing formula was still open afterwards (ECF No. 275 at 162), Voith cites to the same meeting minutes, as well as contemporaneous notes and subsequent Change Orders indicating that the pricing formula may have been adopted at the May 7, 2013 meeting (ECF No. 275 at 199–202). Further, the outcome of this determination impacts whether the May 2013 Pricing Formula indeed applies to these claims. As such, summary judgment is improper on both the Table 2 and Table 3 claims.

### 6. Voith's Claims Concerning its Field Service Allowance (FSA)

#### a. AMP's Argument

AMP last argues that Voith's Field Service Allowance ("FSA") claim is ripe for summary judgment. As characterized by AMP, there are two parts of Voith's claim: (1) a claim for nearly $4.5 million in unpaid invoices related to field services billed under approved (but unexecuted) Change Orders; and (2) a claim for over $5.5 million for the difference between its purported final costs of providing field service Work on the Projects and the current FSA purportedly approved by both parties through the unexecuted Change Orders.

AMP argues that GC Article 7 required Voith to submit FSA claims that followed the Change Request process in order to be entitled to receipt—Voith never did this, so it is barred from recovery. Under Article 7, Voith was required properly to initiate, substantiate, and otherwise demonstrate its entitlement to an increase of the Contract Price on account of that change in its scope of Work. Section 7.01.E is clear that "[t]his Article 7 governs the time and compensation components of all Change Orders, whether additive or deductive; the Contractor's entitlement to additional time, compensation, or damages through the Change Request, Claims, and dispute resolution processes . . . ." (ECF No. 1-1 at 33). And Voith never disputed that it failed to submit any delay analysis to support Voith's field service Change Request claims. Voith does not assert that it provided such analysis to support its claim.

Further, Section 7.06 and 7.11 required Voith to establish the cause of the delays for which it seeks an increase in the Contract Price before recovering on its FSA Claim—it has not. AMP argues that, because the FSA Claim is a delay-related claim, Section 7.11.D also unambiguously limits Voith's recovery to "the additional costs [Voith] actually, reasonably, and necessarily incur[red] as a result of a delay." (ECF No. 1-1 at 38). And the record is clear that the delay-related damages Voith seeks here are not based on Voith's actual costs. Contrary to the terms of the Contracts, Voith supports many of its claims using internal cost estimates and averages without demonstrating with supporting documentation that these estimates and averages truly represent its actual costs. Voith also improperly applied Section 7.09's overhead and profit markup to some of its delay-related claims, without demonstrating that it actually incurred this amount in overhead costs or that the overhead costs it seeks are specifically connected to the Projects' delays at issue.

Most of Voith's claims seek payment based on The May 2013 Pricing Formula. But the Contract was never amended to incorporate that formula. Nor did AMP ever agree to apply The

May 2013 Pricing Formula in all instances. Instead, AMP merely agreed to consider alternative pricing models on a Change-Order-by-Change-Order basis to move the Projects forward. In fact, the parties continued to dispute the applicable pricing formula after the May 7, 2013, meeting, until Voith attempted to achieve its desired modification through the proper course on October 3, 2014, by "propos[ing] that AMP issue a Change Order amending [Section] 7.09 . . . to reflect the May 7, 2013 agreement between the parties." (ECF No. 277-1 at 34–35). Importantly, however, AMP rejected this proposal on October 27, 2014. (ECF No. 271-1 at 191–92).  Instead, AMP reiterated its position from the beginning: while AMP "*may* accept alternative pricing for subcontractor mark-up," it was not required to do so and such determinations would be made "on a case-by-case basis." (*Id.* at 192 (emphasis in original).) Further, AMP also made clear that "[u]nless AMP agrees in writing through the associated [Work Change Directives], Voith will be expected to comply with the Contract's change pricing requirements." (*Id.*)  After all, the Contracts otherwise do not permit oral modifications. The parties agreed in Section 7.01C that, except in emergencies, Voith's "failure to secure a Modification before proceeding with any change in the Work will constitute an irrevocable waiver of any right that [Voith] may have to any adjustment of the Contract Price or Contract Times or both on account of the associated change in the Work." (ECF No. 1-1 at 32–33).  So, the Court should require Voith to comply with the contractual pricing formula set forth in Section 7.09. Per Section 7.09.A, AMP argues, adjustments to the Contract Price due to changes in the Work are limited to "the costs associated with the changed Work," plus a 33% markup for overhead and profit.

### b.  Voith's Response

Voith argues that it need not prove the cause of the Project delays; further, its FSA Claim recovery is not limited to recovery of its "actual costs". Section 10.08 provides:

> If the final cost of the Contractor's services during construction is more than or less than the identified allowance amount (all of which shall be based upon the unit prices described in the Agreement), the parties shall adjust the Contract Price by Change Order. The amount of the Change Order shall reflect the difference between final cost and the allowance amount.

(ECF No. 1-1 at 45). By the language of the Contract, there is nothing that Voith was required to provide to substantiate its FSA claim other than identify the number of days (i.e., "units") that it provided field services. Voith contends that the Contract provides that "the process for reconciling the [field services] allowance is described at Part 4, General Conditions, Paragraph 10.08." (ECF No. 1-1 at 3). And Paragraph 10.08 of the General Conditions dictates that if the cost of Voith's field services exceeds the allowance, AMP was obligated to issue a Change Order adjusting the Contract Price.

Lastly, Voith argues that the May 2013 Pricing Formula modified and superseded the original formula provided for under Section 7.09. The meeting minutes from a May 7, 2013, executive meeting shows that the parties agreed to use the Pricing Formula in calculating markup for changes to Voith's work "moving forward," and the parties' subsequent pattern of conduct reflects that. (ECF No. 271-1 at 187–188). The parties repeatedly executed Change Orders across all the Projects that were based upon the revised pricing method agreed upon at the May 7, 2013, meeting. (*See, e.g.*, ECF No. 317-19). Although Section 1.01.A.38 only lists four ways to modify the Contract, nothing states that these are the only methods to do so. Even if they did, "[a]n oral modification of a written contract can be enforceable notwithstanding a provision in the contract requiring modifications to be in writing where, as alleged here, the parties have engaged in a course of conduct in conformance with the oral modification and where the party seeking to enforce the oral modification would suffer injury if the modification were deemed invalid." *Exact Software N.*

*Am., Inc., Inc. v. Infocon Sys.*, 2004 U.S. Dist. LEXIS 7580, at *15 (N.D. Ohio Apr. 16, 2004) (citing *Lincoln Elec. Co.*, 210 F.3d at 687).

### c.  This Court's Findings

The Court **GRANTS** AMP's summary judgment motion with respect to Voith's FSA Claims. Cannelton Agreement Section 2.2[21] sets out that Voith has an allotted FSA budget, specifying that the process for reconciling the allowance is in Section 10.08. (ECF 1-1 No. at 4). That provision indicates that where the final cost of the Contractor's services goes beyond the allowance, the parties shall adjust the Contract Price by Change Order. Voith's FSA claim coverage, however, is based on costs it incurred for alleged AMP-caused delays. As such, the FSA claims are subject to the initiation and substantiation requirements of Section 7.11. (*Id.* at 37–38). Section 7.06.A sets forth Voith's obligations to initiate and substantiate properly a Change Request, failing the execution of which Voith makes "an irrevocable waiver of the Change Request and any associated Claim which the Contractor could otherwise assert under the Contract." (*Id.* at 35). Section 7.07.C requires that Voith initiate each relevant Change Request within 20 days after Voith "became aware of or should have become aware of the occurrence of the event giving rise to the Change Request." (*Id.* at 35–36). Voith fails to demonstrate that it complied with these requirements or that these requirements were otherwise waived or supplanted by other provisions. As such, summary judgment is proper.

---

[21] Section 2.2 provides:
> If the Contractor fails to achieve one of more of the Equipment Delivery Milestones (adjusted as provided in the Contract), the Owner and Contractor acknowledge that it would be difficult, if not impossible, to determine the actual damages to the Owner. Consequently, the Owner and the Contractor agree that as liquidated damages and the Owner's sole and exclusive remedy, but not as a penalty, the Contractor must, at the Owner's option, pay to or credit the Owner $21,000 per day for each day after the expiration the associated Contract Time that the Contractor fails [sic] achieve an Equipment Delivery Milestone.

(ECF No. 1-1 at 4).

## IV.     CONCLUSION

Given the foregoing analysis, Voith's First and Fourth Motions for Partial Summary Judgment (ECF Nos. 257, 260) is **GRANTED**, while Voith's Second, Third, Fifth, and Sixth Motions for Partial Summary Judgment (ECF Nos. 258, 259, 262, and 263) are **DENIED**. AMP's Motion for Summary Judgment (ECF No. 275) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: October 19, 2022**