## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**AMERICAN MUNICIPAL POWER, INC.,**

     **Plaintiff,**

                                         **Civil Action 2:17-cv-708**

   **v.**                                   **Chief Judge Algenon L. Marbley**

                                              **Magistrate Judge Elizabeth P. Deavers**

**VOITH HYDRO, INC.,**

     **Defendant.**

## OPINION AND ORDER

This matter is before the Court for the resolution of Non-Party Stantec Consulting Services, Inc.'s Motion for Sanctions and/or Cost-Shifting ("Stantec") (ECF No. 287) as supplemented by ECF No. 335.  Defendant Voith Hydro, Inc. ("Voith") has filed a response (ECF No. 357) and Stantec has filed a reply (ECF No. 362).  For the following reasons, Stantec's motion is **GRANTED, in part and DENIED, in part**.

## I.

By way of brief background, by Order dated October 25, 2022 (ECF No. 423), the Court confirmed that, on October 24, 2022, Voith and Plaintiff American Municipal Power, Inc. ("AMP") represented that they had resolved their dispute and orally entered into the record the terms of their settlement agreement.  The Court directed the parties to file a dismissal order within 30 days.  Following that Order, the Court held a conference directed to the status of Stantec's current motion in light of the settlement and to the possibility of mediation.  Voith and Stantec agreed to submit letter briefing regarding the Court's retention of jurisdiction to rule on

Stantec's motion. Stantec submitted its letter brief on November 10, 2022 and Voith submitted its letter brief on November 17, 2022.

After an extension of time, Voith and AMP submitted a joint motion to dismiss on February 1, 2023. (ECF No. 429.) On February 2, 2023, the Court granted the parties' motion and dismissed this case with prejudice while also stating that "this Court will resolve separately Non-Party Stantec Consulting Services Inc.'s … Motion for Sanctions and/or Cost-Shifting." (ECF No. 430.) Because the Court retained jurisdiction over Stantec's motion in its dismissal order, the Court considers the issues raised by the letter briefing to be resolved and will not consider the parties' arguments here.

## II.

Stantec seeks to recover $1,047,031.80 in attorneys' fees and costs incurred in connection with responding to a subpoena issued by Voith on February 3, 2020.[1] According to Stantec, it is entitled to recover these fees and costs in the form of sanctions against Voith and its counsel Thompson Hine pursuant to Federal Rule of Civil Procedure 45(d)(1). Alternatively, Stantec contends that it is entitled to recover these fees and costs under the cost-shifting provision of Federal Rule of Civil Procedure 45(d)(2)(B)(ii). Not surprisingly, Voith vehemently disagrees. The Court will address the relevant provisions of Rule 45 in turn.

### A. Sanctions Pursuant to Rule 45(d)(1)

The Court turns first to the issue of sanctions because, under the circumstances here, only the most minimal discussion is justified. Rule 45(d)(1) requires parties who issue subpoenas to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Rule 45(d)(1) requires courts to "enforce this duty and

---

[1] Subpoena, ECF No. 135-2 at 34-40.

impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." *Id.* What constitutes an "undue burden" is assessed on a case-by-case basis. *In re: Mod. Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018). Factors considered include "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Id.* (citing *Am. Elec. Power Co., Inc. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999)) (quoting *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y. 1996)). An award of sanctions under Rule 45(d)(1) is left to the Court's discretion. *In re Risner*, No. 2:21-MC-00002, 338 F.R.D. 380, 384 (S.D. Ohio Mar. 29, 2021) (citations omitted).

As both Voith and Stantec acknowledge, the Court is being asked to address the issue of Voith's alleged abuse of the subpoena process with the benefit of extensive lived experience, which it initially described this way:

> Stantec, although not a party to this action, was the project engineer retained by AMP pursuant to contract. Voith served the initial subpoena underlying the current dispute on Stantec on June 27, 2018. Negotiations over Stantec's response continued between Voith and Stantec's in-house counsel until that counsel's departure in October 2019. Upon Stantec's retention of outside counsel, negotiations resumed in November 2019. In January 2020, Voith served a new subpoena on Stantec. This second subpoena is the focus of the current dispute.
>
> Fast forward to today. After months of conferences with the Court, Court-ordered meet and confers, and additional briefing, two aspects of the January 2020 subpoena remain at issue: Voith's request for (1) emails from 36 custodians dated between January 1, 2006 and February 3, 2020, as hit by the 96 search terms identified by Voith as of December 16, 2020 (ECF No. 168, Exhibit 4) and (2) the print-out of Stantec's file directory structure.

*Am. Mun. Power, Inc. v. Voith Hydro, Inc.,* No. 2:17-CV-708, 2021 WL 1084605, at *1 (S.D. Ohio Mar. 22, 2021) (*Opinion and Order*, ECF No. 174 at 2.) In the nearly seventeen months between that Opinion and Order and Stantec's current Reply, as Stantec itself details, the Court

conducted multiple discovery conferences in which Stantec participated, the progress of Stantec's document production was monitored, and multiple meet and confers between Voith and Stantec were ordered. (Reply, ECF No. 362 at 10.) Given the enormity of judicial resources consumed on this dispute, let alone over the course of the well-documented contentious discovery process throughout the nearly six-year course of this case overall, any further recount simply is unwarranted. Needless to say, the Court is satisfied from the many, many discussions with counsel on the record and the course of events as reflected in the Court's record and in the current briefing, that Voith took reasonable steps to avoid imposing an undue burden or expense on Stantec such that sanctions pursuant to Rule 45(d)(1) against either Voith or Thompson Hine are not warranted. Indeed, stated more succinctly, Stantec's wisdom in pursuing this argument must be questioned.

### B. Cost-Shifting Pursuant to Rule 45(d)(2)(B)(ii)

Federal Rule of Civil Procedure 45(d)(2)(B)(ii) "'has been deemed to make cost shifting mandatory in all instances in which a non-party incurs significant expense from compliance with a subpoena.'" *Cahoo v. SAS Inst. Inc.,* 377 F. Supp. 3d 769, 776–77 (E.D. Mich. 2019) (quoting *Linglong Americas Inc. v. Horizon Tire, Inc.*, No. 15-1240, 2018 WL 1631341, at *2 (N.D. Ohio Apr. 4, 2018)); *see also Hennigan v. Gen. Elec. Co.,* No. 09-11912, 2012 WL 13005370, at *2 (E.D. Mich. Apr. 2, 2012) ("It is well-established that cost-shifting, in the context of a subpoena, should occur when an order requiring compliance subjects a non-party to 'significant expense.'").

This cost shifting is required to "'protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder non-significant.'" *Linglong,* 2018 WL 1631341, at *2 (quoting *Linder v. Calero–Portocarrero*, 251 F.3d 178, 182

(D.C. Cir. 2001)). However, "[p]rotection of a non-party from significant expense does not necessarily mean that the party issuing the subpoena must bear the entire cost of compliance." *Selective Ins. Co. of Se. v. RLI Ins. Co.,* No. 5:12CV2126, 2016 WL 6915890, at *2 (N.D. Ohio Sept. 16, 2016), *report and recommendation adopted*, No. 5:12CV2126, 2017 WL 1206036 (N.D. Ohio Mar. 31, 2017) (citing *In re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C. 1992)). Rather, determining what costs are significant is within the sound discretion of the trial court. *Linglong*, at *2 (citing *Sound Sec., Inc. v. Sonitrol Corp.*, No. 3:08–cv–05359–RBL, 2009 WL 1835653, at *1 (W.D. Wash. June 6, 2009)). "Expenses incurred complying with a subpoena must also be reasonable, and the determination of reasonableness is also within the trial court's discretion." *Id.* (citing *In re Aggrenox Antitrust Litigation*, No. 3:14–md–02516 (SRU), 2017 WL 4679228, at *2 (D. Conn. Oct 18, 2017)). The relevant factors for determining how much of the production cost the requesting party must bear include "whether the nonparty has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party, and whether the litigation is of public importance." *Selective Ins.*, 2016 WL 6915890 at *2 (quoting *Linder v. Calero–Portcarrero,* 180 F.R.D. 168, 177 (D.D.C. 1998)); *see also In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-CV-3785, 2023 WL 2633675, at *2 (S.D. Ohio Mar. 24, 2023).

Initially, the Court briefly will address Voith's claim that Rule 45(d)(2)(B)(ii) was never triggered with respect to its subpoena to Stantec. This argument is alarmingly disingenuous. The March 2021 Opinion and Order established the parameters of the subpoena and ordered the parties, with that guidance, to meet and confer on the issue of the potential cost of production. From that point on, Stantec, Voith and the Court directed efforts over several months to the matter of Stantec's document production. The Opinion and Order and subsequent conferences

reflect that any determination of "significant expense" was unable to be made absent definitive information.  Certainly, the Court's expectation was that any potential cost shifting would be up to certain choices made by Voith and Stantec, *e.g.,* search protocols or the depth of discovery Voith remained determined to pursue.  Indeed, cost-shifting generally occurs "after the non-party complies with the subpoena so that courts have enough information to understand what expenses were incurred and whether they were reasonable." *Gamache v. Hogue*, No. 1:19-CV-21 (LAG), 2022 WL 1624109, at *3 (M.D. Ga. Mar. 21, 2022).  As other courts have recognized, "'it may be preferable to leave uncertain costs to be determined *after* the materials have been produced, provided that the risk of uncertainty is fully disclosed to the discovering party.'" *Id*. (quoting *Goshawk Dedicated, Ltd. v. Am. Viatical Servs., LLC*, No. 1:05-CV-2343-RWS, 2010 WL 11549740, at *4 (N.D. Ga. Mar. 9, 2010) (emphasis added) (quoting Fed. R. Civ. P. 45 advisory committee's note to 1991 amendment), *R. & R. adopted*, 2010 WL 11549741 (N.D. Ga. Apr. 22, 2010)).

Without question, such is the situation here and the exchange of information relating to subpoena compliance was the primary basis for the many ordered meet and confers and a point of discussion in many conferences with the Court.  To accept Voith's argument and, by extension, condone the subtext that it was free from the confines of Rule 45, "would run afoul" of the Rule's purpose.  *Selective Ins.,* 2017 WL 1206036, at *8. "'[] The entire tenor of Rule 45 is to prohibit a party from shifting its litigation expenses to a non-party.'" *Id*. (quoting *Georgia-Pac. LLC v. Am. Int'l Specialty Lines Ins. Co.*, 278 F.R.D. 187, 190 (S.D. Ohio 2010)).  Thus, this time, in the context of the Court's lived experience, it is Voith's wisdom in pursuing an argument that must be questioned.

### 1.  Reasonableness of Stantec's Expenses

Moving on, the only issue is whether Stantec's claimed expenses of $1,047,031.80, incurred over a fifteen-month period are *significant* as contemplated by Rule 45(d)(2)(B)(ii).  In terms of the total request, it would be difficult to conclude that such a dollar amount, on its face, is not significant.  *See G & E Real Est., Inc. v. Avison Young-Washington, D.C., LLC*, 317 F.R.D. 313, 316 (D.D.C. 2016) (finding that $145,843.50 in attorney's fees and $2,010.94 in invoices was "no doubt" significant and citing *Linder*, 251 F.3d at 191 concluding that $199,537.08 in expenses were significant).  However, the appropriate inquiry here requires more.  That is, the Court must first determine what constitutes expenses resulting from compliance and whether such expenses can be deemed reasonable.  *Id.*

 "It is critical … that only expenses that result from and … are caused by, the order of compliance are potentially compensable."  *G & E Real Est.,* 317 F.R.D. at 316; *see also In re Blue Cross Blue Shield Antitrust Litig.,* No. 2:13-CV-20000-RDP, 2018 WL 11425554, at *2 (N.D. Ala. Oct. 24, 2018) ("From the plain language of the rule, only those expenses 'resulting from compliance' can be shifted to the requesting party.")  Moreover, only reasonable expenses are compensable.  *Id.* (noting that this reasonableness requirement has been adopted by a "significant number of courts across the country").  "[A]n unreasonably incurred expense is not an expense 'resulting from compliance'" within the meaning of Rule 45."  *In re Gladstone Consulting, Inc.,* No. 17-80845-CIV, 2018 WL 7820218, at *4 (S.D. Fla. Sept. 21, 2018) (citing *United States v. McGraw-Hill Companies, Inc.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014)).  "Simply because a non-party undertook certain tasks and incurred associated expenses in the aftermath of an order compelling compliance with a subpoena does not mean that those costs resulted from that order."  *G & E Real Est.*, at 316.

The issue of the reasonable cost of compliance is, no surprise, a contentious one. Voith argues that Stantec's costs, in responding to Voith's subpoena, were "self-inflicted, self-serving, avoidable, unnecessary, and unreasonable." (ECF No. 357 at 48.) Voith takes particular exception to Stantec's privilege and relevancy-review expenses and the many entries on invoices that simply identify "document review." Voith challenges Stantec's claim to cost-shifting for ESI vendor expenses. Voith also cites certain invoice entries that it contends do not "plausibly" relate to subpoena compliance. Finally, Voith objects to Stantec's overall manner of evidence presentation in support of its costs, including attorneys' hourly rates. Given Voith's expressed view of the record, its position can be succinctly stated: *none* of Stantec's costs satisfy the definition of reasonable. Stantec, on the other hand, asserts exactly the opposite; all of its claimed costs are reasonable.

The Court will address each of these issues sequentially, keeping in mind several things. In analogous circumstances, the Sixth Circuit has recognized that "district courts are not required to act as 'green-eyeshade accountants' and 'achieve auditing perfection' but instead must simply to do 'rough justice.'" *The Northeast Ohio Coalition for the Homeless v. Husted*, 831 F.3d 686, 703 (6th Cir. 2016) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). "Non-parties 'should not be permitted to run up bills" merely because they expect "someone else [to] pay[ ] the tab.'" *In re Aggrenox Antitrust Litig,* 2017 WL 4679228, at *10. Further, Stantec cannot "equate any expense with being significant" and expect "to justify the imposition of costs without any legal support for that position." *B.L. v. Schumann*, No. 3:18-CV-151-RGJ-CHL, 2020 WL 3145692, at *6 (W.D. Ky. June 12, 2020).

At the same time, by Stantec's count, at the time it filed its Reply here, it had produced over 1.2 million records because Voith's subpoena "required Stantec to collect the entire email

inboxes of thirty (30) custodians for a fourteen (14) year time period (amounting to approximately 3.2 TB of data after processing) and run 96 search terms through those inboxes." (ECF No. 362 at 7; 21-22.) Thus, according to Stantec, Voith also should not issue such a subpoena, even if relevant to its claims or defenses, and then balk at the cost of compliance or suggest that none of the costs incurred possibly could be found to be reasonable.

### a. Costs other than from compliance

Briefly, on the matter of costs not resulting from compliance, as Voith notes, certain entries appear directed to opposing the subpoena or seeking costs or sanctions. By way of just one example, the submitted invoices include charges of approximately $7,781.00 in connection with the preparation of a response to Voith's motion to compel. (ECF No. 335-1.) By way of an additional example, the invoices include charges of at least $6,987.00 for time spent preparing the current motion. (*See, e.g.,* ECF No. 287-2 at 5, 6). Such costs are not recoverable. *In re Aggrenox Antitrust Litig.,* 2017 WL 4679228, at *9 (citing *Stormans Inc. v. Selecky*, No. C07-5374 RBL, 2015 WL 224914, at *6 (W.D. Wash. Jan. 15, 2015)) ("It is a tenuous proposition, at best, that attorneys' fees incurred *resisting* a subpoena are expenses resulting from compliance); *see also Contant v. Bank of Am. Corp.,* No. 117CV03139LGSSDA, 2020 WL 3260958, at *5 (S.D.N.Y. June 17, 2020) (time not spent in connection with subpoena compliance but spent seeking to avoid compliance or seeking to obtain fees not recoverable). Further, "unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'" *In re Fresh & Process Potatoes Antitrust Litig.,* No. 410MD02186BLWCWD, 2016 WL 11784717, at *6 (D. Idaho Sept. 30, 2016).

Beyond this, there are several instances of block billing, finance charges, and other administrative charges. Further, the submitted invoices reflect wholly unrelated charges for

matters such as reviewing a settlement agreement and a retention agreement. Without belaboring it and in an effort at "rough justice," upon its review of Stantec's submitted records, the Court finds that a deduction of $40,000.00 will appropriately account for the unreasonableness of certain costs not strictly related to Stantec's compliance with the subpoena.

### b. Privilege and Relevancy Reviews

Turning first to the issue of a privilege review, as the parties' cited authority confirms, courts take different views of whether the costs of privilege review are compensable. Some courts have recognized that a subpoenaed party cannot seek reimbursement for the costs of a privilege review. *See, e.g., Cahoo*, 2019 WL 4139152, at *4 (it has been well recognized that a subpoenaed party cannot seek reimbursement for costs of privilege review) (citing *Steward Health Care System LLC v. Blue Cross & Blue Shield of Rhode Island*, No. 15-272, 2016 WL 8716426, at *4 (E.D. Pa. Nov. 4, 2016) (explaining that fees that were "incurred as a result of [a] desire to check for privileged and confidential documents . . . are not subject to reimbursement under Rule 45"); *US Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12-6811, 2012 WL 5395249, at *3 (S.D. N.Y. Nov. 5, 2012) (awarding search, collection, and production costs associated with compliance, but holding that the "non-parties shall bear their own costs of reviewing the documents for privilege," and noting that "[g]enerally, it is not appropriate to shift such costs because the producing party has the exclusive ability to control the cost of reviewing the documents") (internal citation and quotation omitted). Other courts have found circumstances to warrant reimbursement for the costs of such a review. *See, e.g., Lotus Indus., LLC v. Archer*, No. 2:17-CV-13482, 2019 WL 2247793, at *3 (E.D. Mich. May 24, 2019) "[p]laintiff should have anticipated that production of documents in response would require a robust privilege review prior to production, especially given the litigation history….'); *In re*

*Mod. Plastics Corp.,* 577 B.R. 690, 705 (W.D. Mich. 2017), *aff'd sub nom. In re: Mod. Plastics Corp.*, 890 F.3d 244 (6th Cir. 2018) (suggesting that "significant expense," is a term that is broad enough to include expenses for privilege review); *Selective Ins.,* 2017 WL 1206036, at *9 (non-party "was entitled to protection from the significant expense of providing information to the Court related to its claims of privilege or work product protection.").

As detailed at length below, Stantec's status in relation to this case is far from that of a typical non-party. Indeed, given the relationship between Stantec and AMP and the years of litigation history here, it easily could be concluded that Voith should have anticipated a "robust privilege review." *Lotus Indus.,* 2019 WL 2247793, at *3. As Voith points out, however, the fact that many of the invoice entries simply say "document review" is insufficient to allow an accurate assessment of this category of costs. Voith also asserts that there are other problems with Stantec's review, not the least of which include Stantec's formulation of its search and the extra burden of AMP's interference. The Court concludes that, to the extent a privilege review should have been contemplated, even if largely for AMP's benefit, Stantec's manner of invoicing has made it difficult for the Court to isolate the costs specific to this task. This difficulty is apparent when considered along with the issue of Stantec's relevancy review.

Stantec asserts that its costs for a relevancy review are compensable, in part, because the Court recognized in its initial order that such a review was a potential cost of production.[2] That a particular cost is potentially compensable is not a license to "run up bills" simply because someone else may be responsible for "the tab." *In re Aggrenox Antitrust Litig.,* 2017 WL

---

[2] As the Court stated in ordering the meet and confer "The Court expects the discussions to be comprehensive and cover all potential costs of production, including the cost of privilege or relevance review." (*Opinion and Order*, ECF No. 174 at 10.)

4679228, at *10.  Moreover, even assuming such a review was warranted, based on its own

management of the production process, the Court is not convinced, as Stantec contends, that

Stantec "took steps to keep its relevancy review costs as low as possible."  (ECF No. 362 at 26.)

Rather, the Court's recollection is consistent with Voith's representation that, for example,

Stantec declined the opportunity to take advantage of the AEO designation under the Protective

Order.  (ECF No. 194 at 9.)  Additionally, it is difficult to read Stantec's footnote 8 (ECF No.

362 at 26)[3] and not conclude that Stantec's motivation, at least in part was, for whatever reason,

to exercise what it perceived as equal footing with the parties.  AMP's counsel also alluded to

this at the same conference with the Court during which the Court endorsed the idea of the AEO

designation as a cost-saving measure.  (ECF No. 191 at 23-24) ("One point is that both AMP and

Voith obviously, . . . we both withheld documents that were irrelevant from our production, but

I'm not really sure why Stantec can't do the same thing.").  In short, Stantec's insistence on an

unfettered relevancy review is consistent with the scorekeeping tendency recurrent over the

course of this litigation.  Whether or not it suggests gamesmanship in this particular instance, it

seriously undermines any claim to a sincere desire to minimize costs.  In short, given the history

here, the Court cannot conclude that the full costs of Stantec's relevancy review are reasonable

---

[3] Stantec's footnote 8, set forth here verbatim states:

As noted by this Court in the March 2021 Order, Voith redacted irrelevant information from 22,152 non-privileged records during the instant litigation on the basis that Rule 26 restricts the scope of discovery to relevant matter and Rule 34 does not prohibit such redactions. (ECF#174, PAGEID#8649; ECF#133, PAGEID#7762.) Pursuant to the doctrine of judicial estoppel, Voith cannot now contend "there was no reason for Stantec to conduct any relevancy review." (ECF#357, PAGEID#47178.)

 (ECF No. 362 at 26.)

because they may be, at least in part, "colored by a litigious approach." *G & E Real Est.*, 317 F.R.D. at 320.

As noted, many of the invoices either do not specify which type of document review was undertaken or identifies both types of review under one billing entry. By way of example, Invoice #: 14695 billing for March 2022 includes 1,123 hours of billed time totaling $232,937.50 for professional services rendered. (ECF No. 287-2 at 8.) All of the document review entries either state "Conduct document review" or indicate both a relevancy and privilege review in one billing entry. (*Id*. at 1-8.) This matters because, of the $232,937.50 of billed time, approximately $218,815.50 of that total is identified as document review. This makes it difficult for the Court to conclude which time properly is allocated to allowable privilege review and which time more properly is allocated to a more suspect relevancy review. Other invoices, however, isolate the nature of the document review. For example, Invoice #: 13416 reflecting time billed for June 2021, the first month entries for document review appear in earnest, identifies review for relevancy. (*Id*. at 47-52.)

Thus, given Stantec's manner of billing, the Court is unable to make a precise assessment of the reasonableness of the costs of the document review. It seems fair to conclude, however, that the bulk of document review billing entries, at least after January 24, 2022, to the extent that they do not identify a review for privilege, are related to a relevancy review. In February and March 2022 alone, billed time for what presumably was a relevancy review totaled in the neighborhood of $340,000.00. And, the invoices reflect at least an additional $50,000.00 in costs presumably for a continued relevancy review billed in April and May 2022. The Court, having already devoted extraordinary judicial resources to resolving disputes at every conceivable step in the underlying litigation, will not parse the invoices further. Instead, it will again simply

attempt to "do rough justice" with respect to the matter of Stantec's document review.   To this end, the Court finds $425,000.00 of Stantec's billed costs in this category to be unreasonable. This amount, which is equivalent to approximately a 40% reduction in the full amount of costs requested, arguably may still fall on the conservative side, especially given the questionable intention of Stantec's relevancy review.  The Court, however, is satisfied that it fairly accounts for the circumstances of this particular document review, including some portion of a relevancy review and a privilege review that was well within Voith's contemplation, both in terms of scope and AMP's interest.

### c. ESI Vendor Invoices

Stantec seeks reimbursement for $233,203.49 in vendor costs from ProFile Discovery for data storage over a fifteen-month period.  Voith objects to this amount on various grounds.  For example, according to Voith, an increase in data storage in March 2022 suggests that the data was being stored for Stantec's own use and Stantec's own delay resulted in costs being incurred longer than necessary.  The Court easily concludes that the vendor costs are reasonable under the circumstances here, including specifically the sheer volume of data at issue.  The Court is not persuaded by Voith's conjecture or any other argument to the contrary.  Accordingly, the Court will make no deduction for these vendor costs.

### d.  Legal Fees

Courts do not "per se" exclude attorney's fees from "potentially compensable expenses" but such fees are "only compensable if they are reasonable."  *G & E Real Est.,* 317 F.R.D. at 317 (citations omitted).  Voith contends that Stantec's counsel did not properly support the various hourly rates with adequate affidavits or biographical information and otherwise overall failed to demonstrate the reasonableness of any requested amounts.  The hourly rates charged here ranged

from $325/hour to $350/hour for Katherine Ferguson, a partner with over sixteen years of litigation experience, to $205/hour for contract attorneys with a range of experience conducting document review.  In between these rates was a rate of $225/hour to $255/hour for six-year associate Lindsey Nelson, $245/hour for four-year associate Siqin Carol Wang, and $205/hour to $235/hour for two-year associate Zach Miller.  (ECF No. 362, ECF Nos. 362-2 to 362-6.)

In determining what constitutes a reasonable hourly rate, "courts use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *The Ne. Ohio Coal. For the Homeless,* 831 F.3d at 715–16 (citing *Geier v. Sundquist,* 372 F.3d 784, 791 (6th Cir. 2004) (citing *Adcock-Ladd v. Sec'y of Treasury,* 227 F.3d 343, 350 (6th Cir. 2000)). In an attorney's fee case, "the primary concern is that the fee awarded be 'reasonable.'"  *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007) (citations omitted).  "A reasonable fee is 'adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers.'" *Id.* (quoting *Geier,* 372 F.3d at 791.  A district court may look to "a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Van Horn v. Nationwide Pro. & Cas. Ins.*, 436 F. App'x 496, 499 (6th Cir. 2011).

The Ohio State Bar Association's 2019 fee survey provides the hourly billing rates at various percentiles for attorneys with various years of experience in various practice areas.  *See* The Ohio State Bar Association, *The Economics of Law Practice in Ohio in 2019*; *Gonter,* 510 F.3d at 618 n.6 (relying on an earlier version of the OSBA's fee survey as a "point of reference" in reviewing a district court's award of attorney's fees); *Morton v. O'Brien,* No. 2:18-CV-445, 2022 WL 1637725, at *4 (S.D. Ohio May 24, 2022) (relying in part on the OSBA's 2019 fee

survey to determine the appropriate hourly rate); *Woodard v. O'Brien*, No. 2:18-CV-1523, 2022 WL 2256900, at *3 (S.D. Ohio June 23, 2022) (same).  Although courts relying on this fee survey typically have referenced the median hourly rates, to account for the survey's age, the Court will instead reference the 75th percentile hourly rates to account for rate increases in the interim.  *MCP IP, LLC v. .30-06 Outdoors, LLC,* No. 2:21-CV-581, 2023 WL 2768190, at *2 (S.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, No. 2:21-CV-581, 2023 WL 2974525 (S.D. Ohio Apr. 17, 2023).  As explained in *MCP IP:*

> The OSBA survey reflects that, at the 75th percentile, attorneys in Ohio firms with more than 50 attorneys charge an hourly rate of $475; partners in Ohio firms with more than 8 partners charge $425; attorneys in Ohio with both 11–15 and 16–25 years of experience charge $300, those with 6–10 years of experience charge $250, and those with 3–5 years of experience charge $245; attorneys in Downtown Columbus, Downtown Cincinnati, and Dayton charge $270–375.

*Id.*

Given the survey results and its own knowledge and experience in handling other fee requests, the Court finds the hourly rates charged for subpoena compliance to be reasonable. Further, as reflected above, the Court has reviewed the submitted invoices for subpoena compliance and has made appropriate deductions for time it has deemed to be unreasonable. Having reviewed the remaining time entries deemed to relate to subpoena compliance, the Court finds the time spent to be reasonable and will make no further deductions to the costs Stantec seeks to recover here.

### 2.  Significance of Stantec's Costs of Compliance

Now that the Court has identified the reasonable expenses resulting from Stantec's subpoena compliance, the focus turns to whether these expenses are "significant" such that cost-shifting is mandatory under Rule 45.  Certainly, courts recognize the mandatory nature of Rule

45 since its 1991 revision but, as aptly described in *Cornell v. Columbus McKinnon Corp.,* No.

13-CV-02188-SI, 2015 WL 4747260 (N.D. Cal. Aug. 11, 2015):

> [T]he weight of the case law makes clear that determining what constitutes a "significant cost" is a relative, not an absolute, inquiry. *Linder,* 251 F.3d at 182. Rather than looking to the cost of compliance in a vacuum, courts must evaluate that cost in light of all the relevant facts and circumstances in order to "protect[ ] . . . persons who are required to assist the court by giving information or evidence" from incurring significant expense. Fed.R.Civ.P. 45, Advisory Committee Notes. Therefore, "Rule 45 does not cut a blank check to non-parties," but only ensures that they will not be saddled with significant costs. *McGraw–Hill,* 302 F.R.D. at 536. "Thus, a non-party may be required to bear some *or all* of its costs, depending upon the circumstances." *Kwong Mei Lan Mirana v. Battery Tai–Shing Corp.,* No. C 08–80142MISC.JFRS, 2009 WL 290459, at *4 (N.D.Cal. Feb. 5, 2009) (emphasis added).

*Id*. at *4.

Thus, as noted above, to determine how much cost to shift from the nonparty, many

courts, including  this one, balance the equities of the particular case, including "[1] whether the

putative nonparty actually has an interest in the outcome of the case, [2] whether it can more

readily bear its cost than the requesting party; and [3] whether the litigation is of public

importance." *United States v. Blue Cross Blue Shield of Michigan*, No. 10-CV-14155, 2012 WL

4513600, at *7 (E.D. Mich. Oct. 1, 2012); *see also In re FirstEnergy Corp. Sec. Litig*., 2023 WL

2633675, at *2*; Cornell*, 2015 WL 4747260, at *2 ("Many courts have found that this test retains

its vitality even after the Amendments, and have used to it to determine whether costs are

"significant," and thus trigger mandatory cost shifting.")  The Sixth Circuit acknowledged the

use of this balancing approach in *In re: Mod. Plastics Corp.,* 890 F.3d 244, n.2 (6th Cir. 2018)

but, under the circumstances of that case, neither endorsed nor rejected it.

The Court agrees that "'the analysis [required here] is not mechanical'" and recognizes

that the concept of "significant expenses" is "'a term that readily lends itself to myriad

interpretations depending on the circumstances of a particular case.'" *Cornell*, 2015 WL

4747260, at *2 (quoting *McGraw–Hill Companies,* 302 F.R.D. at 536). Moreover, as noted above, "expenses incurred complying with a subpoena must also be reasonable …." *Cahoo,* 377 F. Supp. 3d at 777 (citing *In re Aggrenox Antitrust Litigation*, 2017 WL 4679228, at *2). In sum, "the law does not mandate fee-shifting in every instance." *Greenleaf Bldg. LLC v. Off. Comm. of Unsecured Creditors*, No. 22CV162222CV1651, 2023 WL 2665244, at *5 (N.D. Ill. Mar. 28, 2023). It is with these guidelines in mind that the Court will consider Stantec's request for cost-shifting.

Stantec urges the conclusion that "the fees [it] incurred to comply with the subpoena are significant **as a matter of law**." (ECF No. 362 at 18) (emphasis in original). To support this point, Stantec asserts that "Voith does not cite to, and Stantec is not aware of, any decisions finding that a non-party must bear over $1 million in fees to comply with a subpoena." (*Id*. at 20.) Of course, Stantec's argument did not contemplate any reduction in costs based on a finding of unreasonableness. Nonetheless, at first glance, it is jaw-dropping that even the reduced costs totaling in excess of $600,000.00 would require a "significance" analysis. But, as with many things, context matters. Indeed, as the above authority instructs, the cost of compliance cannot be considered "in a vacuum," and "courts must evaluate that cost in light of all the relevant facts and circumstances." *Cornell*, 2015 WL 4747260, at *4.

Previously, by way of argument summary, the Court outlined that, "[t]his case, involving the construction of four separate hydroelectric power plants, is remarkable in length, breadth and dollar value." *Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, No. 2:17-CV-708, 2022 WL 293516, at *1 (S.D. Ohio Feb. 1, 2022) (*Opinion and Order*, ECF No. 231 at 2.) As suggested by that summary, and in keeping with the obligation identified above, some context is in order. For ease

of reference, in his Opinion and Order dated October 19, 2022, Chief Judge Marbley detailed the

factual background of this case as follows:

> This matter is a diversity lawsuit stemming from a contract dispute between Plaintiff American Municipal Power, Inc. ("AMP") and Defendant Voith Hydro, Inc. ("Voith"). AMP is a wholesale power supplier that started building four hydroelectric power plants along the Ohio River in the mid-2000s. (ECF No. 275 at 17–18). The power plants are as follows—one at the Cannelton Locks and Dam near Hawesville, Kentucky ("Cannelton"); one at the Smithland Locks and Dam near Smithland, Kentucky ("Smithland"); one at the Captain Anthony Meldahl Locks and Dam near Foster, Kentucky ("Meldahl"); and one at the Willow Island Locks and Dam near New Martinsville, West Virginia ("Willow Island"). (*Id.* at 18). The instant litigation arises from the design and construction of these Projects, centered primarily around the Cannelton Project.

> Voith is a self-described "global supplier of hydroelectric equipment, technology and services" that "designs, manufactures and supplies hydropower equipment and services for hydropower plants around the world." (ECF No. 32-1 ¶ 3). AMP hired Defendant Voith in 2007 to design, manufacture, and supply the required equipment (including turbines, governing system, and generators) and associated services (such as submitting technical drawings and other information for proper installation) for all four Projects. (ECF No. 275 at 18). AMP also hired MWH Americas, Inc., ("MWH") to serve as the Engineer of Record on the Projects. (*Id.*) AMP entered into four contracts—one for each Project—with a contractor ("Installation Contractor") responsible for building the power plants into which Voith's turbine and generator equipment would be installed and for providing the labor to install the equipment consistent with Voith's instruction and oversight. (*Id.*)

> The contracts for Cannelton, Smithland, and Willow Island were executed on June 6, 2008, and the contract for Meldahl was executed on March 12, 2009 (collectively, the "Contracts"). (ECF No. 240 ¶¶ 1–2). Each contract contained the same material provisions. The Contracts had a combined initial Contract Price totaling approximately $415 million. (*Id.*). The figure for the current approved Contract Prices stands at nearly $442 million after accounting for various adjustments in the Contracts. (*Id.* ¶ 3). AMP has paid Voith the value of the current approved Contract Price minus $33,017,353, which it has withheld subject to the Court's future determination in this case. (*Id.* ¶ 5). On March 11, 2022, the parties jointly stipulated that the Contractor Liability Limits (set out in Articles 5.2.1, 5.2.2 and 5.2.3 of the Contracts) and the Owner Liability Limits (set out in Article 5.1.1 of the same) of the Contracts will apply without exception to the Parties' damage claims, such that the Contractual Price Liability Limits of the Contracts will be based upon the final Contract Price of the Contracts as determined at trial. (*Id.* ¶ 6–8).

On June 6, 2008, the parties agreed on the duties that would constitute Voith's agreed responsibilities within the Contracts' "Work" sections, located in Section 1.01.A.60 of the Contracts' General Conditions ("GC"). (ECF No. 1 ¶ 19). The Contracts also provide deadlines ("Milestones") pursuant to which Voith was obligated to perform. (*Id.* ¶ 20). If Voith missed the Milestones, it would be liable to AMP for liquidated damages. (*Id.*). The Contracts further provide that Voith warrants that its Work, including the Voith Equipment, will conform to the Contracts and be free of defects in workmanship and material. (*Id.* ¶ 24). The Contracts also warrant that all of Voith's services included within the Work will be performed in accordance with their provisions. (*Id.*).

Excavation and construction on the Cannelton Hydro Project began in 2009; it reached full commercial operation in June 2016. (*Id.* ¶ 9). Excavation and construction on the Meldahl Hydro Project began in August 2011; it reached full commercial operation in April 2016. (*Id.* ¶ 10). Excavation and construction on the Willow Island Hydro Project began in September 2010; it reached full commercial operation in February 2016. (*Id.* ¶ 11). Excavation and construction on the Smithland Hydro Project began in December 2009; it reached full commercial operation in September 2017. (*Id.* ¶ 12).

According to AMP, Voith's performance was less than satisfactory in completing the aforementioned projects. Voith allegedly committed the following errors with respect to its Work with AMP: (i) "delivering drawings and equipment late and out of sequence"; (ii) "delivering defective, incomplete and uncoordinated drawings and defective installation instructions"; (iii) "delivering defectively manufactured guide bearings and discharge rings"; (iv) "defectively designing and/or manufacturing equipment and equipment components"; (v) "delivering equipment that was not completely and/or properly manufactured and required significant additional field work to install"; (vi) "failing to deliver 'Category C' parts necessary for Voith Equipment assembly"; (vii) "failing to timely and completely address installation issues with the Voith Equipment, including but not limited to, failing to timely and completely address turbine alignment issues"; (viii) "failing to provide check sheets consistent with the Contracts' specifications"; (ix) "refusing to promptly and accurately address problems with the Voith Equipment"; (x) "failing to maintain a consistent executive and project management team and site representatives who were informed and prepared to address ongoing issues"; and (xi) "causing substantial delay and damage to the Hydro Projects, all in material breach of the Contracts." (*Id.* ¶ 28).

AMP withheld "approximately $40 million" in payments due to Voith under the Contract to offset Voith's alleged material breaches of the Contracts, which caused damages and delays, "including, *inter alia*, millions of dollars in additional costs of installation, construction and engineering, liquidated damages, lost power production and other costs and damages." (*Id.* ¶¶ 46–47). AMP then filed suit.

AMP filed the present action on August 14, 2017, alleging eight counts—the first four alleging breaches of contract with respect to each of the four projects at issue and the last four alleging breach of warranty claims. (ECF No. 1). In turn, Voith filed a counterclaim with its answer (ECF No. 22) alleging that AMP agreed to pay Voith a lump sum for each Hydro Project, which included the costs of designing, manufacturing, and supplying the equipment and the costs for startup, testing the equipment, and training AMP personnel. (*Id.* ¶ 15). The Contracts also provided allowances for each Project against which Voith could bill for its oversight of the assembly and installation of the equipment. (*Id.* ¶ 21). During the projects, the parties entered int other Memoranda of Understanding ("MOU") and updated agreements. (*Id.* ¶ 28). Voith no alleges that AMP has failed to comply with its contractual obligations such that Voith canno realize the bargained-for economies of scale, and that AMP's conduct deprived Voith of the benefi of its bargain on the Hydro Projects. (*Id.* ¶ 30). In its counterclaim, therefore, Voith asserted breach of contract for the withheld payments and unjust enrichment. (*Id.* ¶ 75–90).

*Am. Mun. Power, Inc. v. Voith Hydro, Inc.,* --F.Supp.3d--, 2022 WL 11172944, at **1-3 (S.D. Ohio Oct. 19, 2022); (*Opinion and Order*, ECF No. 420 at 1-5).

Against this backdrop, the first inquiry is whether Stantec, as the successor to MWH after its 2016 acquisition, is an interested non-party. ***Spoiler alert: it is.***

Some courts have defined an interested non-party as "an entity that does not have an actionable right at issue in the litigation, but has a significant, underlying connection to the case and, typically, some sort of financial or reputational stake in the litigation's outcome." *Culliver v. Ctr. for Toxicology & Env't Health LLC*, No. 3:21-CV-4942-MCR-GRJ, 2022 WL 475185, at *4 (N.D. Fla. Feb. 16, 2022) (quoting *Ala. Aircraft Indus., Inc. v. Boeing Co.*, No 2:11-cv-03577-RDP, 2016 WL 6892113, at *5 (N.D. Ala. Oct. 17, 2016), *R. & R. adopted*, 2016 WL 6897798 (N.D. Ala. Nov. 22, 2016)); *see also Gamache*, 2023 WL 2658034, at *6 (same). The nature of this status matters because "Rule 45 is aimed at protecting persons who are disinterested and thus have little to gain from their outlays in compliance cost. . . .'" *Id.* (quoting *Cornell*, 2015 WL 4747260, at *5 (*citing* Fed. R. Civ. P. 45, Advisory Committee Notes); *see also Cornell,* at *5 (citing *Tutor–Saliba Corp. v. United States*, 32 Fed. Cl. 609, 610 n. 5 (1995)) (the fact that the

nonparty was "substantially involved in the underlying transaction and could have anticipated that [its involvement might] reasonably spawn some litigation, and discovery" was a circumstance weighing against shifting costs for compliance with Rule 45 subpoena). Driving the significance home, the *Cornell* court characterized the extent of a nonparty's interest as "[c]hief among the factors to be considered" in the analysis. *Cornell*, at *5.

For its part, Voith characterizes Stantec as "the most interested 'non-party' imaginable," (ECF No. 357 at 11), and dedicates five pages of its response to recounting the nature of the exceedingly well-documented relationship between AMP and Stantec relevant to this action. (*Id*. at 11-16.) Even Stantec itself acknowledges that it "may have an interest in the outcome" of one of the issues in this case but attempts to minimize it as being "only one of the many issues being litigated in this case." (ECF No. 362 at 17.) Moreover, but one example of AMP's own characterization of its relationship with Voith is readily found in the Motion to Quash or Modify Subpoena and Motion for Protective Order that AMP filed in response to the subpoena at issue here:

> … once Voith terminated the Standstill Agreement on June 22, 2017, AMP and Stantec's shared legal interests in defending against Voith's claims aligned and crystallized. On behalf of and in conjunction with counsel, AMP and Stantec worked together, shared communications, and gathered documents in furtherance of that shared legal interest. Second, following the filing of the suit, AMP and Stantec also entered into a formal JDA, memorializing June 22, 2017 as the effective date of the JDA.

(ECF No. 159 at 16.)

To conclude under the circumstances of this case that Stantec was anything other than an interested non-party, having at minimum entered into a joint defense agreement with AMP, would deny reality on a level remarkable even by current societal standards. Stantec's position that its requested dollar amount establishes significance as a matter of law is overly simplistic.

To the contrary, the sheer dollar amount of costs Stantec seeks to recover here underscores the magnitude of its underlying connection to this case.  That is, while Stantec sees de facto significance, a more accurate read is that these costs were driven, at least in part, by Stantec's trove of potentially responsive documents, which it maintained because of its status vis-a-vis AMP in connection with this years-spanning, large dollar figure, complex litigation.  In fact, Stantec itself describes its participation in this litigation, aside from its underlying role as the project manager, "as both a litigation consultant and testifying expert for AMP." (ECF No. 362 at 23.)  Further, Stantec confirms that AMP's counsel "represented Stantec employees during depositions in this case." *Id.*  Again, Stantec offers this description in a manner designed to highlight Voith's unreasonableness while ignoring the extent to which it proves Voith's point as to the depth of Stantec's interest here.  Indeed, as Voith points out, "there is unquestionable evidence of the significant level of cooperation between AMP and Stantec" and AMP's involvement in Stantec's subpoena response is confirmed by certain time entries on Stantec's invoices.  (ECF No. 357 at 69-72.)

Many courts have declined to shift all the costs of compliance to the requesting party when the nonparty has an interest in the litigation.  *Culliver,* 2022 WL 475185, at *4 (citing *In re Seroquel Prods. Liab. Litig., Case No.* 6:06-md-1769-Orl-22DAB, 2007 WL 4287676, *3 (M.D. Fla. Dec. 6, 2007) "([w]hen a party from whom documents are sought is not a 'classic disinterested non-party,' . . .  the court can order that the non-party produce the documents at its own expense.")); *see also Bell Inc. v. GE Lighting, LLC*, Case No. 6:14-cv-12, 2014 WL 1630754, at *13 (W.D. Va. Apr. 23, 2014) (total cost-shifting not appropriate where non-party was intimately involved in the underlying events); *United States v. Cardinal Growth, L.P.*, Case No. 11-C-4071, 2015 WL 850230, at *3 (N.D. Ill. Feb. 23, 2015) (reimbursement of compliance

costs not awarded where non-party law firm was "not a typical disinterested non-party," as it had served as defendant's primary transactional firm for over a decade); *Cornell*, 2015 WL 4747260, at *3-5 (costs of compliance not shifted to requesting party where non-party had interest in the litigation).  For all of the reasons identified above, this factor weighs heavily against complete cost-shifting to Voith.

The next issue for consideration is whether Stantec more readily can bear the costs of subpoena compliance than Voith.  Both entities address this issue by arguing that the other can readily bear the costs.  To this point, Stantec cites Voith's 2021 Annual Report and asserts that Voith "is a massive global company with almost 20,000 employees and 2021 sales of over $4.4 billion.  (ECF No. 362 at 20.)  Voith, on the other hand, asserts that "Stantec is a large global company with over 25,000 employees and gross 2021 revenue of over $4 billion, who was paid more than $100 million on these four projects alone."  (ECF No. 357 at 46.)   There is no need for discussion.  It is fair to conclude that both of these entities are "well resourced" such that this issue is a "relatively neutral factor."  *In re FirstEnergy Corp. Sec. Litig.,* 2023 WL 2633675, at *3.[4]

The next factor addresses whether the litigation is of public importance.  Some courts have questioned this issue's impact on the question of whether "the subpoena imposes significant expense on the non-party." *McGraw-Hill,* 302 F.R.D. 532, 535 ("Absent a strained definition of 'significant,' for example, a non-party's expenses are not made less significant by the fact that the litigation is important to the general public."); *see also Cornell*, 2015 WL 4747260, at *3

---

[4] In its effort to demonstrate the reasonableness of all costs incurred, Stantec indicates that it has paid or will pay all invoices. (ECF No. 362 at 36.)  While Stantec sees reasonableness, such uncontested payment in full confirms the depths of its resources.  Of course, it also may suggest an expectation of reimbursement.

(citing *id.*)  Voith recognizes this but nevertheless claims that AMP constructed the underlying

projects "for the benefit of its participating public entity membership and their constituents."

(ECF No. 357 at 46.)  As Voith explains it, "Stantec's gross underestimation of the original

project costs led to a 90% cost overrun before Voith became involved" and "those costs overruns

were passed through to the public participants, and ultimately the individual rate payers."  (*Id.*)

Additionally, according to Voith, "Stantec's flawed foundation design led to significant claims

related to the alignment of Voith's equipment" and these also were passed through to the public

participants."  (*Id.*)  Voith contends that, for these reasons, this lawsuit is important to the public.

In Stantec's view, while the projects at issue may have provided a public benefit, this matter

involved only "private entities … litigating matters pertaining to their respective business

interests."  (ECF No. 362 at 21.)  As Stantec describes it, AMP sought to recover over $1.35

billion through claims of breach of contract" and Voith sought "to recover over $76 million

through claims of breach of contract."

As other courts have done, the Court also questions the relevance of this public

importance factor and which way it is intended to cut.  This is underscored by the parties'

arguments on this issue.  For example, if, as Voith contends, the public already has borne the

costs of Stantec's conduct, would the public not benefit more from a shift of costs here to Voith,

a private entity?  Further, would Stantec not be better off arguing that the public interest is great

in an effort to shift costs to Voith rather than framing this case as between two private entities,

which at best casts this issue as neutral?   Moreover, this is not a major antitrust suit brought on

behalf of all the people as *United States v. Int'l Bus. Machines Corp.,* 62 F.R.D. 526, 529

(S.D.N.Y. 1974), a case in which the court declined to cost-shift.  Nor is this action of "great

public importance generally" as was the case in *In re Exxon Valdez*, 142 F.R.D. 380, 385

(D.D.C. 1992), where the court did allow some cost-shifting despite having found the non-party distinguishable "from the pure non-party witness identified in Rule 45." For these reasons, the Court assigns no weight to this factor within the context of this particular case and will not consider it in resolving the issue of cost-shifting.

So, to briefly recap, it simply cannot be overstated that Stantec is an interested non-party, both entities have the ability to bear the costs at issue, and the public interest factor has no bearing in the analysis. With respect to Stantec's interest, this factor weighs quite heavily against a finding of significance and mandatory cost-shifting to Voith. In fact, as discussed above, some courts have not shifted any costs of compliance when the non-party is found to have an interest. *Culliver*, 2022 WL 475185, at *4. Other courts, presumably having divided the three factors into corresponding percentages, have shifted two-thirds of costs. *See Gamache*, 2023 WL 2658034, at *7 (citing cases). Adopting that approach here, with only two of the recognized equitable factors in play, could yield a 50-50 apportionment. Such a resolution, however, would fail to account for the true scope of Stantec's interest. To be clear, Stantec's interest is such that the denial of any cost-shifting is both a tempting and readily defensible result.

As the above authority advises, however, the required determination cannot be made in a vacuum and consideration of relevant facts and circumstances is warranted. As stated, the Court has direct knowledge of such facts and circumstances, having monitored the discovery process in this case over several years and having been called upon multiple times to resolve disputes and set parameters. For this reason, any significance determination for purposes of cost-shifting that does not also consider Voith's role would, without doubt, be made in a vacuum. Although, as found above, there is no basis on which to order cost-shifting as a sanction under Rule 45(d)(1),

the fact remains that Voith's subpoena to Stantec was made with its signature intention to leave no pebble unturned.

Also, true to their fiercely adversarial natures, both Voith and Stantec adhere to absolutist positions on the matter of cost-shifting. Stantec contends that the total cost of its subpoena compliance is significant and must be shifted to Voith. Voith argues that Stantec must bear all costs of compliance. They declined the Court's offer to assist in achieving an agreed upon, collaborative resolution. Also, for reasons wholly inexplicable, the matter of the costs of Stantec's subpoena compliance was not resolved in the course of the settlement reached by AMP and Voith. Stantec represents that it did not participate in any settlement discussions because it did not receive notice. (Stantec Letter Brief dated November 10, 2022, attached hereto.) As Voith notes, however, the settlement negotiations took place during a court ordered settlement conference, notice of which was provided to Stantec's counsel by way of the Court's CM/ECF notification system [ECF No. 416]." (Voith Letter Brief dated November 17, 2022, also attached.) The Court's Notice of Electronic Filing confirms that the Notice resetting the Settlement Conference was emailed on September 27, 2022 at 3:22 p.m. to all counsel, including Stantec's.[5]

This is the backdrop against which the Court is called upon to determine whether the costs of Stantec's subpoena compliance are significant such that cost-shifting is mandatory. As set forth above, the Court has found that $465,000.00 of Stantec's submitted costs relating to subpoena compliance cannot be deemed reasonable under the particular circumstances of this

---

[5] Whether Stantec's failure to participate in the Court-ordered settlement conference resolving the underlying case was the result of a strategic decision or the represented lack of notice, it, of course, precluded any exploration of Stantec-specific issues, including AMP's potential role as a viable source of recovery for all or some of the costs of subpoena compliance incurred by Stantec.

case and this particular document production.  With that deduction, the reasonable costs of

Stantec's subpoena compliance total $582,031.80.  Balancing the equities here, including the

history and scope of the underlying litigation, the extent of Stantec's involvement, and both

parties' abilities to bear the costs of subpoena compliance, the Court finds the reasonable costs in

excess of $500,000.00 to be significant.  Accordingly, Stantec is awarded $82,031.80 for costs

incurred in complying with the subpoena.

**IV.**

In sum, having balanced the cost shifting factors and reviewed Stantec's submitted costs

for reasonableness, the Court **GRANTS**, **in part**, Stantec's motion to the extent that Voith is

**DIRECTED** to reimburse Stantec for costs in the amount of **$82,031.80**.  Such reimbursement

shall be made within **THIRTY (30) DAYS OF THE DATE OF THIS ORDER**.  Stantec's

motion is **DENIED** in all other respects.

**IT IS SO ORDERED.**

Date: May xx, 2023                          */s/ Elizabeth A. Preston Deavers*
                                            **ELIZABETH A. PRESTON DEAVERS**
                                            **UNITED STATES MAGISTRATE JUDGE**